**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOR ZURBRIGGEN, DENA CATAN, HALEY JOHNSON, LYNNETTE CHESTER, KIMBERLY JOHNSON, JOSEPH CATAN, BARBARA BELL, LAURA URQUHART, DOUG CRUMRINE, LUJUAN PRESTON, and TIMOTHY TERRY, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| | | No. 17 C 5648 |
| Plaintiffs, | ) ) | Judge John J. Tharp, Jr. |
| v. | ) ) | |
| TWIN HILL ACQUISTION COMPANY, INC and AMERICAN AIRLINES, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

American Airlines, Inc. ("American") rolled out a new line of uniforms for its worldwide workforce in late 2016. What it hoped would be a seamless transition was anything but. According to the amended complaint, the new uniforms created a plague of health problems for American's workforce; within weeks, employees across the company reported developing skin rashes, respiratory problems, vertigo, and other ailments. The number of complaints supposedly grew so large so quickly that American backpedaled on the rollout two months later and permitted employees to revert back to their old uniforms. Within a year, the airline announced that it would cut ties with the uniform manufacturer, Twin Hill Acquisition Company, Inc. ("Twin Hill"). In the aftermath of the rollout, eleven American employees filed suit against their employer and Twin Hill on behalf of themselves and all other American employees who have been exposed to the uniforms. Plaintiffs contend that both defendants are liable for battery and intentional infliction of

emotional distress, and that Twin Hill also is liable in negligence and products liability. Plaintiffs individually seek damages and on behalf of the class seek injunctive relief, including an order requiring Twin Hill to recall the uniforms it has provided to American employees and directing both companies to establish a medical monitoring fund to mitigate any possible long-term health effects to class members. American and Twin Hill responded to the amended complaint by filing a motion to dismiss under Rule 12(b)(6) for failure to state a claim. Twin Hill also filed a motion strike all class allegations under Rule 12(f) and Rule 23. For the reasons set forth below, the Court grants American's motion to dismiss but denies Twin Hill's motions to dismiss and strike.

## BACKGROUND

In around September 2016, American implemented a uniform change across its worldwide workforce. Am. Compl. ¶ 2, ECF No. 14.[1] Flight attendants, pilots, other cockpit crew members, and service representatives were required to set aside their old blue uniforms in favor of new grey uniforms manufactured by Twin Hill. *Id.* ¶ 2, 33. The uniform change was American's first in almost thirty years and was the product of several years of planning and development. *Id.* ¶ 33. The change proved to be short lived.

Shortly after the companywide rollout—"within weeks if not days"—American employees began experiencing adverse reactions to the new uniform. *Id.* ¶ 27. The reactions included skin rashes, ear and throat irritation, headaches, fatigue, vertigo, the triggering of various auto-immune conditions, and negative effects on endocrine and liver functions. *Id.* ¶ 4. The reports of adverse reactions swelled in the months that followed, so much so that two of the unions representing

---

[1] As it must on a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the amended complaint and draws all reasonable inferences in plaintiffs' favor. *Deb v. Sirva, Inc.*, 832 F.3d 800, 810 (7th Cir. 2016).

American flight attendants set up special task forces to address the health issues posed by the uniforms. *Id.* ¶ 56.

American had learned of similar reports prior to the rollout. *Id.* ¶¶ 28-29. Twin Hill had supplied uniforms to Alaska Airlines ("Alaska") in 2011. *Id.* ¶ 29. However, Alaska was forced to transition to a different vendor after almost one-third of its flight attendants reported adverse health conditions akin to those later experienced by American employees. *Id.* Moreover, two years before American introduced Twin Hill uniforms to its workforce, American asked a number of pilots to field test the uniforms. *Id.* ¶ 28. Many of those pilots reported experiencing ill effects during testing, including rashes, flu-like symptoms, headache, vomiting, and respiratory problems. *Id.* When those adverse reactions came to light, one of the unions representing American pilots asked American not to introduce the uniforms. *Id.* The union's request went unheeded. *Id.*

In early October 2016, about a month after American switched to Twin Hill uniforms, the airline "formally recognized" the health concerns posed by the uniforms. *Id.* ¶ 62. In doing so, American established a call center to address individual complaints about the uniforms and offered employees who had been adversely affected to either order replacement garments or continue wearing their old blue uniform. *Id.* ¶ 63. American also agreed to perform "further random testing of garments" to determine the cause of the reported symptoms. *Id.* A month later, in November 2016, American went a step further and announced a reversal of the uniform change. *Id.* ¶ 79. The airline permitted employees to obtain new grey uniforms manufactured by a company other than Twin Hill or go back to wearing their old blue uniforms. *Id.* ¶¶ 79-80.[2]

---

[2] It is not clear whether American permitted all employees or only those who had been adversely affected to take advantage of these options. *Compare* Am. Compl. ¶ 33 *with* ¶ 79. In either case, the complaint makes clear that some American employees continued to wear Twin Hill uniforms (and were permitted to do so) after the November 2016 announcement. *Id.* ¶ 84.

Despite these accommodations, health problems continued among American employees. After the November 2016 announcement, "thousands" more employees reported adverse reactions, many of whom had never worn a Twin Hill uniform. *Id.* ¶ 83. Some employees also reported an increase in the severity of their symptoms. *Id.* ¶ 82. The problem, according to the amended complaint, is that these employees have been required to work alongside others who are still wearing Twin Hill uniforms—often in close quarters in aircraft cabins that utilize closed air systems that re-circulate air. *Id.* ¶¶ 51, 82. An estimated 25-30% percent of American employees are "reactors"; that is, they are individuals who become ill through direct contact with, or being in close proximity to, the Twin Hill uniforms. *Id.* ¶ 84.[3]

Following these developments, on June 22, 2017, American announced in a letter to employees that it was terminating its relationship with Twin Hill as of 2020. *Id.* ¶ 87. The letter, which was signed by several American senior vice presidents, stated that "[i]t is clear we [American] need a long-term solution because the current approach simply does not work." *Id.* By September 2017, Twin Hill had shipped over 1.4 million garments and accessories to more than 65,000 American employees worldwide. *Id.* ¶ 85. The garments had been manufactured in a number of countries throughout the world, including Bangladesh, Indonesia, China, Sri Lanka, and Vietnam. *Id.* ¶ 76. Between September 2016 and September 2017, over 4,700 flight attendants and over 600 pilots, in addition to other cockpit crew members and service representatives, reported experiencing ill effects from Twin Hill uniforms. *Id.* ¶¶ 4, 57, 85. The introduction of the Twin Hill uniforms was the only single common event that occurred throughout American's workforce during that timeframe. *Id.* ¶ 30.

---

[3] The amended complaint alleges that Alaska flight attendants also continued to experience adverse reactions after Alaska transitioned to a different uniform supplier in 2014. *Id.* ¶ 29.

Testing has been conducted on some of the uniform pieces manufactured by Twin Hill for American. Results from those tests indicate that Twin Hill uniforms are manufactured from synthetic materials and contain "[d]etectable amounts" of several chemicals, including known and possible carcinogens, as well as chemicals known to cause the type of "auto-immune" conditions experienced by American employees. *Id.* ¶¶ 52, 70-74. For example, testing detected the presence of chlordane, a potent carcinogen that is banned in the United States and is known to cause migraines, respiratory problems, immune system problems, blurry vision, confusion, and intractable seizures. *Id.* ¶ 71. Test results also identified the presence of formaldehyde, another known carcinogen that is widely used in industrial applications. *Id.* ¶ 74. Chronic long-term exposure to formaldehyde by inhalation can cause a wide array of health problems ranging from skin rashes and respiratory problems to fatigue and even cancer. *Id.* Moreover, testing has shown that levels of two other chemicals exceed limits established by OEKO-TEX, an independent testing certification service that sets standards for allowable amounts of chemicals in clothing. *Id.* ¶ 53. The excess amounts were found in several of the most commonly worn clothing items among American employees, including the suiting skirts. *Id.* ¶¶ 53, 75.

In September 2017, eleven American employees filed the present suit against American and Twin Hill. Plaintiffs include seven flight attendants, three pilots, and one service representative who work for American in locations across the country. *Id.* ¶¶ 13-24. Each plaintiff alleges that he or she was issued Twin Hill uniforms in connection with the companywide rollout in September 2016. *Id.* ¶ 37. Each plaintiff further alleges that he or she has experienced "adverse reactions" while wearing Twin Hill uniforms or being near others who are wearing the uniforms. *Id.* ¶¶ 38-48. Finally, plaintiffs allege that, along with thousands of other American employees, they have been "caught in a nightmarish 'Groundhog Day'—a never ending cycle of (a) going to work,

(b) experiencing debilitating symptoms of headaches, fatigue, respiratory problems, vertigo and rashes as of result of working in and around [the uniforms], (c) leaving work and starting to recuperate, (d) only to repeat this again when they return to work." *Id.* ¶ 49.

Plaintiffs filed a five-count amended complaint. Counts I and II allege that both American and Twin Hill are liable for battery and intentional infliction of emotional distress for exposing plaintiffs to Twin Hill's toxic uniforms. In Counts III and IV, plaintiffs assert that Twin Hill is strictly liable and negligent for manufacturing and supplying defective uniform. Finally, in Count V, plaintiffs seek to hold American and Twin Hill liable under a medical monitoring theory for exposing them to on-going and future risks of developing additional medical complications. The complaint also states that plaintiffs seek to represent a nationwide class of all current and former American employees who were exposed to Twin Hill's uniforms on or after September 1, 2016. On behalf of the class, plaintiffs seek an injunction barring Twin Hill from providing any new uniforms to American and requiring Twin Hill to recall the uniforms it previously supplied to American employees. They also seek to establish a medical monitoring program that includes: (1) a trust fund to pay for the costs of monitoring the health of employees who have been exposed to the uniforms; (2) notification to all affected employees that they may require monitoring to detect any long-term effects from their exposure; and (3) disclosure and analysis of the chemicals present in the uniforms for use by physicians who are to treat American's employees. Finally, the named plaintiffs seek damages for their individual injuries.

American and Twin Hill responded to the amended complaint by moving to dismiss under Rule 12(b)(6). American argues that plaintiffs' claims against it are barred by state workers' compensation statutes, which provide the exclusive remedy for on-the-job injuries. Twin Hill contends that plaintiffs fail to state a plausible claim for relief against it largely because there is no

basis to conclude its uniforms are the source of the harm alleged. Twin Hill further asks the Court to strike the class allegations in the complaint pursuant to Rule 12(f) and Rule 23 on the basis that plaintiffs will be unable to establish that their claims merit class treatment. Before addressing those motions, the Court must clarify the appropriate pleading standard and identify the substantive law to be applied at this stage of the proceedings.

## DISCUSSION

### I.  Pleading Requirements and Choice of Law

A motion under Rule 12(b)(6) challenges the sufficiency of a complaint to state a claim upon which relief may be granted. *Hallinan v. Fraternal Order of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, "a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365-66 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 366 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Court "must accept as true all factual allegations in the . . . complaint and draw all permissible inferences" in each plaintiff's favor. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (internal quotation marks omitted) (quoting *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015)). However, "[w]hile a plaintiff need not plead 'detailed factual allegations' to survive a motion to dismiss, she still must provide more than mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action' for her complaint to be considered adequate under [Rule] 8." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

Plaintiffs have divided their allegations into five counts corresponding to five legal theories. Although this is a common and often helpful approach to pleading, it obscures the difference between "claims," which set forth grievances and demands for relief, and "counts" which describe legal theories by which those facts purportedly give rise to liability and damages. *See ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 981 (7th Cir. 2016); *Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1002 (N.D. Ill. 2017); *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013). Pleading in counts is permitted, though not required, under Rule 10(b); indeed, it is axiomatic that plaintiffs need not plead legal theories at all. *See Jajeh v. County of Cook*, 678 F.3d 560, 567 (7th Cir. 2012) (hostile work environment claim pleaded where complaint never used that term); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").

The distinction between claims and theories holds two implications for analyzing the adequacy of the complaint in this case. The first is that "[o]ne set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violates." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992). That principal applies here; the complaint is premised on one core set of facts and establishes a single grievance (*i.e.*, claim) stemming from plaintiffs' exposure to Twin Hill uniforms. The second import is that, although the defendants challenge the viability of each legal theory asserted against them, plaintiffs' complaint, asserting that single claim, survives if it is supported by any single recognized legal theory. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). That includes theories that are not "expressly identified in the complaint." *Liston*, 254 F. Supp. 3d at 1002; *see Bartholet v. Reishauser A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 2012). To prevail on their Rule 12(b)(6) motions then,

American and Twin Hill must show that none of the legal theories plaintiffs advance against them, or any other legal theory, plausibly establishes a right to relief for the harm alleged. *Id.*

There is an additional wrinkle concerning the substantive law to apply to this dispute. The claim relies on diversity jurisdiction, so the Court must apply Illinois' choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Atl. Cas. Ins. Co. v. Garcia*, 878 F.3d 566, 569 (7th Cir. 2017). Illinois applies the most significant relationship test to address conflicting laws. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 879 N.E.2d 893, 903-04 (2007); *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (applying Illinois law). Under that test, the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties. *Townsend*, 227 Ill. 2d 147, 879 N.E.2d at 902-04. In applying the test, courts must consider four factors: (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered. *Id.* at 901-02.

At this early stage of the litigation, there is little to go on to identify the state or states with the most significant relationship to the plaintiffs' alleged harms. The only exception is with regard to Plaintiffs Zurbriggen and Haley Johnson; both of these plaintiffs received and began wearing their Twin Hill uniforms in Illinois and suffered injury in that state. Am. Compl. ¶¶ 11, 13, 15. For the other nine plaintiffs, the complaint identifies only their domiciles; it does not indicate where they obtained their uniforms or where they experienced ill effects from the uniforms. *Id.* ¶¶ 14, 16-23. Based on this information, the defendants apply the law of each plaintiff's alleged domicile for purposes of their motions. AA Br. 4, ECF No. 36; TH Br. 6-7, ECF No. 44. The plaintiffs follow suit in their responses, with the caveat that discovery may reveal that the law of some other states may apply at a later stage, especially given the size and mobility of American's workforce. Pl.

Opp'n to TH Br. 3 & n.2, ECF No. 44; Pl. Opp'n to AA Br. 2 n.1, ECF No. 45. Given the lack of

dispute over choice of law at this stage, *see Auto-Owners*, 580 F.3d at 547 ("Courts do not worry

about conflicts of laws unless the parties disagree on which state's law applies."), the Court will

apply the substantive law of the following states: Connecticut, Illinois, Indiana, Iowa, North

Carolina, Nevada, and Texas (hereafter, the "Applicable States").[4] With this backdrop in mind,

the Court turns first to American's motion to dismiss.

## II.    American's Rule 12(b)(6) Motion to Dismiss

American's primary challenge to the complaint is that plaintiffs are barred from bringing

suit against their employer under the Applicable States' workers' compensation regimes.[5] The

Applicable States have each enacted a statute that creates a no-fault system for compensating

employees who are injured on the job. Subject to certain exceptions, the statutes provide the

exclusive remedy for workplace injuries.[6] Workers' compensation provisions represent a tradeoff

in which employees forgo their right to sue their employer in tort in exchange for employers

agreeing to be held strictly liable and provide an expedited and certain remedy for work-related

---

[4] Specifically, the Court applies Connecticut law to the Catans; Illinois law to Zurbriggen and Haley Johnson; Indiana law to Chester; Iowa law to Terry; North Carolina law to Kimberly Johnson and Preston; Nevada law to Bell; and Texas law to Urquhart and Crumrine.

[5] Although American's motion essentially challenges whether the courts of the Applicable States have subject matter jurisdiction over the claim against American (given that this Court is sitting in diversity), the Seventh Circuit has clarified that the motion is properly characterized as a Rule 12(b)(6) motion, rather than a Rule 12(b)(1) motion. *Tacket v. General Motors Corp., Delco Remy Div.*, 93 F.3d 332, 334 (7th Cir. 1996).

[6] Conn. Gen. Stat. Ann. § 31-284 (West 2018); 820 Ill. Comp. Stat. Ann. 305/5 (West 2018); Ind. Code. Ann. § 22-3-2-6 (West 2018); Iowa Code § 85.20 (West 2018); Nev. Rev. Stat. Ann. § 616A.020 (West 2018); N.C. Gen. Stat. Ann. § 97-10.1 (West 2018); Tex. Lab. Code Ann. § 408.001 (West 2018).

injuries. 1 Lex K. Larson, *Larson's Workers' Compensation Law* § 1.03 (Mathew Bender, Rev. Ed.) (discussing social policy behind compensation regimes).[7]

In many states, including the Applicable States, there is an exception to the exclusivity rule for intentional harm caused by the employer. The intentional harm exception lies at the heart of whether plaintiffs may maintain a suit against their employer. If it can be said that American intended to inflict physical (battery) or emotional (IIED) harm on the plaintiffs, then they can pursue relief against American outside of the workers' compensation system. Resolution of this dispute turns (depending on the jurisdiction) on whether the defendants specifically intended, were certain or were substantially certain that the new Twin Hill uniforms would injure the plaintiffs. Because the allegations of the complaint do not plausibly suggest that American was even substantially certain that any of the named plaintiffs would be injured by the new uniforms, it falls short of stating causes of action for the intentional torts of battery and intentional infliction of emotional distress under the law of any of the Applicable States.

Intent, as the term is commonly understood, refers to "a state of mind . . . about the consequences of an act (or omission)." Prosser & Keaton, *The Law of Torts* 34 (5th ed. 1984). The Second Restatement defines intent to mean "that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (Am. Law. Inst. 1965). Put somewhat differently, intent embraces two concepts: purpose and knowledge. Restatement (Third) of Torts: Phys. & Emot.

---

[7] Plaintiffs assert that they really have no workers' compensation remedies because "American and its worker's compensation insurer have turned down *every* injured on-duty claim . . . on the basis that any claimed injuries due to uniform reactions are *not* work related." Pl. Opp'n to AA Br. 6, ECF No. 45 (emphasis original). The plaintiffs' success (or lack thereof) in litigating their workers' compensation claims, however, has nothing to do with an analysis of the scope of the statutory preemption of state tort law by a state's workers' compensation program.

Harm § 1 cmt. a (Am. Law. Inst. 2010) (restyling definition to emphasize "dual definition" of intent). The purpose sense of intent is much easier to recognize; a quintessential example is an employer who punches an employee in the nose out of anger. *Id.* When a defendant seeks out or desires to inflict a certain type of harm, he specifically contemplates the consequences of his actions and his conduct almost always is considered wrongful. *Id.* The knowledge sense of intent is different; it turns not on what the defendant desired but on what was certain to follow from the defendant's actions. Restatement (Second) Torts § 8A cmt. b ("If the actor knows the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."). Thus, for example, a defendant may be liable for intentional harm when he is "engaging in a generally proper activity for generally proper reasons," yet the "activity produces harm as an unavoidable but unwanted byproduct." Restatement (Third) Torts: Phys. & Emot. Harm § 1 cmt. a.

The distinction between purpose and knowledge matters in this case because jurisdictions are split on whether the intentional-tort exception to workers' compensation coverage embraces both aspects of intent. Several states, including Nevada and Illinois, construe the intentional-harm exception narrowly and permit civil suits only when there is a specific intent to injure. *Conway v. Circus Circus Casinos, Inc.*, 116 Nev. 870, 8 P.3d 837, 840 (2000) ("We conclude that the Employees may avoid the exclusive remedy provision of the NIIA in regard to their injuries only if [their employer] deliberately and specifically intended to injure them."); *Garland v. Morgan Stanley & Co., Inc.*, 2013 IL App (1st) 112121, 996 N.E.2d 188, 199 (2013) ("[T]he case law is clear that, for an employee seeking to bypass the exclusive remedy of the [IWCA], the employee

must show that the employer specifically intended to injure the plaintiff.").[8] These states recognize

only the purpose definition of intent when employees seek to recover in tort for injuries that arose

in the course of employment.

Several jurisdictions take a broader view and permit employees to bring suit under the

knowledge prong as well. But the standard even among these states is not uniform. Several,

including Indiana, require plaintiffs to establish actual knowledge; that is, knowledge that harm

was "certain" to follow from the employer's conduct. *Baker v. Westinghouse Elec. Corp.*, 637

N.E.2d 1271, 1275 & n.5 (Ind. 1994). But a number of other states construe intentional conduct to

include substantial certainty that the conduct at issue will bring about a particular result. Three of

the Applicable States—Connecticut, North Carolina, and Texas—fall into this category. *Lucenti

v. Laviero*, 327 Conn. 764, 176 A.3d 1, 8-9 (2018); *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d

222, 231 (1991); *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 407 (Tex. 1985).[9] In light of this

divide, the Court must answer two questions: (1) does the complaint plausibly allege that American

---

[8] The Illinois Supreme Court has not weighed in on the definition of intent for purposes of exclusivity. However, given that Illinois appellate courts consistently have held that the purpose sense of intent is required to bypass IWCA exclusivity, *see, e.g.*, *Dale v. S. Cent. Ill. Mass Transit Dist.*, 2014 IL App (5th) 130361, 17 N.E.3d 229, 234; *Garland*, 2013 IL App (1st) 112121, 96 N.E. 2d at 199; *Copass v. Ill. Power Co.*, 221 Ill. App. 3d 205, 569 N.E.2d 1211, 1214 (4th Dist. 1991), it seems likely that, if faced with the issue, the Illinois Supreme Court would find that the intentional-tort exception is limited to the purpose prong, *see Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002) ("[A] federal court, exercising its authority to hear diversity cases, must make a predictive judgment as to how the supreme court of the state would decide the matter if it were presented presently to that tribunal.").

[9] Iowa recognizes an intentional-tort exception, *see Brcka v. St. Paul Travelers Companies, Inc.*, 366 F. Supp. 2d 850, 855-56 (S.D. Iowa 2005), but the contours of its exception are not clearly defined. Indeed, neither the parties nor this Court have identified any cases that construe the state's exception, at least as it applies to an employer's intentional tort as opposed to intentional torts committed by the plaintiff's co-employees. For purposes of this motion, the Court assumes that if Iowa does embrace a substantial certainty approach to its intentional-tort exception, the Iowa Supreme Court would nonetheless reject the plaintiff's collective view of intent for the reasons set forth below.

purposefully sought to harm any of its employees by requiring them to work in and around Twin Hill uniforms and, (2) if not, does the complaint plausibly establish that American was certain or substantially certain harm would result.

The first question is easily answered in the negative. The complaint stops short of alleging that American acted with a purpose to harm anyone. To be sure, plaintiffs contend that American intended its employees to "come in contact with" the Twin Hill uniforms and, in the process, become exposed to chemicals in the uniforms. Am. Compl. ¶ 101. But plaintiffs do not allege that American specifically desired the alleged **consequences** of the uniform change; namely, that its employees develop skin, respiratory, and other health problems. Plaintiffs instead stake their claim on the notion that American knew the Twin Hill uniforms were unsafe but went forward with the rollout anyway without concern for the consequences to its employees. *See, e.g.*, Am. Compl. ¶ 33 ("American and Twin Hill's subsequent conduct shows that they too know that the uniforms are unsafe and exposed thousands of American Airlines employees to health hazards."), ¶ 65 ("The only explanation for such intentional and reckless conduct on Defendants' part is they have made corporate decisions to avoid confronting this serious problem in order to avoid any potential liability."), ¶ 88 ("American admitted by its statements and its conduct that it knew that the Twin Hill uniforms had and would continue to cause harm to Plaintiffs and the Class."). As such, the plaintiffs' allegations do not pass muster under the intentional-tort exception as fashioned under Nevada and Illinois law. *See Conway*, 116 Nev. 870, 8 P.3d at 840-41 (affirming dismissal of complaint based on workers' compensation exclusivity where allegations showed only that employer knew that employees were being exposed to noxious fumes and failed to correct issue, rather than establish that employer "acted with deliberate and specific intent to injury them"); *Copass*, 211 Ill. App. 3d 205, 569 N.E.2d at 1216 (dismissing complaint under IWCA where

allegations failed to show employer acted "deliberately with specific intent" to injure its employee).

Turning to the second question, plaintiffs contend that the complaint gives rise to the inference that American was certain, or at least substantially certain, that the Twin Hill uniforms would harm employees. Pl. Opp'n to AA Br. 6-10, ECF No. 45. In support, they point to allegations showing American received adverse reaction reports from pilots during pre-launch testing and knew about Twin Hill's prior problems with uniforms manufactured for Alaska. In all events, plaintiffs continue, American knew the uniforms were hazardous shortly after they were introduced across the company. American received a flood of reports from across its workforce within days of the launch, and those complaints culminated in American's decision to roll back the new uniforms and repudiate its contract with Twin Hill. Even construing these allegations in a light most favorable to plaintiffs, the Court finds that they do not establish the intentional conduct necessary to avoid workers' compensation preemption.

The problem is not that plaintiffs fail to sufficiently allege that Twin Hill's uniforms can be harmful or even that American knew as much.[10] Indeed, as discussed below in the context of their product liability theory, the Court finds that the complaint plausibly alleges that the uniforms are unreasonably dangerous. And the Court agrees with plaintiffs that the allegations of the complaint, taken as true, provide a basis to conclude that American knew something was amiss

---

[10] The plaintiffs' reliance on this Court's opinion in *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991 (N.D. Ill. 2013), for the proposition that an employer's creation of a "dangerous work environment" suffices to exempt a claim from workers' compensation preemption is misplaced. In *Volling*, the question was whether the employer could be deemed to have "expressly authorized" the indisputably intentional tortious conduct of several employees where that conduct was known to the employer, was ongoing, and the employer had repeatedly failed to intervene to prevent it. *Id.* at 1002-03. The concept of "substantial certainty" was not at issue and was not discussed in that opinion.

with the uniforms even before September 2016. Nevertheless, where the complaint falls short in alleging an intentional tort is that it fails to give rise to the inference that American knew with requisite certainty that any particular employees, much less *the named plaintiffs*, would be harmed by the Twin Hill uniforms.

Plaintiffs estimate that 25-30% of American's workforce has suffered adverse health effects from working in or around Twin Hill uniforms. Am. Compl. ¶ 84 (referring to affected employees as "reactors"). There are two inferences that reasonably can be drawn from this allegation that bear on the issue of substantial certainty. The first is that each American employee faced a 25 to 30% risk of suffering ill effects after the uniforms were introduced. This inference does not take plaintiffs very far; even assuming American knew that its new uniforms posed such a risk to each employee, that risk exposure is too modest to plausibly suggest that American was substantially certain that the uniforms would injure any particular employee. "Mere risk, however great, is not enough to show intent under the traditional concept of substantial certainty." Dan B. Dobbs et al., *Dobbs' Law of Torts* § 506 (2d ed.); *accord Sullivan v. Lake Compounce Theme Park*, 277 Conn. 113, 889 A.2d 810, 814 (2006) (noting that even "high risk or probability of harm is not equivalent to . . . substantial certainty without which an actor cannot be said to intend the harm in which his act results") (citation omitted); *Whitaker v. Town of Scotland Neck*, 357 N.C. 552, 597 S.E.2d 665, 668 (2003) ("[S]imply having knowledge of some possibility, or even probability, of injury or death is not the same as knowledge of a substantial injury or death.").

The second inference that can be drawn from the alleged number of reactors is that American was substantially certain that its new uniforms would cause harm to 25 to 30% of its workforce. This inference shifts the vantage point of certainty from what American knew about the risk of harm to its employees individually to what American knew about the risk of harm to its

employees collectively. And it is from this collective perspective that plaintiffs seek to gage American's intent. Plaintiffs contend that American is liable to any employee who was ultimately harmed by the uniforms as long as the airline knew (or was substantially certain) that some portion of its workforce would be harmed. Pl Opp'n to AA Br. 6-7, ECF No. 45 (arguing that allegations support "inference that American has knowingly . . . taking actions that are causing . . . harm . . . to thousands of its employees"); Pl. Supp. Mem. 2, ECF No. 89 (stating that American knew that it was "going to harm thousands of American employees with [the Twin Hill] uniforms"). The difficulty with the plaintiffs' collective view of substantial certainty, however, is that it blurs the line between negligence, recklessness, and knowledge.

Substantial certainty, like negligence and recklessness, is a way point along the spectrum of culpability. The difference between these thresholds is "a matter of degree," with the line being drawn "where the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and comes in the mind of the actor a substantial certainty." *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 378 (Tex. 1993); *accord Lucenti*, 327 Conn. 764, 176 A.3d at 9. "As the probability that a certain consequence will follow decreases, and becomes less than substantially certain, the actor's conduct loses the character of intent, and becomes mere recklessness. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence." *Woodson*, 329 N.C. 330, 407 S.E.2d at 229 (internal alterations omitted) (citing Restatement (Second) of Torts § 8A cmt. b).

But the degree of certainty is not the only factor that bears on the issue of substantial certainty; there also must be some predictability as to who the victim of the actor's misconduct will be. It is not enough for purposes of intentional-tort liability to show that injury is substantially certain to occur to someone. Dobbs, *supra*, § 29 ("It does not suffice to say that the defendant

maintains a dangerous condition on his land that, over a period of years, is almost certain to cause injury to someone."). Rather, the test requires, at least in the context of occupational-hazard cases, that the defendant know to a substantial certainty that its conduct will result in harm to "***a particular victim***, or to someone within ***a small class of potential victims*** within a localized area." Restatement (Third) Torts: Phys. & Emot. Harm § 1 cmt. e (emphasis added);[11] *see also* Restatement (Third) Torts: Intent. Torts to Persons § 101 cmt. e (Am. Law Inst., Discussion Draft 2014).

This focus on the identity of the victim is essential to distinguishing accidental and intentional conduct. At a broad level of generality, it might be said that there are few "accidents" in the workplace; work creates risk and where humans are involved—that is to say, everywhere on the planet—with enough repetition, risks will be realized and injuries will occur. This is a function of the laws of probability; with enough repetition, all possible results are substantially certain to occur. *See* Kenneth W. Simons, Statistical Knowledge Deconstructed, 92 B.U. L. Rev. 1, 25 & n.42 (2012). But that does not mean that such results are ***intended***; were that the case, the intent requirement would be rendered meaningless. *See Reed Tool*, 689 S.W.2d at 407 ("The intentional removal of a safety device or toleration of a dangerous condition may or may not set the stage for an accidental injury later. But in any normal use of the words, it cannot be said, if such an injury does happen, that this was deliberate infliction of harm . . . .") (quoting 2A Larson, *The Law of Worker's Compensation* § 68.13 (1982)); Restatement (Third) of Torts: Phys. & Emot. Harm § 1 ("The company's knowledge of the certainty of harm, at some undefined time and place, does provide an argument in favor of the company's liability. Yet that liability, when imposed, is

---

[11] For ease of reference, the Court refers to this provision as "comment e" going forward.

understood as a form of strict liability, not as liability for anything that can properly be regarded as an intentional tort."). The Utah Supreme Court has explained the point this way:

> [Plaintiff] conflates probability with intent, suggesting that intent may be imputed where a high probability of injury exists because the employer knew that harm was substantially likely to occur sometime to some employee. Adopting this standard would unravel the structure of the [Workers' Compensation] Act. Almost every form of employment bears some risk of injury. Employers willing to expend the time and effort could sit down and calculate with some specificity the number of employees likely to be injured on the job in a year. . . . It does not make sense that a risk calculation, which is intended to expose the likelihood of an uncertain or unexpected event, could transform an unexpected or uncertain event (an accident) into an intentional injury. Such an approach would ignore the intent requirement altogether.

*Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, 203 P.3d 962, 973 (2009). Put yet another way, knowledge that an injury will occur to unknown employees at an unknown time presents a question of probability, not intent. *See Walston v. Boeing Co.*, 181 Wash. 2d 391, 334 P.3d 519, 522-23 (2014) (rejecting argument that employer satisfied state's exclusivity rule "so long as the employer knows that *someone*, not necessarily the plaintiff, is certain to be injured"); *Reeves v. Structural Pres. Sys.*, 731 So. 2d 208, 212 (La. 1999) ("Believing that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation."). And without a focus on identity, the substantial certainty test "loses its persuasiveness," especially "when the identity of potential victims becomes vaguer and when, in a related way, the time frame involving the actor's conduct expands and the causal sequence connecting conduct and harm becomes more complex." Restatement (Third) Torts: Phys. & Emot. Harm § 1 cmt. e; *accord* Dobbs, *supra*, § 29 (substantial certainty must be "focused on the plaintiff (or a particular group of plaintiffs) and on the source of the harm and a particular time and place").

Plaintiffs object that it would be an "anomalous result if no intent can be found where American was substantially certain that thousands would be harmed, but would be found to act

with intent if it knew that one or two employees would be harmed." Pl. Supp. Br. 6, ECF No. 89. But that's not quite right; the premise conflates statistical knowledge that harm will result to some members of a collective group with individualized knowledge that harm will result to an identifiable victim. Liability on an intentional-tort theory generally requires the latter: to recover, a plaintiff must demonstrate that the defendant intended (or at least was substantially certain) that the plaintiff—not someone else—would be harmed by the conduct at issue.[12] Based on the allegations of the complaint, however, none of the named plaintiffs (and likely none of American's employees) could make a claim that American was substantially certain that he or she would develop a rash, respiratory problems, or any of the other ailments allegedly caused by the Twin Hill uniforms. At least that is the import of plaintiffs' allegation that 25-30% of American employees are reactors; the odds are substantially higher that the employee, like most of his or her counterparts (the 65-70% non-reactors) would ***not*** be bothered by the uniform.

Recognizing this problem, the plaintiffs focus not on the question of whether American intended to harm a particular plaintiff but on the statistical risks to employees as a collective group; they suggest that given the scope of distribution—over 1.4 million clothing articles issued to over 65,000 employees—American was aware that the uniforms were bound to harm thousands of its employees based on the issues that had cropped up during testing and among Alaskan employees. They contend that even if the risk of harm to any one of them was low, American knew that harm to some portion of its workforce was statistically certain given that the risk was run tens of thousands of times.

---

[12] Cases of "transferred intent"—where conduct intentionally targeting one victim injures someone else—might be an exception to this rule, but they have no relevance to the facts alleged here. As noted, the plaintiffs do not allege that American intended or knew that any individual employee would be adversely affected by the Twin Hill uniforms. *See* Pl. Supp. Br. 9, ECF No. 89. There is no individualized intent to "transfer."

The problem with this contention—and relying on statistical knowledge in general—is that scale alone does not transform negligence into knowledge. As one commentator has explained, "[i]f performing a single act is merely negligent, then so is performing a hundred similar acts[.] . . . Aggregation of acts," either over time or space, "does not, by itself increase culpability." Simons, *supra*, at 24-25; *see also R.L. Haines Const., LLC v. Santamaria*, 161 So. 3d 528, 533-34 (Fla. Dist. Ct. App. 2014) (explaining that plaintiffs cannot "add together or cumulate the individual probabilities of an accident on each occasion to reach a conclusion that an accident is inevitable or that a risk is inordinately high") (citation and emphasis omitted). And the same is true where a defendant "engages in a single act that exposes multiple persons to a risk of harm"; multiplying the number of people exposed does not alter the defendant's culpability if each person is exposed to the same level of risk. Simons, *supra*, at 46-48 & n. 89.[13] That is why it matters not that the plaintiffs in this case seek to represent a class of injured employees; a class action is an aggregation of individual claims, not a vehicle that transforms those individual claims into a single claim predicated upon substantial certainty of harm to the collective group. The collection of claims that

---

[13] Dipping further into the *reductio ad absurdum* well, the plaintiffs contend that requiring identifiable victims would immunize a shooter who fires into a crowd of thousands of people. Pl. Supp. Br. 4, ECF No. 89. They posit that even if the shooter is substantially certain that someone would be hit by the bullet, he would not be liable under the Third Restatement's approach because he is not certain who or how many would be struck. *Id.* Putting aside the distinction that firing into a dense crowd falls on the purpose side of intent because it evinces a desire to kill or wound someone in the crowd, the analogy fails in any event because it assesses the culpability of the act not based on the intention or knowledge that animates the act but with the number of times it is repeated. Unlike the shooter in the plaintiff's example, who knows that the likelihood that firing a single bullet will cause harm is 100% (because it is unavoidable that the bullet will hit at least one person), American knows (based on the plaintiffs' allegations) that the likelihood that the act of issuing a single Twin Hill uniform will cause harm is only 25-30%—as discussed, far too low to count as intentional conduct. It is only with repetition that the statistical likelihood of harm increases, but repetition of an act that is not performed with substantial certainty that harm will result does not make any of the acts intentional torts. In short, the shooter knows that that bullet will harm anyone it contacts; not so a uniform.

is the class is only as good as the individual claims it comprises; if a putative class member cannot plausibly allege that American was substantially certain that he or she would be harmed, that class member has no individual claim for battery (or any other intentional tort). The putative class cannot sidestep this problem by substituting statistics about the likelihood that American's conduct was bound to harm employees collectively. Alleging that American had statistical knowledge that some portion of its workforce would suffer harm, then, is entirely different than saying that American specifically knew that a specific employee would be harmed.[14]

Plaintiffs further argue that none of the Applicable States have applied comment e and, as a result, the particularity it requires has no bearing on this analysis. Pl. Supp. Br. 3. While it is true that none of the state supreme courts at issue have explicitly endorsed the Third Restatement's approach, the rule is aligned with their approaches to enforcing workers' compensation exclusivity. For starters, even the states that have incorporated the knowledge prong into their intentional-tort exceptions have cautioned that workers' compensation exclusivity must still be strictly construed to avoid blurring the line between accidental and intentional conduct. *See Lucenti*, 327 Conn. 764, 176 A.3d at 19-20 (discussing the "high bar of workers' compensation exclusivity" and explaining how court historically believed substantial certainty was meant to apply in only "rare instances"); *Baker*, 637 N.E.2d at 1275 (holding that "nothing short of deliberate intent to inflict an injury, or actual knowledge that an injury is certain to occur, will

---

[14] Distinguishing between statistical and individual may seem harsh; it suggests that that victims who are considered mere statistics (though injured nonetheless) are valued less than those who are identified in advance. It is important to bear in mind, however, that "it is not the gravity or depravity of the employer's conduct but rather the narrow issue of intentional versus accidental quality of the injury" that animates the issue of workers' compensation exclusivity. *Reed Tool*, 689 S.W.2d at 407; *see also* Simons, *supra*, at 72 ("But the question before us is how best to measure the culpability of an actor who causes harm to victims, and in this context, we have reason to condemn more strongly . . . those actors who possess individualized rather than statistical knowledge that they will cause harm.").

suffice" to circumvent the IWCA); *Whitaker*, 357 N.C. 552, 597 S.E.2d at 668 (emphasizing that state's exception is "narrow" and "applies only in the most egregious cases of employer misconduct"); *see also Fryer v. Kranz*, 2000 S.D. 125, 616 N.W.2d 102, 109 (explaining that substantial certainty "should not be allowed to be so watered down as to allow ordinary negligent conduct or reckless or wanton conduct on the employer's part to overcome the exclusivity of workmen's compensation"). Moreover, the Connecticut Supreme Court has cited approvingly to comment e, stating that its subjective approach to substantial certainty is "consistent with" the Third Restatement and echoing comment e's warning that "[t]he substantial-certainty definition of intent requires an appreciation of its limits" and that courts typically apply the test when there is "a localized job-site hazard, which threatens harm to a small number of identifiable employees during a relatively limited period of time." *Lucenti*, 327 Conn. 764, 176 A.3d at 12 n.6. (quoting Restatement (Third) Torts: Phys. & Emot. Harm § 1 cmt. e).

Two of the other Applicable States also appear to require employers to know that their actions will result in the specific injury at issue. In *Reed Tool*, the Texas Supreme Court stated that an employer's intentional failure to provide a safe workplace will not amount to an intentional tort "except when the employer believes his conduct is substantially certain to cause the injury." 689 S.W.2d at 407. "By using the definite article 'the' instead of the indefinite article 'an,' a Texas court recently explained, *Reed Tool* "implicitly held that knowledge of a general or non specific consequences would not suffice." *Berkel & Co. Contractors, Inc. v. Lee*, 543 S.W.3d 288, 300 (Tex. App. 2018), *reh'g granted in part* (Jan. 23, 2018), *petition for review filed* (June 20, 2018). The North Carolina Supreme Court utilized similar language in *Whitaker*, its most recent discussion of the state's exclusivity provision. There, the Court held that an employee may invoke the intentional-tort exception only "where there is uncontroverted evidence of the employer's

intentional misconduct and where such misconduct is substantially certain to lead to the employee's serious injury or death." *Whitaker*, 357 N.C. 552, 597 S.E.3d at 668.[15]

Two other occupational hazard cases, applying Texas and North Carolina law, further support the need for an employer to be substantially certain as to the identity of the potential victim. The first is the Texas Court of Appeal's recent decision in *Berkel*. In that case, a superintendent working on a construction site sued an employer for intentional harm stemming from injuries he sustained from a falling crane. 543 S.W.3d at 292-94. After a jury found in favor of the superintendent, the employer appealed, arguing that there was insufficient evidence to show that it was substantially certain that the superintendent would be injured by the crane. *Id.* at 295-96. The appellate court agreed and overturned the verdict. *Id.* at 308. In doing so, the court first recognized that Texas law's conception of substantially certain was consistent with comment e, meaning that the employer must be able to "confidently predict[]" who would be a victim of its misconduct. *Id.* at 300-02. Applying this standard, it held that even if the employer was certain the crane would fall, the evidence did not establish the employer was certain the crane would strike the superintendent or even fall along a particular path. *Id.* at 305-07. Accordingly, the court concluded that the evidence permitted an inference only that the employer "knew that someone would be injured from his operation," which was not enough to establish a right to proceed under the intentional-tort exception to the state's exclusivity rule. *Id.* at 307.

---

[15] The Indiana Supreme Court implicitly has held in another context that a plaintiff must demonstrate the defendant's intent to harm a particular victim to be liable for battery. *See Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 611 (Ind. 2007) (holding that plaintiff must show not only that "harmful contact . . . directly resulted" from defendant's act, but that the defendant "acted *intending* to cause a harmful or offensive contact with [plaintiff]" in affirming summary judgment for defendant in medical battery dispute) (emphasis original).

In the second case, *Moore v. Alcatel-Lucent USA, Inc.*, a federal district court applying North Carolina law held that a cable installer failed to sufficiently show intentional harm from asbestos exposure and was thus statutorily barred from suing his employer. No. 16 CV 00157-MR-DLH, 2017 WL 4350982, at *2-3 (W.D.N.C. Sept. 27, 2017). The installer proffered evidence showing, among other things, that the employer supplied numerous asbestos-containing products that the installer and others had used, that the installer had been subjected to high levels of asbestos, and that the employer was aware of a link between asbestos and mesothelioma. *Id.* at *2. In granting summary judgment for the employer, the court concluded that even though the evidence suggested the employer "knew that such exposure was possibly or even probably harmful, it is not sufficient to establish that [the employer] *intentionally* engaged in misconduct knowing that it was *substantially certain* to cause serious injury or death to Mr. Moore [the installer]." *Id.* at *3.

Plaintiffs contend that other courts have reached the opposite conclusion; namely, that a defendant has the requisite intent to commit an intentional tort so long as it was substantially certainty that someone—though not the particular victim—would be harmed by its misconduct. Pl. Supp. Br. 2, 6, 7. Implicitly acknowledging that courts in the Applicable States have not so held, they rely heavily on two cases—*Field v. Philadelphia Electric Co.*, 388 Pa. Super. 400, 565 A.2d 1170 (Pa. Super. Ct. 1989), and *Arias v. DynCorp*, No. 01 C 1908 (ESH), 2016 WL 6496214 (D.D.C. Sept. 23, 2016)—that apply the law of jurisdictions other than the Applicable States (Pennsylvania and the District of Columbia, respectively). Neither case is persuasive. *Field* is entirely inapposite; it concerned a power plant technician who was exposed to high levels of radiation after his employer vented radioactive steam inside the tunnel where he was working. 388 Pa. Super. 400, 565 A.2d at 1172-73. In concluding that the technician stated a claim for intentional exposure to radiation, a Pennsylvania court emphasized that the employer vented the steam

knowing that the technician was in the tunnel. *Id.* at 1178.[16] That is, the employer knew precisely

who would be harmed by its decision to vent the radiation.

Although *Arias* is more factually analogous, it rests on a shaky foundation. The district

court in that case denied a motion to dismiss a battery claim brought by numerous Ecuadoran

citizens against a company that had released fumigants by air over large swaths of the country in

an effort to eradicate poppy plantations. 2016 WL 6496214, at *6-9. In so holding, the court stated

that a finding of intent requires "merely knowledge that harmful or offensive contact to somebody

will occur with substantial probability." *Id.* at *6. Although the court did not discuss its formulation

of the intent requirement in depth, it did cite to two other cases. Neither of those cases, however,

support that proposition. The first case, *Acosta Orellana v. CropLife Intern.*, 711 F. Supp. 2d 81,

91 (D.D.C. 2010), actually undermines a "some" person standard of intent. *Acosta* held that a

defendant is liable for battery under District of Columbia law when it commits "'(a) harmful or

offensive contact with a person,' which, '(b) results from an act intended to cause **that person** to

suffer such a contact.'" *Id.* (alterations and citation omitted) (emphasis added). Moreover, the court

in *Acosta* went on to dismiss plaintiffs' intentional tort claims under Rule 12(b)(6) because they

failed to plausibly allege that defendants intended to harm them. *Id.* at 91-93. Although the second

case, *Roeder v. Atlantic Richfield Co.*, No. 3:11-CV-105-RCJ-RAM, 2011 WL 4048515, at *6-7

(D. Nev. Sept. 8, 2011), applies a "some" person standard of intent, this Court does not find its

---

[16] Many of the other industrial hazard cases that plaintiffs cite are distinguishable for the same reason; *i.e.*, the alleged harm was concreted on a particular victim or a localized area where a small group of potential victims worked. *See Advanced Countertop Design, Inc. v. Second Judicial Dist. Court of State ex. rel. Cnty. of Washoe*, 115 Nev. 268, 984 P.2d 756, 757 (1999) (employee operating unshielded table saw); *Rodriquez v. Naylor Indus., Inc.*, 763 S.W.2d 411, 412 (Tex. 1989) (driver operating truck with cracked, worn tires); *Woodson*, 329 N.C. 330, 407 S.E.2d at 231-32 (subcontractor working in specific trench); *McClain v. Pfizer, Inc.*, 692 F. Supp. 2d 229, 243 (D. Conn. 2010) (scientist working in single lab containing hazardous materials and fumes).

reasoning to be persuasive. The *Roeder* court primarily focused on whether Nevada law construes the desire and knowledge prongs of intent to be conjunctive or disjunctive. No. 3:11-CV-105-RCJ-RAM, 2011 WL 4048515, at *6-7 (D. Nev. Sept. 8, 2011). And although the court also examined two of the illustrations of intent provided in the Second Restatement, it noted that neither "address[ed] the situation where an actor subjectively desires no harm to any person all, but believes that harmful consequences are substantially certain to befall some person as a result of his actions." *Id.* at *6.

In all events, the weight of authority outside of the Applicable States appears to acknowledge the requirement that substantial certainty must extend to the identity of the victim as well as the potential consequence of the conduct at issue. As discussed above, at least three other state supreme courts have embraced the principle underlying comment e, even if they have not cited the Third Restatement. *See Walston*, 181 Wash. 2d 391, 334 P.3d at 522-23; *Help*, 203 P.3d at 974; *Reeves*, 731 So. 2d at 212. Myriad other courts have taken a consistent approach. *See, e.g.*, *R.L. Haines*, 161 So. 3d at 533-34 ("Appellees argue that if the employer's course of conduct were replicated, it is virtually certain that on 'some occasion' the column would fall and cause injury to an employee. Acceptance of the Appellees' reasoning would convert a merely potentially dangerous condition into a virtual certainty and do violence to the legislative intent underpinning the workers' compensation system in this state."); *Perret v. Cytec Indus., Inc.*, 889 So. 2d 1121, 1125 (La. Ct. App. 2004) (tort claim stemming from exposure to mercury barred by exclusivity rule where evidence failed to show employers were "substantially certain that plaintiffs would be become ill" from exposure; "[b]elieving that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional tort"); *LaDuke v. Ziebart Corp.*, 211 Mich. App. 169, 535 N.W.2d 201, 204 (1995) ("It is not enough to show that

a risk of injury existed or that someone, but not necessarily the plaintiff, was certain to suffer an injury."); *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539 (D. Md. 1997) (defendant employer that authorized office smoking not liable for battery because it "did not know with a substantial degree of certainty that second-hand smoke would touch any particular non-smoker").

Plaintiffs raise one other argument about the viability of the identification requirement reflected in comment e. They suggest that, given the examples set forth in the Third Restatement, the comment applies only in situations where the harm is a necessary by-product of the employer's business. Pl. Supp. Br. 3, ECF No. 89. In this case, plaintiffs continue, the rule does not apply because "providing dangerous uniforms is not an unavoidable consequence of the normal operation of American's business." *Id.* The Court disagrees with plaintiffs' interpretation. Whether or not a danger is an unavoidable byproduct of an employer's business says nothing about who will be the particular victim of that conduct (indeed, if anything, it makes it more difficult to identify the likely victim(s) with substantial certainty). The focus of the rule is on whether the employer could have "confidentially predicted" the identity of potential victims that would be harmed by its business decision. *Berkel*, 543 S.W.3d at 301; *see also Helf*, 2009 UT 11, 203 P.3d at 974 ("For a workplace injury to qualify as an intentional injury under the Act, the employer . . . must know or except that the assigned task will injure the particular employee that undertakes it."). Thus, the Court concludes that to avoid workers' compensation preemption in the Applicable States that recognize the knowledge prong of intent, a plaintiff must plead and prove that the

defendant was (at least) substantially certain that its actions would injure the plaintiff, either individually or as a member of a small class of potential victims.[17]

In light of this requirement, the Court concludes that the complaint fails to plausible allege that American knew, or was substantially certain, that any of the named plaintiffs would be harmed. First, there is no basis to conclude that American could have confidently predicted that any of these plaintiffs, in particular, would be harmed when it first rolled out the uniforms. Nothing in the complaint indicates that the named plaintiffs were susceptible to developing health problems from the uniforms, let alone that American had notice of such predisposition. The story might be different for the pilots who served as uniform testers. In their case, American would have some basis to predict that those who reported experiencing adverse effects during the testing phase would experience the same effects after being asked to wear the uniform full time (assuming, of course, that no changes were made to the uniforms between testing and rollout). But there is no indication that any of the pilot plaintiffs served as uniform testers.

Nor is there a basis to conclude that any of the named plaintiffs were part of a small class of employees who were certain to develop health problems. Plaintiffs contend that, even under comment e, it is enough that American knew that some portion of its over 65,000 employees would

---

[17] Plaintiffs argue that even if comment e is applicable, it has no bearing at the motion to dismiss stage given that knowledge is inherently a factual issue. The Court disagrees. That many of the cases cited above were decided on summary judgment or post trial does not detract from the fundamental point underlying their holdings: to avoid the exclusivity provisions of state workers' compensation laws, plaintiffs must show—and thus plausibly allege at the pleading stage—that their employer knew with actual or substantial certainty that they would be harmed by the conduct at issue. Moreover, as at least one other district court in this circuit has recognized, a complaint "must do more than merely allege intentional injury as an exception to the general exclusiveness rule" to survive dismissal; "it must allege *facts* that add up to a deliberate intent to bring about injury." *Hurd v. Monsanto Co.*, 908 F. Supp. 604, 610 (S.D. Ind. 1995) (quoting 2 A. Larson, *Larson's Workmen's Compensation* § 68.14 (1995)), *aff'd in part sub nom. Hurd v. Westinghouse Elec. Corp.*, 107 F.3d 873 (7th Cir. 1997).

be harmed. In support of this argument, they urge the Court not to read the Restatement literally; rather, they insist, the rule requires only that the defendant be substantially certain that some "defined group or class of people, as opposed to some unknown group in some unknown area, would be harmed." Pl. Supp. Mem. 4, ECF No. 89. They add as well that requiring a narrower class of potential victims is unnecessary here given that are "no temporal attenuations" that make the connection between American's conduct and the harm alleged "more complex," given that some employees experienced adverse reactions immediately after the roll-out. *Id.* at 7. This argument lacks force.

If the Court were to adopt plaintiff's construction, then the identity requirement would be satisfied in every occupational hazard case because an employer's workforce would always constitute a "defined" group. To be sure, the qualifications referenced in comment e—"a small class of potential victims within a localized area"—typically raise a question of fact regarding whether a risk is sufficiently concentrated and imminent to support a finding of substantial certainty. But, the allegations of harm here are so far removed from being "small" or "localized" that the complaint does not plausibly invoke this standard. It is one thing to say that the known risk posed by a specific machine to the small number of identifiable employees who use it could satisfy substantial certainty standard, *see, e.g.*, *Suarez v. Dickmont Plastics Corp.*, 229 Conn. 99, 639 A.2d 507 (1994), because in that case the employer's ersatz "intent"—its substantial certainty—remains narrowly focused on a truly discrete group of employees. It is entirely another to apply the doctrine of substantial certainty to virtually every one of tens of thousands of employees, performing widely varied roles, throughout every part of the company and located throughout the world.

Nor does the fact that some employees experienced ill effects shortly after the roll out solve this problem. Although the timing certainly supports plaintiffs' contention that the uniforms are the cause of the harm at issue, it does not shed light (at least in this case) on the identity of any potential victims. At bottom, that American was aware of the risk that some portion of its workforce would develop health problems does not support liability for an intentional tort sufficient to overcome exclusivity. *See Lucenti*, 327 Conn. 764, 176 A.3d at 9 (holding that "mere knowledge and appreciation of a risk," without more, does not amount to substantial certainty); *Reed Tool*, 689 S.W.2d at 406 ("[T]o establish intentional conduct, more than the knowledge and appreciation of risk is necessary . . . ."); *see also Millson v. E.I du Pont de Nemours & Co.*, 101 N.J. 161, 501 A.2d 505, 514 (1985) (explaining that the substantial-certainty test "must be drawn with caution," so that workers' compensation is "not circumvented simply because a known risk later blossoms into reality"). Again, such knowledge might give rise to liability under some other legal theories in a different context, but it does not permit the named plaintiffs in this case to seek damages outside the confines of the Applicable States' workers' compensation regimes.

Finally, and contrary to plaintiff's contention, the outcome of the substantial certainty analysis does not change if the focus is shifted to American's refusal to pull all Twin Hill uniforms from circulation after receiving a torrent of complaints from employees. Plaintiffs acknowledge that American took some measures to address the adverse reaction reports. American initially permitted employees who reported experiencing health problems to order new uniforms or revert to their old ones. Am. Compl. ¶ 63. And when that did not eliminate the problem, American reversed course on the uniform rollout in November 2016 and stopped requiring (at least affected) employees to wear Twin Hill uniforms. *Id.* ¶¶ 79-80. Given these allegations, what plaintiffs are really contending is that American is liable for battery and intentional infliction of emotional

distress because it was certain that employees were being harmed from working near others who still wore Twin Hill uniforms. Put differently, plaintiffs allege that in light of the thousands of adverse reaction reports that were filed after November 2016, American must have known that its employees were being harmed through close proximity, not just direct contact, with the Twin Hill uniforms.

This contention fails for much the same reason the uniform rollout allegations are insufficient. The complaint provides no basis to find that American knew that any of the named plaintiffs would suffer or continue to suffer harm after being permitted to wear alternative uniforms. That plaintiffs are among the portion of American's workforce who react to Twin Hill uniforms through close proximity does not mean that American knew they would be among that population. To the contrary, the complaint at most alleges that American knowingly permitted a hazardous condition to exist throughout its workforce and willfully failed to furnish a safe place to work. And absent some indication that the employer was substantially certain that the plaintiffs would be injured by such misconduct, neither basis is sufficient to overcome workers' compensation exclusivity. *See, e.g.*, *Reed Tool*, 689 S.W.2d at 406 (citing 2A A. Larson, *The Law of Workers' Compensation* § 68.13 (1983)); *Stebbins v. Doncasters, Inc.*, 47 Conn. Supp. 638, 820 A.2d 1137, 1142 (2002) ("Failure to take affirmative remedial action, even if wrongful, does not demonstrate an affirmative intent to create a situation that causes personal injury.") (citation omitted), *aff'd*, 263 Conn. 231, 819 A.2d 287 (2003). Therefore, because the allegations in the amended complaint do not support intentional-tort liability—either under the purpose or knowledge sense of intent—the plaintiffs' recovery against American is limited to the remedies provided by the Applicable States' workers' compensation regimes.

Two other issues regarding plaintiffs' claims against American must also be addressed before closing. First, plaintiffs contend that even if the exclusivity rule applies, it does not foreclose their ability to seek injunctive relief. Pl. Resp. to AA's Supp. Br. 1, ECF No. 93. While that may be true (at least in Nevada, *Conway*, 116 Nev. 870, 8 P.3d at 841), plaintiffs' claims against American are nonetheless subject to dismissal as currently pled. That is because the primary form of injunctive relief they seek against American is to enjoin it from "continuing to commit battery and intentional infliction of emotional distress upon Plaintiffs and the Class." Am. Compl. at 27. Given that the Court finds that complaint does not plausibly allege that American has committed or is committing battery or intentional infliction of emotional distress, plaintiffs are not entitled to such relief.

The second issue concerns plaintiffs' medical monitoring theory. Although plaintiffs argue (in response to Twin Hill's motion to dismiss) that they have pled sufficient facts to proceed on this theory, they fail to address how it squares with workers' compensation exclusivity. It is not readily apparent to this Court how this theory (whether labeled as a cause of action or a form of relief) would overcome exclusivity, especially considering that the crux of the relief plaintiffs seek is to establish a medical monitoring trust fund; that is, a pool of damages meant to compensate American employees for the risk of future harm imposed on them by their employer. There may be reasons to conclude otherwise, but the plaintiffs offer no explanation as to how they can maintain a medical monitoring claim consistent with the exclusivity rule in the absence of conduct that qualifies as intentional under that rule. Accordingly, the Court finds that this theory is barred as well. Because that the plaintiffs' claims against American are precluded by the applicable exclusivity statutes, American's motion to dismiss is granted.

## III.     Twin Hill's Rule 12(b)(6) Motion to Dismiss

Having dismissed American, the Court now turns to Twin Hill's motion to dismiss. Twin Hill argues that plaintiffs have not sufficiently alleged facts showing an entitlement to relief under any of the five legal theories they assert: battery, intentional infliction of emotional distress, negligence, strict liability, or medical monitoring. Because the Court concludes that plaintiffs state a claim under a product liability theory, Twin Hill's Rule 12(b)(6) motion to dismiss the complaint must be denied.

Although there is "no monolithic products liability law in the United States," 1 M. Stuart Madden, *Products Liability* § 2.01 (2018), there are some shared principles that characterize product liability theory across jurisdictions. In many states, including the Applicable States, plaintiffs must show at least that the product at issue has an unreasonably dangerous defect; that the defect existed at the time the product left the manufacturer's control; and that the defect caused the injury for which the plaintiffs seek redress.[18] Moreover, plaintiffs typically may show that a product is defective due to a flaw in the manufacturing process, a design defect, or because of inadequate warnings or instructions. *E.g.*, *Simoneau v. Stryker Corp.*, No. 3:13-CV-1200 (JCH), 2014 WL 1289426, at *5 (D. Conn. Mar. 31, 2014) (Connecticut law); *Romo v. Ford Motor Co.*, 798 F. Supp. 2d 798, 806-07 (S.D. Tex. 2011) (Texas law); *Tillman v. Taro Pharm. Indus. Ltd.*, No. 10-CV-04202, 2011 WL 3704762, at *3 (N.D. Ill. Aug. 17, 2011) (Illinois law). Here, although

---

[18] Ind. Code Ann. § 34–20–2–1 (West 2018); N.C. Gen. Stat. Ann. § 99B-6 (West 2018); *Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 136 A.3d 1232, 1238-39 (2016); *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 901 N.E.3d 329, 345 (2008); *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 809-10 (Ind. 2007); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 168-69 (Iowa 2002); *Ford Motor Co. v. Trejo*, 402 P.3d 649, 653 (Nev. 2017); *DeWitt v. Eveready Battery Co.*, 144 N.C. App. 143, 550 S.E.2d 511, 518-19 (2001), *aff'd*, 355 N.C. 672, 565 S.E.2d 140 (2002); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788-89 (Tex. 1967).

plaintiffs do not specify in the complaint which type of defect is at issue,[19] their allegations suggest the defect is one of design, given the widespread nature of the harm alleged.[20]

The Applicable States apply various approaches to design defects. For starters, the states are divided on whether they classify design defects as a matter of strict liability or negligence. Connecticut, Illinois, Nevada, and Texas fall on the strict liability side of the divide. *See Izzarelli*, 321 Conn. 172, 136 A.3d at 1244; *Mikolajczyk*, 231 Ill. 2d 516, 901 N.E.3d at 345; *Trejo*, 402 P.3d at 657; *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334-35 (Tex. 1998). But Indiana, Iowa, and North Carolina view design defects through the lens of negligence. *See TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 209 (Ind. 2010); *Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 504 (Iowa 2009); *see DeWitt*, 144 N.C. App. 143, 550 S.E.2d at 518 (stating that plaintiff must establish manufacturer "acted unreasonably") (citation omitted).[21]

The Applicable States also subscribe to different methods of proof for establishing design defects. Nevada utilizes the consumer expectation test, which generally asks whether the product failed to perform as safely as an ordinary consumer would expect when used in an intended or

---

[19] Twin Hill argues that certain plaintiffs' product liability "claims" should be dismissed because those plaintiffs do not assert a cause of action under their home states' products liability statutes. *See, e.g.*, TH Br. 13, ECF No. 43 ("Because the CPLA provides the Catan Plaintiffs with an exclusive remedy, the Court should dismiss their strict liability claim to the extent it is brought pursuant to common law."); *id.* at 17 ("Inasmuch as the IPLA subsumes any common law negligence, Plaintiff Chester's negligence claim must be dismissed."). The Court disagrees. Because plaintiffs are not required to identify legal theories in their complaint, they need not identify which statutory provisions support their claims.

[20] That is not to say that a design defect is the only theory plaintiffs may pursue in discovery. The Court simply notes that a design defect theory is the most readily apparent based on the allegations in the complaint.

[21] Some courts have questioned whether there is truly a distinction between strict liability and negligence in design defect cases. *See, e.g.*, *Wright*, 652 N.W.2d at 167 ("We are convinced such a distinction is illusory, just as we found no real difference between strict liability and negligence principles in failure-to-warn cases.").

reasonably foreseeable manner. *Trejo*, 402 P.3d at 652, 658. Texas applies a risk-utility test that looks at whether the manufacturer could have provided a safer alternative design. *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 7 (Tex. 2015) ("A safer alternative design is one that would have prevented or significantly reduced the risk of injury, would not substantially impair the product's utility, and was economically and technological feasible at the time."). Iowa applies a risk-utility test as well, though it has specifically adopted the standard set out in the Third Restatement of Products Liability. *Wright*, 652 N.W.2d at 169-70. This version of the risk-utility test asks whether "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or distributor . . . and the omission of the alternative design renders the product not reasonably safe." *Id.* (quoting Restatement (Third) of Torts: Products Liability § 2(b)).

Connecticut and Illinois apply some combination of the consumer expectation and risk-utility tests. Connecticut typically employs a risk-utility test but applies a consumer exception test in a narrow set of cases where the product fails to meet a consumer's minimum safety expectations. *Bagley v. Adel Wiggins Grp.*, 327 Conn. 89, 171 A.3d 432, 446 & n.17 (2017); *Izzarelli*, 321 Conn. 172, 136 A.3d at 1242-44, 1249 (referring to Connecticut's primary test as "modified consumer expectation test" and explaining that test calls for jury to "weigh the product's risks and utility and then inquire, in light of those factors, whether a 'reasonable consumer would consider the product design unreasonably dangerous'"). Illinois, on the other hand, permits plaintiffs to utilize either a consumer expectation or risk-utility test. *Mikolajczyk*, 231 Ill. 2d 516, 901 N.E.2d at 352-53.

Finally, North Carolina and Indiana have codified their standards for determining when a manufacturer has breached its duty of care in designing a product. North Carolina requires a plaintiff to show "that at the time of its manufacture[,] the manufacturer acted unreasonably in

designing or formulating the product" and "that this conduct was a proximate cause of the harm from which damages are sought." N.C. Gen. Stat. Ann. § 99B-6 (West 2018). Additionally, a plaintiff must show one of two alternatives:

> (1) At the time the product left the control of the manufacturer, the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

> (2) At the time the product left the control of the manufacturer, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

*Id.*; *see also DeWitt*, 144 N.C. App. 143, 550 S.E.2d at 518-19 (noting that statute sets out seven nonexclusive factors for assessing whether design is unreasonable). And in Indiana, a plaintiff is required to show that the manufacturer "failed to exercise reasonable care under the circumstances in designing the product." Ind. Code Ann. § 34–20–2–2; *see TRW*, 936 N.E.2d at 209 ("We decline to require proof of any additional or more particular standard of care in product liability actions alleging a design defect."); *Weigle v. SPX Corp.*, 729 F.3d 724, 734 (7th Cir. 2013) (explaining that statute asks whether "the defendant 'failed to take precautions that are less expensive than the net costs of accidents'") (citation omitted). Indiana plaintiffs also must show that the product was "unreasonably dangerous," meaning that it "expose[d] the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer." Ind. Code § 34-6-2-146; *see also Weigle*, 729 F.3d at 735 (citation omitted) (noting that Indiana's "requirement that the product be in defective condition focuses on the product itself while the requirement that the product be unreasonably dangerous focuses on the reasonable expectations of the consumer").

Despite the variance in state law, the Court concludes that each of the plaintiffs has pleaded sufficient facts to maintain a design defect theory at this stage.[22] There are a number of allegations in the complaint that plausibly suggest Twin Hill uniforms were defectively designed so as to render them unreasonably dangerous. First and foremost, plaintiffs aver that thousands of American employees have suffered adverse health effects from working in and around the uniforms, including skin rashes, ear and throat irritations, headaches, vertigo, the triggering of auto-immune conditions, and impairment of endocrine and liver functions. Am. Compl. ¶¶ 4, 38-48. The complaint also states that testing has shown that some Twin Hill uniform garments contain several "auto-immune affecting chemicals," including known and possible carcinogens, which, on their own or in combination, can cause a litany of health problems. *Id.* ¶¶ 69-75. For example, plaintiffs allege that long-term exposure to small amounts of pentachlorophenol, one of the chemicals detected, "can cause damage to the liver, kidneys, blood, lungs, [and] nervous system." *Id.* ¶ 71. And "chronic long term exposure by inhalation" to formaldehyde, another one of the chemicals present, "can cause a cascade of health issues from skin rashes and respiratory problems to cancer, as well as causing fatigue." *Id.* ¶ 74.

These allegations are sufficient to infer a design defect under a consumer expectation test and the various risk-utility tests. An ordinary American employee would not expect company-issued uniforms to give rise to any health problems—let alone skin, respiratory, and auto-immune issues—through normal wear. And although plaintiffs do not posit an alternative design in the complaint, one can be inferred from their allegations: a uniform free of the hazardous chemicals identified in the complaint. Whether it would actually have been feasible for Twin Hill to

---

[22] Twin Hill does not dispute in its motion that it designed the uniforms at issue or that the uniforms were altered in any way after they left Twin Hill's control. Thus, the Court limits its analysis to the defect and causation requirements.

manufacture the uniforms in a way that minimized or eliminated these substances is a question of fact to be developed through discovery, but it is plausible to infer at this stage that it was feasible to design uniforms that did not use such chemicals; companies outfit their employees in uniforms every day that do not create the sort of health issues alleged in this case.

The allegations also give rise to the inference that Twin Hill failed to exercise reasonable care in designing the uniforms. In particular, the allegations suggest Twin Hill knew, or at least should have known, that its uniforms would cause numerous American employees to develop health problems. Twin Hill was aware that "many" American pilots reported experiencing "rashes, flu-like symptoms, headaches, vomiting, and respiratory problems" during testing and that one of the pilot unions requested that the uniforms not be used. Am. Compl. ¶ 28. And Twin Hill also knew that it was embroiled in litigation with Alaska employees who had reported suffering similar adverse reactions. *Id.* ¶ 28.

At bottom, the complaint presents a plausible, factual-based story that Twin Hill uniforms are unreasonably dangerous in their design and so meets the pleading standards set forth in Rule 8. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 560 (7th Cir. 2010) (holding that plaintiffs need not specify precise defect in complaint in reversing Rule 12(b)(6) dismissal of product liability claim); *Tyler v. Boston Sci. Corp.*, No. 17 C 9170, 2018 WL 2220531, at *3 (N.D. Ill. May 15, 2018) (denying motion to dismiss product liability claim where plaintiff identified defective product, and alleged how and when he received product, when he was injured, and what complications arose from product); *Rysewyk v. Sears Holdings Corp.*, No. 15 CV 4519, 2015 WL 9259886, at *6 (N.D. Ill. Dec. 18, 2015) (rejecting argument that plaintiffs failed to plausibly allege fire was caused by defective tractor in denying motion to dismiss); *Stuhlmacher v. Home Depot U.S.A., Inc.*, No. 2:10

CV 467, 2011 WL 1792853, at *5 (N.D. Ind. May 11, 2011) (finding plaintiff plausibly alleged ladder was defective under Rule 8).

Twin Hill contends that even if the uniforms are somehow defective, plaintiffs fail to establish a plausible causal connection between the chemicals identified in the uniforms and any of the adverse reactions referenced by the plaintiffs. According to Twin Hill, plaintiffs "acknowledge" that no single chemical is present in the uniforms "at a high enough level to cause health problems," and "all but admit[] that testing likely cannot determine whether or not a synergistic effect from a combination of chemicals caused health effects." TH Br. 11-12 (citing Am. Compl. ¶¶ 35-36). Neither contention is accurate. In paragraph 35, plaintiffs merely acknowledge that its *defendants' position* that testing fails to show any single harmful chemical in the uniforms. Indeed, as discussed above, plaintiffs allege that testing on some of the uniform pieces shows the existence of chemicals that may be harmful on their own. Twin Hill also misconstrues paragraph 36, which states that "[n]o amount of testing can serve to negate the real-world events that are taking place"—*i.e.*, that thousands of American employees developed similar symptoms after the uniforms were introduced into the workforce. This is not, as Twin Hill suggests, an admission that no amount of testing can confirm whether a combination of chemicals is producing harmful effects.

Even if testing to date has not identified an objectively high level of any single chemical or corroborated plaintiffs' synergistic theory, the complaint still plausibly alleges that Twin Hill's uniforms are the source of the harm at issue. Plaintiffs contend that a large number of American employees began experiencing similar health problems shortly after the Twin Hill uniforms were introduced. *Id.* ¶¶ 4, 55. Employees began reporting health problems "within weeks if not days" of the rollout. *Id.* ¶ 27. The number of reports allegedly swelled over the course of the next several

months, with over 5,000 American employees complaining of uniform-related health problems within a year of the launch. *Id.* ¶¶ 4, 55, 57. Moreover, plaintiffs allege that the introduction of the Twin Hill uniforms was the only "common event that happened to the entire workforce" during that timeframe. *Id.* ¶ 30. They add as well that the adverse reactions typically dissipate when employees are not exposed to the uniforms yet reappear when the employees are exposed to the uniforms again. *Id.* ¶¶ 37-39. These factual allegations, taken as true and in the light most favorable to plaintiffs, are sufficient to establish above a speculative level that the uniforms are the source of harm.[23] *See Adkins v. Nestle Purina PetCare Co.*, 973 F. Supp. 2d 905, 916 (N.D. Ill. 2013) (holding that plaintiffs sufficiently alleged defendants' dog treats caused several dogs to become sick based on similarity in dogs' symptoms, lack of other change in dogs' diets, and that some dogs recovered from illness after consumption of treats ceased). To be sure, the uniforms are not the ***only*** plausible explanation for the health problems being reported, as the plaintiffs suggest. But it is ***one*** plausible explanation, and that is sufficient to withstand a motion to dismiss.

Twin Hill's final argument is that plaintiffs "cloak their allegations in generalities." TH Reply 8, ECF No. 51. Twin Hill essentially complains that plaintiffs do not allege what "specific

---

[23] Twin Hill asks the Court to take judicial notice of two documents in support of its causation argument. The first is a decision by a California superior court in a suit by Alaska employees against Twin Hill holding that Alaska employees failed to show above a speculative level that the chemicals found in their uniforms were causing the symptoms they alleged. Ex. A to TH Br., ECF No. 43-1. The second document is a report issued by the National Institute of Occupational Safety and Health ("NOISH"), which concludes that its testing of American employees' uniforms did not "identify a single chemical, an individual uniform component, or combinations that were responsible for the constellation of symptoms" reported by American employees. Ex. A to TH Reply, ECF No. 51-1. Although the Court may take judicial notice of documents in the public record and reports of administrative bodies, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012), it declines to do so here. Although Twin Hill's submissions may cast some doubt on plaintiffs' ability to ultimately prove causation, they do not negate the well-pleaded allegations supporting plaintiffs' theory of causation, which, at this stage, the Court must accept as true. Plaintiffs will have the opportunity to develop their own evidence of causation in this case and test the NOISH report's findings through discovery.

uniforms garments they wore or were exposed to" and what specific "adverse health effects" they experienced, let alone how those effects "could be associated with the uniforms garments Plaintiffs wore." *Id.*; *see also* TH Br. 16, ECF No. 43. Given this lack of specificity, Twin Hill contends, plaintiffs do not provide sufficient information—which is well within their possession and control—to support their individual claims. This argument lacks force as well. Addressing the second issue first, the complaint does in fact specify how the plaintiffs have been affected. Twin Hill focuses on the rote allegations in which plaintiffs state in a general fashion that they experienced "adverse reactions" while working in or around Twin Hill uniforms. Am. Compl. ¶¶ 38-48. But Twin Hill overlooks the very next paragraph in the complaint: "***Plaintiffs***, as well as thousands of other American Airlines employees, ***are*** . . . ***experiencing*** debilitating symptoms of headaches, fatigue, respiratory problems, vertigo and rashes as a result working in and around persons who are wearing the [Twin Hill] uniforms." *Id.* ¶ 49 (emphasis added).

Nor is the Court persuaded that plaintiffs must provide more detail about the uniform garments they wore or to which they were exposed. Twin Hill suggests that there is an insufficient link between the uniform garments that plaintiffs tested and the ones that allegedly caused plaintiffs to suffer adverse effects—especially given that Twin Hill has supplied "dozens of different garments choices" to American employees. TH Br. 8, ECF No. 51. There are two problems with this argument. First, it draws on facts that are beyond the four corners of the complaint. Second, the Court may infer from the complaint that plaintiffs' Twin Hill uniforms contain some of the same chemicals as the uniforms that were tested. Plaintiffs allege that they have experienced symptoms that are consistent with those associated with exposure to the chemicals identified through testing. *See* Am. Compl. ¶¶ 31, 49, 70-74. The facts may prove otherwise and the plaintiffs will need to establish causation, but they at least will have the benefit

of discovery to meet this burden. Therefore, because plaintiffs have stated a claim against Twin

Hill under at least a product liability theory, Twin Hill's motion to dismiss the complaint is

denied.[24]

## IV.  Twin Hill's Rule 12(f) Motion to Strike Class Allegations

Finally, Twin Hill moves to strike plaintiffs' class allegations on the grounds that they have

not, and cannot at a later stage, meet the requirements for class treatment. A number of courts in

this district have recognized that striking class allegations at the pleading stage is permissible

"when it is apparent from the complaint that class certification is inappropriate." *Rysewyk*, 2015

WL 9259886, at *7 (citations omitted); *see also Cowen v. Lenny & Larry's, Inc.*, No. 17 CV 1530,

2017 WL 4572201, at *4 (N.D. Ill. Oct. 12, 2017) (finding Rule 12(f) motion to strike class

allegations appropriate when allegations are "facially and inherently deficient"). *But see Mednick*

*v. Precor, Inc.*, No. 14 C 3624, 2014 WL 6474915, at *7 (N.D. Ill. Nov. 13, 2014) ("Whether a

plaintiff has fulfilled Rule 23 class action requirements . . . is not an appropriate inquiry at the

motion to dismiss stage."). Courts hewing to this approach look to Rule 23 and Rule 12(f) for

authority. Rule 23(c)(1)(A) calls on courts to determine "[a]t an early practicable time" whether

certification is appropriate. Rule 23(d)(1)(D), moreover, provides that "[i]n conducting an action

under this rule, the court may issue orders that: . . . require that the pleadings be amended to

eliminate allegations about representation of absent persons and that the action proceed

---

[24] Because the Court finds that plaintiffs have pled facts supporting at least one of their theories of relief, it need not evaluate the other theories asserted against Twin Hill. S*ee supra* at 8. Denial of the motion to dismiss, however, does not affirm the viability of any of the legal theories advanced by the plaintiffs against Twin Hill other than the product liability theory. Indeed, the flaws in the intentional tort theories aimed at American may well apply in the context of the plaintiffs' claim against Twin Hill (though the fact that workers' compensation exclusivity rules do not come into play as to Twin Hill might also bear on the analysis). It remains for the plaintiffs to identify, and Twin Hill to test, the plaintiffs' legal theories in discovery and, if warranted, for Twin Hill to seek summary judgment as to any theory it believes fails as a matter of law.

accordingly." Coupled with these provisions is Rule 12(f), which permits district courts to strike "an insufficient defense" from a pleading.

Twin Hill argues that the class allegations here should be stricken for two reasons, but neither persuades. The first is that variations in state law and individual class member's circumstances will make certification impossible. TH Br. 21, ECF No. 43. In particular, Twin Hill suggests that the class may require applying the law of all fifty states and points to the lack of uniformity in product liability and medical monitoring law across jurisdictions. Moreover, Twin Hill continues, the divergent legal standards will be complicated by individualized factual questions, such as "how long each individual wore the uniforms, the alleged chemical(s) present in each uniform, and each individual's health history." *Id.* at 23. Plaintiffs respond that this argument is premature at best. Pl. Opp'n to TH Br. 17-18, ECF No. 44. Although they concede that the class' claim "conceivably might involve the laws of [fifty] different states at some point," they note that it is not clear whether that will be the case. *Id.* at 17. Plaintiffs add that the parties will need discovery on the domicile of each class member, as well as on where each class member was injured, to understand the implications of Illinois' choice-of-law rules. *Id.* at 18. At any rate, plaintiffs argue, even if state law varies significantly, the Court may certify a class based on common issues of fact, of which there are several in this case. *Id.* at 20.

Plaintiffs have the better of this argument. The Court is hard pressed to declare that a class action is unworkable based on variations in state law when it is far from clear which state law ultimately will be at issue. *See Wagner v. Gen. Nutrition Corp.*, No. 16-CV-10961, 2017 WL 3070772, at *9 (N.D. Ill. July 19, 2017) (refusing to deny class certification at pleading stage based on variation of state law without "benefit of full briefing on the issue"); *Bietsch v. Sergeant's Pet Care Prods., Inc.*, No. 15 C 5432, 2016 WL 1011512, at *11 (N.D. Ill. Mar. 15, 2016) (concluding

that defendant's examination of variations in state law was premature and insufficient "to demonstrate that a multistate class is 'per se unworkable'" prior to discovery); *Rysewyk*, 2015 WL 9259886, at * 8 (denying motion to strike nationwide class allegations after concluding that "nothing in the complaint or defendants' explanation of the law" established that it was "practicable to resolve the certification question at this stage"). Given American's nationwide presence and the inherent mobility of its workforce, none of the parties can presently predict with any confidence which states' law may apply to the claims of putative class members. And as for the named plaintiffs, there is no guarantee that the Court will apply at a later stage the same law that it is applying now. The choice-of-law analysis for purposes of this motion is limited to the alleged domicile of each plaintiff; discovery could reveal that some other states have more significant relationships to their claims.

Two other considerations bolster the Court's conclusion. First, material differences in substantive state law could be addressed through subclasses. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798-99 (7th Cir. 2013) (explaining that district courts may address complications arising from variances in state laws through the creation of subclasses); *Wagner*, 2017 WL 3070772, at *9 (rejecting pre-discovery motion to deny class certification based on differences in state law, in part, because concern could be addressed through subclasses). Although it is unclear whether subclasses would fully address Twin Hill's concern down the road, what matters here is that the subclass mechanism is a potential alternative to denying certification outright. *Cf. Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (explaining that some impediments to class certification "can and often should be solved by refining the class definition rather than flatly denying class certification"). Second, there is at least one common question of

fact that could give rise to certification.[25] One critical issue in this suit is whether any of Twin

Hill's uniform pieces are capable of causing the type of harm the plaintiffs allege—either by

proximity or direct contact. And more importantly, this issue, at least, is likely to be addressed

through classwide proof and expert testimony. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

350 (2011) ("What matters to class certification . . . is not the raising of common 'questions'—

even in droves—but, rather the capacity of a classwide proceeding to generate common *answers*

apt to drive the resolution of the litigation.") (citation omitted).

Twin Hill's second ground for striking the class allegations is similarly unavailing. Twin

Hill contends that plaintiffs seek prospective injunctive relief on behalf of the class yet cannot

show that any members of the class are suffering from a continuing harm in light of American's

decision to permit employees to wear alternative uniforms. TH Br. 23, ECF No. 43. But Twin Hill

ignores allegations in the complaint that plaintiffs and putative class members continue to suffer

ill effects by working near employees who still wear Twin Hill uniforms. Because the Court finds

that plaintiffs' proximity theory is not implausible based on the facts alleged, plaintiffs sufficiently

plead on-going or future harm. Whether plaintiffs can establish a likelihood of future harm is again

an issue for another day. Therefore, the Court denies Twin Hill's motion to strike class allegations.

*        *        *

For the above reasons, American's Rule 12(b)(6) motion to dismiss is granted. The

dismissal, however, is without prejudice; plaintiffs have leave to re-plead their claims to address

the issues set forth in this opinion, if they are able. Any amended complaint is due no later than

---

[25] Because plaintiffs seek class certification only under Rule 23(b)(2) they will not be required to establish that common questions of fact predominate over individual issues.

October 4, 2018. Twin Hill's Rule 12(b)(6) motion to dismiss and Rule 12(f) motion to strike are denied.

Date: September 4, 2018

_John J. Tharp, Jr._
John J. Tharp, Jr.
United States District Judge