**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOR ZURBRIGGEN, DENA CATAN, HALEY JOHNSON, LYNNETTE CHESTER, KIMBERLY JOHNSON, JOSEPH CATAN, BARBARA BELL, DOUG CRUMRINE, LAJUAN PRESTON, TIMOTHY TERRY, JULIETTE ONODY, CONSTANCE GERMOND MCCORD, TIMOTHY R. AKERS, JULIE BURKE, PATRICIA BEHNKE, EDWARD J. BURKE, STEPHEN WEIGEL, DORA A. BROWN BRANCH, SOAD HAMDAN, VICKIE ISAAC, DEMETRIA ANDERSON, KEITH MAGINN, JUDITH J. DRAKE, DESIREE WEBBER-VAN BOXTEL, CHRISTINA NYAKAS, CHRISTINA H. ENDICOTT, SHERYL KELLY, SCOTT J. AUSTIN, MIN LI, CARLA J. PATTERSON, BOBBI GORDON, CARRIE BEAN, LISA JOY, KATHY L. RUNKLE, VERONICA VERA, JULIE F. KRESKO, SANDRA STUART, DEANNA JONES, and DEBORAH A. BRASIER, on behalf of themselves and others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 17 C 05648<br><br>Judge John J. Tharp, Jr. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TWIN HILL ACQUISITION COMPANY, INC., AMERICAN AIRLINES, INC., PSA AIRLINES, INC., and ENVOY AIR INC., | )<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In September 2016, American Airlines debuted new uniforms, the first in nearly 30 years, for its above-the-wing workforce. Soon after the rollout, pilots and flight attendants began reporting a variety of health issues linked to the uniforms, including skin rashes, vertigo, and respiratory problems. American represented that the uniforms were safe, but as the number of complaints continued to rise, the company permitted employees to wear alternative uniforms and ultimately announced that it would terminate its contract with the uniform manufacturer, Twin Hill, as of 2020. In evaluating American's motion to dismiss the First Amended Complaint,[1] the Court found that the plaintiffs could not bring tort claims against American outside of the applicable workers' compensation regimes because they had not demonstrated that American knew with requisite "substantial certainty" that any particular employees, much less the named plaintiffs, would be harmed by the Twin Hill uniforms.

In the Second Amended Complaint ("SAC"), the plaintiffs continue to press intentional tort claims against American (and Twin Hill) on behalf of all employees exposed to the Twin Hill uniforms, but they also seek to clear the "substantial certainty" obstacle by asserting claims based on a smaller group of employees who were "proximity reactors" to the uniforms—that is, who reacted to the Twin Hill uniforms when they were near someone wearing one, even if they themselves wore an alternative uniform—and who reported their adverse reactions to American

---

[1] The SAC asserts claims against American Airlines, Inc. and three affiliated companies: American Airlines Group, Inc., PSA Airlines, Inc., and Envoy Air, Inc. They are referred to herein collectively as "American." As to PSA Airlines and Envoy Airlines, the motion to dismiss relies entirely on the arguments as to American Airlines, Inc. As to American Airlines Group, Inc., the motion asserts that the complaint should be dismissed for the same reasons and also because it is a holding company with no employees or operations and so had no role in the introduction of the new Twin Hill uniforms. In assessing a motion to dismiss, however, this Court cannot rely on assertions of fact outside the pleadings, so this ground does not warrant dismissal of the SAC as to American Airlines Group, Inc.

and continued to have reactions to the Twin Hill uniforms at work. In addition, the SAC adds a fraud claim against American alleging that it falsely represented the safety of the Twin Hill uniforms.

American has moved to dismiss the SAC as again failing to adequately allege substantial certainty and asserting that the plaintiffs could not have relied on any statements by American about the safety of the uniforms because they had been exposed to the uniforms before the statements were made. With respect to proximity reactor plaintiffs who reported the health problems they were experiencing to American, the Court finds that the plaintiffs have plausibly shown that American knew harm was substantially certain to result from requiring them to work in proximity to others wearing the Twin Hill uniforms. That knowledge is sufficient to overcome workers' compensation exclusivity in several states and, therefore, the SAC states a plausible claim to relief as to proximity reactor plaintiffs who reside in those states. The Court also concludes that the SAC plausibly alleges that certain plaintiffs relied on American's statements in continuing to wear the uniforms and as to such plaintiffs therefore also states a plausible claim for fraud. Otherwise, the motion to dismiss is granted.

## BACKGROUND

The Second Amended Complaint has swollen to some 717 paragraphs setting forth the claims of 80 named plaintiffs.[2] The Court accepts the truth of well-pleaded (that is, nonconclusory) facts alleged in the SAC for purposes of this motion, but this background section focuses on the

---

[2] Per the parties' stipulation, *see* ECF No. 128, the plaintiffs have filed appendices to the SAC adding new plaintiffs. Paragraphs numbered above 486 are included in these appendices. *See* ECF Nos. 122 (¶¶ 487-519), 139 (¶¶ 520-25), 148 (¶¶ 526-40), 154 (¶¶ 541-71), 166 (¶¶ 572-84), 169 (¶¶ 585-637), 176 (¶¶ 638-57), 179 (¶¶ 658-68), 183 (¶¶ 669-717). Appendices AA and BB, pertaining to plaintiffs Howard and Seiber, contain duplicate paragraphs ¶¶ 572-74, ECF No. 166.

facts most relevant to the new theories (proximity reaction and fraud) advanced against American in the SAC.

### 1. The Initial Testing of the Twin Hill Uniforms

In 2013, American selected Twin Hill to manufacture a new line of uniforms for its flight attendants, pilots, and service agents. SAC ¶¶ 71, 73, ECF No. 98. Prior to Twin Hill's selection, the Allied Pilots Association ("APA") asked that American "not select Twin Hill because of its history and the dangers Twin Hill uniforms could pose to American's 70,000 person workforce," *id.* ¶ 81, as "[s]ubstantial numbers of employees of Alaska Airlines, as well as employees at UPS, Southwest and NetJet had all previously complained about their Twin Hill uniforms causing them ill-health," *id.* ¶ 79. American conducted two initial wear tests of the new Twin Hill uniforms, the first in early 2015 and the second in early 2016, and two rounds of testing with product testing company Intertek. In the early wear tests, some testers reported skin rashes and respiratory issues. *Id.* ¶ 111. In response to a letter from OSHA, American Occupational Health and Safety official Michael Hodes acknowledged that during the first wear test a "small number of participants reported developing physical symptoms while wearing the uniforms," *id.* ¶ 270, and that their symptoms were not limited to skin conditions, but also included "migraines, nausea, [and] sinus problems," *id.* ¶ 269.

In response to the first wear test, American sought out Intertek to test uniform fabric samples, both worn and unworn, for "chemicals that might provoke skin reactions." *Id.* ¶ 122. In its first report, dated April 1, 2015, Intertek found a total of 59 chemicals in the garments,[3] including six that it could not identify. *Id.* ¶ 131. Four chemicals that had sensitization potential,

---

[3] Intertek tested 24 sample garments and found between zero and three chemicals with irritation or sensitization potential on the various garments.

two of which could also be irritants,[4] were found in four garments; ten of the identified chemicals had irritation potential but were not known to be sensitizers. Of the twenty-four fabric samples tested, sensitizers or irritants appeared in twelve of them, including four of five worn samples. Intertek Report 1 at 7-9, ECF No. 108-1. Intertek concluded in its first report that while irritants were present in the fabrics, the concentrations of these chemicals would need to be quantified, as it is "unlikely that very low exposures to trace irritants from the fabric would cause a rash." *Id.* at 10.

The second Intertek report, published April 5, 2016, found three chemicals with sensitization potential and eleven with irritation potential. "Only those chemicals that were clearly identified with a corresponding [Chemical Abstracts Service] number were assessed" for their sensitization or irritation risk, though the report indicated that several unidentified chemicals were detected in the fabric samples, including "aromatic nitriles." Intertek Report 2 at 9, 12, ECF No. 108-2. The sensitization or irritation potential of these chemicals could not be ruled out without more specifically identifying them, but the report states that "the limited information available suggests that 'aromatic nitriles' are unlikely to be irritants or sensitizers" at the observed concentrations. *Id.* at 15.

Both Intertek reports focused on the risk of irritation or sensitization based on direct skin contact, rather than respiratory or other symptoms or proximity reactions. The plaintiffs allege that wearing "the new uniforms over time can cause the release of [chemicals] into the cabin air where

---

[4] Intertek's report distinguishes between sensitization responses, in which a skin rash would occur "in individuals who have been previously exposed to the chemical and have developed an allergy to it," and an irritant effect, which "would be expected to occur in most individuals when the concentration of the irritant is high enough." Intertek Report 1 at 5, ECF No. 108-1. Most textile rashes are caused by sensitizers rather than irritants, because the "amount of a chemical released from a fabric is likely to be very small." *Id.*

it can combine with other vapors caused by the other chemicals in the new uniforms." SAC ¶ 237. Once exposed to sensitizers in the uniforms, the SAC alleges, employees risk reactions to even small amounts of these chemicals in everyday household items like shaving cream or cosmetics, *id.* ¶ 152, and because the chemicals have a cumulative effect with additional exposure, the SAC alleges that certain individuals "are only just now starting to react, even though they have worn the uniforms without incident for almost two years," *id.* ¶ 243.

The SAC alleges that management at American worked to downplay concerns about the uniforms, *see id.* ¶ 215, but internally expressed concern that "benzyl benzoate was in 'both sweaters and tailored garments, which is considered a sensitizer and could result in an allergic response in certain people,'" *id.* ¶ 217. In August 2016, as complaints from employees mounted, American Vice President of Flight Service Hector Adler forwarded an email to his colleagues reporting that "[t]he groundswell is growing . . . We are going to have to set a process to respond to these emails as I cannot keep up with the volume . . . ." *Id.* ¶ 173.

### 2. The Introduction and American's Response to Complaints about the New Uniforms

American officially debuted the new uniforms on September 19, 2016. *Id.* ¶ 187. By September 29, the Association of Professional Flight Attendants ("APFA") had received 400 adverse reaction reports from flight attendants. *Id.* ¶ 193. In response to these complaints, the SAC alleges that American officials downplayed or mischaracterized the results of the wear tests to present a rosier view of the uniforms. When one employee wrote to American to complain of uniform-related symptoms, Mitchell Moss, an otherwise unidentified American employee allegedly responded that "none" of the wear testers "gave feedback that they were overly itchy, caused rashes or resulted in headaches" though some wear testers had reported such issues. *Id.* ¶ 235. When another complained that a sweater was "incredibly uncomfortable against the skin,"

Adler replied on behalf of American that "[o]ver 70,000 individuals are involved with this program and there are no complaints from work groups other than flight attendants," *id.* ¶ 191, though pilots had also complained about the Twin Hill uniforms from the first wear test. *See id.* ¶ 297 (American manager Brady Byrnes "claimed that wear testers never reported problems. [Another American manager] corrected him, stating that 'we had some complaints from pilots after the first wear test . . . .'").

Similarly, the SAC alleges that American represented at multiple junctures that the Twin Hill uniforms complied with safety standards set by Oeko-Tex, a private certification entity that conducts proprietary testing and sets threshold safety levels for 100 chemicals in garments. *See id.* ¶¶ 227, 299. While 12 of the 14 factories that manufactured the Twin Hill uniforms had Oeko-Tex certifications, *id.* ¶¶ 170, 415, the SAC asserts that the fabric was ***not*** Oeko-Tex certified and that Oeko-Tex declined to perform postproduction testing of the uniforms because garments cannot be proven safe once the manufacturing process is complete. *Id.* ¶¶ 98, 151. After the second Intertek report was released, American management asked whether the factories had up-to-date Oeko-Tex certifications, or whether these certificates had expired. According to the SAC, "American's Byrnes wrote to Szparaga of Twin Hill: 'This is very serious. We need to squash employee concern immediately, and it would seem these certificates should be readily available … no?'" *Id.* ¶ 163.

A few weeks after the rollout, on October 6, 2016, American "formally recognized . . . the health concerns raised by Flight Attendants who have reported experiencing adverse reactions and symptoms as a result of wearing the new uniform." *Id.* ¶ 200. In response, American established a call center to field complaints about the uniforms, permitted employees to wear the old uniform or purchase their own off-the-rack approximations of uniform pieces, and agreed to further garment testing. *See id.* ¶ 201, 245.

The APFA conducted its own garment testing and reported to American on November 26, 2016 that it had found levels of cadmium in the Twin Hill uniforms above the Oeko-Tex limit, in addition to detectable levels of several chemicals that had not been reported by Intertek. The president of APFA also wrote that "although the additional toxins were not above the maximum allowable values according to the Oeko-Tex standards, when acting synergistically together, can make exposure at lower levels significantly more toxic." *Id.* ¶ 251. The APFA asked American senior management to fully recall the Twin Hill uniforms to protect employees reacting directly to the uniform as well as proximity reactors. *Id.* ¶ 264. As of November 28, 2016, American "had received 1,415 unique calls to its call center set up for employees to report reaction problems with the uniforms." *Id.* ¶ 253. Notwithstanding these reports, on November 30, 2016 American communicated to its employees that the uniforms had been "proven safe." *Id.* ¶ 255.

### 3. Proximity Reaction Claims

Employees who have complained to American about health issues with the Twin Hill uniforms fall into two broad and overlapping categories: those who claim to react to the uniform while wearing it, and those who claim to react when they are near coworkers wearing the Twin Hill uniforms, "as in the way people with [a] peanut allergy react," *id.* ¶ 206. The latter group, the "proximity reactors," also includes those who claim to have reactions when they come into contact with the same work surfaces as their Twin Hill uniform-wearing counterparts, including "company lounges, vans, jump seats, or crew sleeping bunks on the long-haul planes." *Id.* ¶ 247. According to the plaintiffs' review of American's internal communications, an estimated 14,000 employees have elected to wear an alternative to the Twin Hill uniform, and at least 3,500 are proximity reactors. *Id.* ¶ 14. More than half of American's 15,000 pilots "have certified, by name and in writing to American, that they are having health problems with the Twin Hill uniforms," in order

to obtain an alternative uniform. *See id.* ¶¶ 15, 328-29.

Nearly all of the proximity reactor plaintiffs[5] report that they initially experienced direct reactions from wearing the Twin Hill uniform, switched to an alternative uniform, and continued to have proximity reactions while working with Twin Hill-wearing colleagues. Several proximity reactors also reported that their symptoms subsided during periods when they were not being exposed to the Twin Hill uniforms: Plaintiff Roberts, for example, developed minor itching after a month or two of wearing the Twin Hill uniform and switched to an alternative uniform in 2018. *Id.* ¶¶ 600-02. She switched back to the Twin Hill uniform in 2019, believing that she may have overreacted to her initial irritation, but allegedly began "feeling fatigue, her heart would race, and she would get nauseated" when she wore it. *Id.* ¶ 603. In August 2019, the SAC alleges, "Plaintiff Roberts stopped wearing the Twin Hill uniform for five days because she could not work. During this time, when she was not being exposed to the Twin Hill uniforms, she began to get better." *Id.* ¶ 606. When she returned to work, Plaintiff Roberts initially wore the Twin Hill uniform and felt ill again; on the second leg of the trip, "even though she was not wearing the Twin Hill uniform, while around those who were wearing Twin Hill garments, her symptoms got worse." *Id.* ¶ 607. Similarly, Plaintiff Dena Catan received her Twin Hill uniform in October 2016; the SAC alleges that after trying on the uniform and hanging it up in her living room, for "the next two weeks she suffered from a cascade of health issues, all of which stopped when the uniforms were removed to the garage." *Id.* ¶ 368. Plaintiff Sibai's symptoms temporarily subsided when she went on vacation and stopped wearing the uniform for a few days. *Id.* ¶ 673. Plaintiff Heirlmeier also "began to feel better once she discontinued wearing" the Twin Hill uniform in late 2017, though "she still reacts

---

[5] Plaintiff Behnke alleges only proximity reactions; she "never wore the Twin Hill uniforms to work" but nevertheless "experienced adverse reactions when she worked around others who wore the Twin Hill uniforms." *Id.* ¶ 376.

to the uniforms by just being around or coming into contact with others wearing the uniform." *Id.* ¶ 645.

According to the SAC, many proximity reactor plaintiffs sought treatment from their personal doctors: Plaintiff Chester sent her manager a doctor's note "indicating that she was suffering respiratory issues allegedly caused by the uniforms and recommending that she not fly international flights." *Id.* ¶ 370. Plaintiff Jennifer Johnson, who wore the Twin Hill uniform for approximately four months beginning in August 2018, developed a lump in her neck in August 2019. According to the SAC, her doctor told her "that her lumps were likely caused by chemical exposures due to the Twin Hill uniforms." *Id.* ¶¶ 587-89, 595. Plaintiff Averill reports that she has developed rashes and thyroid and respiratory issues. She states that her physician advised her to stop wearing the Twin Hill uniform. *Id.* ¶¶ 613-17. Plaintiff Ivers reported that she first wore the Twin Hill uniform on a work trip to South America; after a three-hour sleep break, she could not open her eyes, and when she could, her vision was blurry. *Id.* ¶ 651. She saw her primary care doctor and was referred to an eye specialist, who determined that she was having an allergic reaction and instructed her "to avoid the uniforms and remove them from her house." *Id.* ¶ 656. After a particularly severe "asthma-like attack" at work in August 2018, Plaintiff Thomas experienced respiratory failure and was placed in a medically induced coma for a week. *Id.* ¶ 710. The SAC alleges that Plaintiff Thomas continued to have reactions "just being in the vicinity of others wearing the Twin Hill uniforms" after this incident. *Id.* ¶ 716.

Plaintiff Coulter alleges that she developed hives when she first wore the Twin Hill uniform, and since switching to an alternative uniform has had respiratory symptoms as a proximity reaction. *Id.* ¶¶ 624-28. The SAC states that in May 2017, Plaintiff Coulter saw an allergist and tested negative for every allergen tested, though the number of tested allergens is not

specified. She reports that her symptoms get worse at work, but subside when she returns home. *Id.* ¶¶ 629, 632. When Plaintiff Coulter filed an Injury on Duty report for her proximity reactions, the SAC states, "AA told Plaintiff Coulter to get a flu shot." *Id.* ¶ 635.

As an exhibit to the SAC, the plaintiffs include a 2018 study by researchers at the Harvard T.H. Chan School of Public Health of Alaska Airlines flight attendants during a period in which new Twin Hill uniforms were introduced and flight attendants self-reported "skin reactions, hair loss, breathing problems, thyroid dysfunction, headaches, fatigue, and chemical sensitivity." McNeely et al. Study at 2, ECF No. 98-1. The study notes that flight attendants might be particularly prone to irritation, as "[f]light attendants are exposed to an unusual occupational environment, which includes various air contaminants" and "studies of aircraft cabin environments have found harmful compounds released from clothing and upholstery because of interactions with ozone in flight." *Id.* at 7.

### 4. Proximity Reaction Complaints to American Management

The SAC alleges that employees complained of proximity reactions to both senior American executives and to their direct managers and supervisors. One American employee wrote to several members of American's upper-level management team, including President Robert Isom, describing her proximity reactions and stating "we cannot work around others in the greys [Twin Hill uniforms]. Giving those with reactions another option will not fix this problem. The issue here is toxins in the material, not the type of material." Internally, American VP Jill Surdek "commented that there is going to be 'continued noise' like this . . . and then suggested that American offer leaves of absence for such employees." SAC ¶¶ 308-10. Another proximity reactor wrote to American management to complain of "sky high" thyroid levels and "asthma type" reactions, asking American: "What are you doing to protect me from the exposure via my

coworkers? Sharing a jumpseat? Sitting in the cockpit for lav breaks?" *Id.* ¶ 324. Lauren Nalbandian of the APA wrote to American management on May 17, 2017, stating: "We still believe that all pilots should be provided with a new [brand of] uniform for safety reasons. Replacing only a few uniforms doesn't solve the problem of a pilot reacting to the other pilot(s) in the cockpit wearing the uniform. The only way to remedy this is to replace all of the uniforms due to the close proximity and confined quarters in which we work." *Id.* ¶ 331.

Several of the plaintiffs state that they reported their proximity reactions to their managers or filed Injury on Duty reports numerous times over a period of months. Plaintiff Joy submitted Injury on Duty reports in October 2016 and November 2017 and emailed her Flight Service Manager about her proximity reactions on October 22, 2016, November 6, 2016, and January 24, 2017. *Id.* ¶ 388. The SAC states that she took unpaid leave in February 2017 to recuperate, but after returning to work filed another Injury on Duty report on March 22, 2017. *Id.* Plaintiff Thierry filed Injury on Duty reports in December 2016, January 2017, and February 2017, and spoke to her manager about her proximity reactions in February, March, and April 2017. *Id.* ¶ 521. Plaintiff Cherie Anderson reported her proximity reactions in March 2017 and January 2019. *Id.* ¶ 539. After reporting her reactions every few months in 2017, the SAC alleges that in 2018 Plaintiff Vera asked her "Flight Service Manager that it be notated that she was having reactions to the Twin Hill uniforms so that it would not be called into question why she was not wearing the Twin Hill uniform. This was done prior to transferring [her] to another base of operations." *Id.* ¶ 390. Several of the plaintiffs who allege proximity reactions have requested or taken FMLA leave. *Id.* ¶¶ 373 (Preston), 381 (Maginn), 392 (Jones), 591 (J. Johnson), 691 (Oliver), 714 (Thomas).

### 5. American's Reaction to Proximity Complaints

The plaintiffs allege that while American was aware of proximity reactors, it never did

anything to "understand and diagnose" their reactions and has not granted any workers' compensation claims for uniform reactions.[6] *Id.* ¶¶ 322-23. The plaintiffs allege that "in the beginning American's in-house doctors were concluding that the uniforms were causing injuries but were quickly quelled" by pressure from upper-level management. *See id.* ¶ 207. For at least one proximity reactor, the plaintiffs allege that "American's own doctors concluded that he was 'not able to work around current uniforms,' and was having a 'reaction to [a] chemical substance.'" *Id.* ¶ 275.

In addition, the plaintiffs allege that American has interfered with certain proximity reactors' attempts to mitigate their own reactions. Plaintiff Joe Catan, a pilot, reported his proximity reactions in writing at least three times, beginning in February 2017. *Id.* ¶ 351. He

_____

[6] On this point, the Court reiterates that the "plaintiffs' success (or lack thereof) in litigating their workers' compensation claims . . . has nothing to do with an analysis of the scope of the statutory preemption of state tort law by a state workers' compensation program." Mem. Op. & Order at 11, ECF No. 96. There is, moreover, no *per se* inconsistency between opposing a claim of workplace injury advanced by a worker in a worker's compensation proceeding by arguing that the claimed injury was not incurred on duty and invoking worker's compensation exclusivity in opposing the worker's civil claim. *See, e.g.*, *Tractor Supply Co. v. Kent*, 966 So. 2d 978, 981 (Fla. Dist. Ct. App. 2007) ("There is no irreconcilable conflict in the employer here raising a pre-existing medical condition defense to a [workers' compensation] claim, but asserting it is, nevertheless, insulated from a civil suit."). The former is a merits argument (is the employer responsible for the injury); the other, an assertion regarding the appropriate forum in which the merits question must be resolved. This case illustrates the point: the plaintiffs claim that American intentionally injured them in the workplace by exposing them to the Twin Hill uniforms; American responds that a claim of workplace injury must be heard in a worker's compensation proceeding (the forum argument). It is not inconsistent for American to maintain in the worker's compensation proceeding that the employee failed to show that the uniform caused the harm rather than some cause unrelated to the workplace (the merits argument). American's argument does not deny any employee a forum; it simply takes the view that "injury on duty" (IOD) claims relating to the uniforms be presented in the forum in which all other IOD claims are heard. In any event, while the SAC alleges that American's insurer has consistently denied IOD claims relating to the Twin Hill uniforms on the ground that the injuries alleged were not workplace injuries (*see e.g.*, SAC ¶ 207), neither the SAC nor the plaintiffs' briefs report the outcome of any proceedings contesting such determinations, nor do they provide any specifics relating to the arguments advanced in any such proceedings. In short, the plaintiffs have not presented sufficient information to support an estoppel argument as to any specific plaintiff, much less as to all members of the putative classes.

experienced an asthma-like proximity reaction prior to a flight in August 2017 and delayed his departure for 20 minutes for safety reasons, *id.* ¶¶ 354-55. American grounded him for six months after this incident, and later grounded him again for a month, the SAC states, "on the pretext that he had bullied a fellow crew member into wearing non-Twin Hill garments in Captain Catan's cockpit," *id.* ¶¶ 357, 359. In September 2018, Plaintiff Catan's First Officer allegedly offered to purchase (and Catan offered to pay for) an alternative uniform to wear when flying with him. *Id.* ¶ 361. The Chief Pilot at LaGuardia airport agreed to this arrangement, but the Director of Flight Operations NYC contacted the First Officer and instructed him to wear the Twin Hill uniform when working with Plaintiff Catan, notwithstanding his proximity reactions and American's policy that any employee may choose to wear an alternative uniform. *Id.* ¶ 362. The Director allegedly told Plaintiff Catan that "the First Officer would be wearing a Twin Hill uniform and that Captain Catan should call in sick if necessary." *Id.* ¶ 363.

Other plaintiffs report similar responses to proximity reactions from American officials. Plaintiff Julie Burke, a flight attendant, called her manager in July 2018 to "discuss a confrontation with a colleague regarding her wearing an alternative uniform after informing this colleague [that] she would like to keep an arm's distance away" to prevent proximity reactions. *Id.* ¶ 375. Her manager instructed her "not to ask other employees to stay an arm's distance away" and told her "she should tell her colleagues that her 'body is inadequate,' and that it was her fault she was having issues being in proximity to the uniform." *Id.* Moreover, the SAC states, the manager "informed her that she would be terminated if she could not perform all her duties in close proximity with other Flight Attendants wearing Twin Hill." *Id.* When Plaintiff Snow reported proximity reactions to her manager, the manager told her to "just suffer through it." *Id.* ¶ 488. Plaintiff Kresko reported her proximity reactions to the Twin Hill uniform to the Flight Office in

May 2018 and asked whether the office had an alternative tie available; despite "being told just moments prior she was reacting to the uniforms, the Flight Office handed her a Twin Hill tie." *Id.* ¶ 391. Similarly, Plaintiff Ivers' supervisor asked her to wear a Twin Hill uniform scarf rather than the alternative scarf she had been wearing, despite her previously reported reactions. *Id.* ¶ 654. Plaintiff Sibai switched to an alternative uniform in October 2017 but reportedly felt harassed by management for not wearing the Twin Hill uniform; despite being aware of her reactions, "her manager told her that a supervisor had directed that Plaintiff Sibai stop wearing her alternative shirt and sweater." *Id.* ¶ 679. Plaintiff Lherisson was allegedly also "admonished by a supervisor for not being in the approved uniform" despite her reactions. *Id.* ¶ 700.

### 6. Post-Rollout Testing by NIOSH

In 2018, the National Institute for Occupational Safety and Health (NIOSH) issued a report in response to a request from an unidentified American employee for a health hazard evaluation "regarding symptoms attributed to uniforms introduced from May to September 2016." NIOSH Letter at 1, ECF No. 98-2. NIOSH collected information from American, Twin Hill, and the APFA, reviewed laboratory textile testing results, examined American's log of OSHA reports and the APFA's de-identified database of employee symptom reports from August 11, 2016 to May 2, 2017, and spoke with 50 American employees.

NIOSH reviewed American's OSHA logs of work-related injuries and illnesses from 2015, 2016, and the first four months of 2017. While there were "no skin disorder entries documented on the 2015 OSHA logs," in 2016, all but one American hub reported at least one skin disorder entry that was allegedly related to the new uniforms.[7] NIOSH Report at 5, ECF No. 98-2. In total, the 2016 OSHA logs contained 87 skin disorder entries (8% of the total entries), of which 83 (95%

---

[7] The one remaining hub, JFK, had only one OSHA entry for the year.

of 87) were reported to be related to the uniforms. The report indicates that all but two of the skin entries reported to be related to the uniforms were reported on or after the September 9, 2016 rollout date, and that the other two were reported on June 28 and August 8, 2016, after the Twin Hill uniforms had begun to be distributed. In the first four months of 2017, 13 skin disorder entries were reported, all of which were allegedly related to the Twin Hill uniform. The 2015 OSHA logs show 14 reported respiratory conditions, none of which were reported to be related to the uniform. In 2016, 68 respiratory complaints were made (6% of the total entries for the year), of which 27 (roughly 40%) were attributed to the uniform. From January to April 2017, 39 respiratory conditions were reported, of which 18 (46%) were attributed to the uniforms. *Id.*

NIOSH found evidence in the literature that subthreshold concentrations of irritants can have additive effects and lead to a reaction, and acknowledged the difficulty of detecting newer textile allergens, noting that garment testing may not identify these chemicals. The report also suggested that flight attendants may be uniquely susceptible to certain conditions because of the "cabin environment itself (e.g., cabin pressure and relative humidity), contaminants in the cabin air (e.g., ozone, pesticides, constituents of engine lubricating oils, and hydraulic fluids), and physiologic stressors (e.g., fatigue, cramped space, and disrupted circadian rhythms)." *Id.* at 11-12. The report cites several studies of "reported eye and respiratory symptoms among flight attendants" and notes that studies of "flight attendants and airline cabin crew found significantly higher rates of self-reported eye (10%-12%), nose (14%-16%), throat (7.5%), fatigue (18%), and hand skin symptoms (11%) when compared to other working women or to office workers." *Id.* at 11.

Ultimately, however, the NIOSH report found that the "results of the uniform samples testing did not reveal a pattern of chemical or metal contamination that would indicate a cause for

the widespread reported symptoms." NIOSH Letter at 4, ECF No. 98-2. NIOSH concluded that it is "possible" that chemicals in textiles could have caused skin symptoms among American employees, but with respect to claims of proximity reactions the report states:

> We cannot make a determination whether working in proximity to others wearing the new uniform would cause employees to experience symptoms because of the current limitations involved in assessing work-related exposures (including limitations in the methods of testing the garments), and the inability to determine the precise significance of some of the reported symptoms. Based on our review of the analytical data and available literature regarding health and exposure to textiles, we think that proximity exposure is unlikely to result in symptoms.

*Id.* at 4-5. In particular, the report states: "We know that the chemicals identified in the uniforms have low volatility in the temperatures found on an aircraft and in normal indoor environments, and the levels of chemicals found in the garments would be unlikely to 'off-gas' and lead to air concentrations that would cause symptoms." *Id.* at 4.

## DISCUSSION

The plaintiffs bring individual claims and claims on behalf of two putative classes, a "Uniform Class" of all American Airlines current and former employees who were exposed to Twin Hill uniforms after September 1, 2016, and a "Proximity Reactor Class" of all American Airlines current and former employees who were exposed to Twin Hill's uniforms, reported a problem with exposure to the uniforms to American, and who reacted to the Twin Hill uniforms after reporting. The individual plaintiffs and putative Uniform Class bring several claims against only Twin Hill but, as Twin Hill has not moved to dismiss the SAC, those claims are not at issue here.[8] The remainder of the claims asserted on behalf of the Uniform Class are fraud claims against American. The other class claims against American are brought by plaintiffs who are allegedly

---

[8] The claims against Twin Hill only are for strict liability (Count III) and negligence (Count IV).

"proximity reactors" who notified American of their problems (and the proposed Proximity Reactor Class). As to American, the SAC sets forth counts under theories of battery, intentional infliction of emotional distress, and fraud; the SAC also seeks equitable relief including medical monitoring as to all of the individual plaintiffs and the members of both putative classes.

## I. Legal Standards

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In ruling on a motion to dismiss under Rule 12(b)(6), a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but the court need not accept legal conclusions or conclusory allegations. *Id.* at 680-82.

As with the First Amended Complaint, the SAC sets forth several "counts" that American's motion to dismiss addresses one by one. The Court previously addressed the distinction between "counts" and "claims" in granting American's first motion to dismiss, ECF No. 96. No matter how many counts a plaintiff may plead, they constitute a single claim to the extent that they are premised on the same facts. Rule 12(b)(6) does not allow for "piecemeal dismissals of **parts** of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original). A Rule 12(b)(6) motion should therefore be granted only when the facts in the complaint, taken as true, do not state a plausible claim under any recognized legal theory. *Volling v. Antioch Rescue*

*Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013); *see also Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). The Federal Rules of Civil Procedure allow for dismissal of a complaint for failure to state a claim, but they provide no basis "for striking individual legal theories." *Zidek v. Analgesic Healthcare, Inc.*, No. 13-CV-7742, 2014 WL 2566527, at *2 (N.D. Ill. June 6, 2014). Thus, if there is any identifiable legal theory that supports a given claim, that claim survives, and the Court has no need—or authority—to "dismiss" alternative legal theories presented in support of that claim at this stage of the litigation.

As discussed in this Court's prior ruling on American's motion to dismiss the First Amended Complaint, because this claim relies on diversity jurisdiction, the Court must apply Illinois' choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Atl. Cas. Ins. Co. v. Garcia*, 878 F.3d 566, 569 (7th Cir. 2017). Illinois applies the most significant relationship test to address conflicting laws. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (applying Illinois law). Under that test, the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 161-67, 879 N.E.2d 893, 902-04 (Ill. 2007). The SAC identifies the plaintiffs' domiciles, but not specifically where they received their uniforms or where they suffered injury. In their briefing, both the plaintiffs and defendants apply the law of each plaintiff's alleged domicile. Given the lack of dispute over choice of law at this stage, *see Auto-Owners*, 580 F.3d at 547 ("Courts do not worry about conflicts of laws unless the parties disagree on which state's law applies"), the Court will apply the substantive law of the plaintiffs' domiciles to their respective claims. These include the following 24 states: Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Massachusetts, Missouri, Nevada, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island,

South Carolina, Tennessee, Texas, Utah, Virginia, and Washington (the "Applicable States").[9]

## II.   Workers' Compensation Exclusivity Laws

In this Court's ruling on American's motion to dismiss the First Amended Complaint, the main obstacle to the plaintiffs' claims was state workers' compensation regimes that provide the exclusive remedy for workplace injuries.[10] While many state regimes contain an exception to the exclusivity rule for intentional harm caused by the employer, that exception requires at a minimum that the employer was substantially certain that harm would result.[11] 48 Am. Jur. Proof of Facts 2d

---

[9] Specifically, the Court applies Arizona law to plaintiffs Brasier and Mangone; California law to Baugh, Evans, Olson, and Snow; Colorado law to Epstein, Gordon, Heirlmeier, and Kresko; Connecticut law to the Catans; Florida law to Akers, Averill, Lherisson, Li, Robert Johnson, Nyakas, Oliver, Roberts, Sibai, Szczepaniak, and Thomas; Georgia law to Branch; Illinois law to Behnke, Boxtel, Julie Burke, Drake, Gradei, Hamdan, Haley Johnson, Onody, Stuart, Weigel, and Zurbriggen; Indiana law to Chester; Iowa law to Terry; Massachusetts law to Austin, Jones, Kelly, and Whitney; Missouri law to Kure; Nevada law to Bell; New York law to Arcate and Ouladbrik; North Carolina law to Cherie Anderson, Bean, Kimberly Johnson, Joy, McCord, Preston, Shanneen, Thierry, and Young; Ohio law to Maginn, Patterson, Seiber, Sutherland, and Wooten; Oklahoma law to Rosengren; Pennsylvania law to Edward Burke, Christensen, Ivers, Morales, and Runkle; Rhode Island law to Endicott; South Carolina law to Graham; Tennessee law to Demetria Anderson, Jennifer Johnson, and Sizemore; Texas law to Corey, Crumrine, Dugué, McAlpin, and Vera; Utah law to Isaac; Virginia law to Coulter and Dunard; and Washington law to Cassidy and Howard.

[10] Ariz. Rev. Stat. Ann. § 23-1022; Cal. Lab. Code §§ 3600, 3602; Colo. Rev. Stat. Ann. § 8-41-102; Conn. Gen. Stat. Ann. § 31-284 (West 2018); Fla. Stat. § 440.11(1); Ga. Code Ann. § 34-9-11; 820 Ill. Comp. Stat. Ann. 305/5 (West 2018); Ind. Code. Ann. § 22-3-2-6 (West 2018); Iowa Code § 85.20 (West 2018); Mass. Gen. Laws Ann. ch. 152, § 24; Mo. Rev. Stat. § 287.120.2; Nev. Rev. Stat. Ann. § 616A.020 (West 2018); N.C. Gen. Stat. Ann. § 97-10.1 (West 2018); N.Y. Workers' Comp. Law § 11; Ohio Rev. Code Ann. § 4123.74; Okla. Stat. Ann. tit. 85A, § 5; 77 Pa. Cons. Stat. § 481(a); 28 R.I. Gen. Laws Ann. § 28-29-20; S.C. Code Ann. § 42-1-540; Tenn. Code Ann. § 50-6-108; Tex. Lab. Code Ann. § 408.001 (West 2018); Utah Code Ann. § 34A-2-105; Va. Code Ann. § 65.2-307; Wash. Rev. Code Ann. § 51.04.010.

[11] Four of the Applicable States have no exception to workers' compensation exclusivity, even for intentional torts (Georgia, Massachusetts, Pennsylvania, and Rhode Island). Seven Applicable States require specific intent to injure from the employer to overcome workers' compensation exclusivity (Arizona, Colorado, Illinois, Nevada, Ohio, South Carolina, and Tennessee). Two Applicable States require virtual certainty that harm will result (Florida and Utah), and six require only substantial certainty that harm will result (Connecticut, Iowa, New York, North Carolina, Oklahoma and Texas). The Missouri Labor and Industrial Relations Commission has exclusive jurisdiction over all Missouri tort-based claims against employers for

1 (2019). This Court held that in the First Amended Complaint, though they plausibly alleged that the uniforms were unreasonably dangerous, the plaintiffs had not shown that American intended or knew with substantial certainty that any specific plaintiffs, much less the named plaintiffs, would be injured by the Twin Hill uniforms. Alleging that all employees sustained a certain percentage risk of injury, or that a certain percentage of the overall workforce would be negatively impacted, is insufficient for a specific individual to state a claim for an intentional tort; the plaintiffs must show that defendants knew with substantial certainty that harm would result to "*a particular victim*, or to someone within *a small class of potential victims* within a localized area." Restatement (Third) Torts: Phys. & Emot. Harm § 1 cmt. e (emphasis added). Accordingly, this Court held that the plaintiffs had not stated a claim for an intentional tort by the employer sufficient to overcome workers' compensation exclusivity.

In the case of the proposed Uniform Class, the plaintiffs' current claims face the same obstacle. Because the plaintiffs have not alleged that American knew with requisite certainty that any particular member or members of the Uniform Class would be injured, their claim of injuries stemming from exposure to the Twin Hill uniforms cannot overcome the intentional tort exception to workers' compensation exclusivity.

In the First Amended Complaint, the plaintiffs raised and the Court rejected the initial proximity theory for the same reason: "That plaintiffs are among the portion of American's

---

workplace injuries, including for intentional torts. Washington and Indiana require that the employer have actual knowledge that an injury was certain to occur to the plaintiff. In Virginia, workers' compensation exclusivity applies to "accidental" workplace injuries, even if the employer intended to harm the employee. For California, the only exceptions to workers' compensation exclusivity are for willful physical assault by the employer, injuries aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with employment, or those caused by a defective product manufactured by the employer that is thereafter provided for the employee's use by a third person.

workforce who react to Twin Hill uniforms through close proximity does not mean that American knew they would be among that population." Mem. Op. & Order at 32, ECF No. 96. In the SAC, the plaintiffs offer a new claim based on knowledge of continuing harm to proximity reactors. Specifically, the plaintiffs assert claims on behalf of a putative Proximity Reactor Class who experience adverse health consequences from being near colleagues wearing the Twin Hill uniforms or coming into contact with work surfaces like jump seats that Twin Hill-wearing colleagues have occupied. The class is further defined as those who had a proximity reaction, reported the reaction to American, and then continued to experience reactions. The SAC asserts that American knows most or all of these proximity reactors by name based on their reported complaints. SAC ¶ 19, 450.

### A. States Without Substantial Certainty Exceptions

Most of the claims of the plaintiffs claiming "proximity reactor" status are barred regardless of whether the SAC adequately alleges that American knowingly or intentionally harmed them. As noted above in note 11, four of the Applicable States (Georgia, Massachusetts, Pennsylvania,[12] and Rhode Island) have no exception to workers' compensation exclusivity, even for intentional torts. Further, the Missouri Labor and Industrial Relations Commission has exclusive jurisdiction over all Missouri tort-based claims against employers for workplace injuries,

---

[12] The plaintiffs assert, and defendants dispute, that Pennsylvania law includes an intentional tort exception to workers' compensation exclusivity. Pls.' Resp. MTD at 14-15, ECF No. 133; Defs.' Reply MTD at 5-6, ECF No. 141. Here, the defendants largely have the better of the argument: "There is no such provision in The Pennsylvania Workmen's Compensation Act." *Poyser v. Newman & Co., Inc.*, 514 Pa. 32, 38, 522 A.2d 548, 551 (Pa. 1987). The Pennsylvania Supreme Court has, however, recognized a "very narrow exception to the exclusivity provision of the WCA where the employee demonstrates (1) fraudulent misrepresentation, which (2) leads to the aggravation of an employee's pre-existing condition," further discussed below. *Kostryckyj v. Pentron Lab. Techs., LLC*, 2012 PA Super 152, 52 A.3d 333, 338 (Pa. Super. Ct. 2012) (quoting *Martin v. Lancaster Battery Co., Inc.*, 530 Pa. 11, 606 A.2d 444, 448 (Pa. 1992)).

including intentional torts. Accordingly, the claims by plaintiffs who are citizens of Georgia, Massachusetts, Rhode Island, and Missouri cannot go forward. The fraud claims of plaintiffs who are citizens of Pennsylvania are further discussed below, but their non-fraud claims also fail. The claims of plaintiffs Austin, Branch, Endicott, Jones, Kelly, Kure, and Whitney, and the non-fraud claims of plaintiffs Edward Burke, Christensen, Ivers, Morales, and Runkle, are therefore dismissed.[13]

The claims of proximity reactor plaintiffs from Washington, Florida, Utah, Indiana, Virginia, and California meet the same fate for substantially the same reason. Each of these states has a unique workers' compensation regime that bars litigation of workplace injuries even if intended by the employer. In Washington, the employer must have had actual knowledge that an injury was certain to occur to the plaintiff to avoid workers' compensation exclusivity. *See Walston v. Boeing Co.*, 181 Wash. 2d 391, 396-97, 334 P.3d 519, 521-22 (Wash. 2014). There are two Washington plaintiffs: Cassidy and Howard. Plaintiff Cassidy did not report her reactions to American, so American could not have had actual knowledge of her injuries. And neither Cassidy nor Howard has alleged that injury was certain to occur to them every time they were in proximity to a Twin Hill uniform, nor that American had actual knowledge that they were certain to be harmed. Accordingly, the claims of plaintiffs Cassidy and Howard are barred as a matter of Washington law[14] and are therefore dismissed.

---

[13] Plaintiffs Branch, Kelly, Austin, Jones, Endicott, and Kure concede that their claims are barred. Pls.' Resp. MTD at 14-15, ECF No. 133; Pls.' Resp. American Defs.' Suppl. MTD Apps. A-M at 10, ECF No. 149.

[14] The plaintiffs dispute that these claims are barred, arguing that American had actual knowledge that Plaintiff Cassidy was being harmed by her proximity reactions after she reported in Appendix K to the SAC, filed on December 6, 2018. Pls.' Resp. American Defs.' Suppl. MTD Apps. A-M at 4, ECF No. 149. A plaintiff cannot state a plausible claim in a pleading based on conduct that has not yet occurred when that pleading was filed; while damages may continue to accrue during the course of litigating a claim, the viability of the claim is measured from its filing.

Florida and Utah similarly require that the employer "*know* that its conduct is *virtually certain* to cause injury" to overcome immunity. *See, e.g.*, *Gorham v. Zachry Indus., Inc.*, 105 So. 3d 629, 630 (Fla. Dist. Ct. App. 2013). Virtual certainty "is an extremely difficult and a manifestly more difficult standard to meet" than substantial certainty, and requires that a plaintiff "show that a given danger will result in an accident every—or almost every—time." *List Indus., Inc. v. Dalien*, 107 So. 3d 470, 471 (Fla. Dist. Ct. App. 2013). Courts have found that "withholding knowledge of a potentially dangerous condition" is insufficient to meet this standard, *see Gorham*, 105 So. 3d at 634. Here, the plaintiffs have not alleged that the Twin Hill uniforms were so dangerous as to be virtually certain to cause harm every time reactors were in close proximity, nor that American was aware of the virtual certainty of injury.

In Indiana, two statutes provide compensation for work-related injuries: the Workmen's Compensation Act "for personal injury or death by accident arising out of and in the course of employment" and the Occupational Diseases Act "for disablement or death by occupational disease arising out of and in the course of the employment," where an "occupational disease" is caused by exposure to dangerous conditions in the workplace that are not ordinarily encountered outside the employment context. *Buford v. Am. Tel. & Tel. Co.*, 881 F.2d 432, 433 (7th Cir. 1989).

---

*See, e.g.*, *U.S. Oil & Ref. Co. v. State Dep't of Ecology*, 96 Wash. 2d 85, 91, 633 P.2d 1329, 1333 (Wash. 1981) (en banc) ("A cause of action accrues when the party has a 'right to apply to a court for relief.'"). American avers that Plaintiff Cassidy did not report her proximity reactions before filing her pleading and that she provides no basis to infer that American had actual knowledge that she was certain to have a proximity reaction to the uniforms, particularly as the NIOSH report concluded that it was "unlikely" that proximity reactions would occur. American Defs.' Reply Suppl. MTD Apps. A-M at 3-4, ECF No. 153. Because American did not have actual knowledge of Plaintiff Cassidy's proximity reactions prior to filing the complaint—that is, her notice was untimely to overcome workers' compensation exclusivity—her claim may not proceed. *See Walston v. Boeing Co.*, 173 Wash. App. 271, 284, 294 P.3d 759, 766 (Wash. Ct. App. 2013), *aff'd*, 181 Wash. 2d 391, 334 P.3d 519 (Wash. 2014) (employee who did not complain to employer about effects of chemical exposure prior to filing complaint could not show that employer had actual notice sufficient to overcome workers' compensation exclusivity).

While the Workmen's Compensation Act has an intentional tort exception, the Occupational Diseases Act does not. *Id.* And to meet the intentional tort exception to the Workmen's Compensation Act, an employee must allege that the employer—not a supervisor or manager—either deliberately intended to injure the employee or had actual knowledge that an injury was certain to occur. *Baker v. Westinghouse Elec. Corp.*, 637 N.E.2d 1271, 1274-75 (Ind. 1994). Here, Plaintiff Chester has not alleged that injury was certain to occur when she was in proximity to a Twin Hill uniform, nor that American had actual knowledge that she was certain to be harmed, and therefore her claim fails.[15]

In Virginia, workers' compensation exclusivity applies to all "accidental" workplace injuries arising out of and in the course of a plaintiff's employment, even if the employer intended to harm the employee. *See Combs v. Virginia Elec. & Power Co.*, 259 Va. 503, 508, 525 S.E.2d 278, 281 (Va. 2000); *Haddon v. Metropolitan Life Ins. Co.*, 239 Va. 397, 399, 389 S.E.2d 712, 714 (Va. 1990). An injury is "accidental" if it results from "(1) an identifiable incident; (2) that occurred at some reasonably definite time; (3) where an obvious, sudden mechanical or structural change in the body occurs; and (4) a causal connection between the incident and the bodily change exists." *Murhutta v. Planning Systems Inc.*, 61 Va. Cir. 340, 2003 WL 1960936, at *2 (Va. Cir. Ct. 2003). The Virginia plaintiffs, Coulter and Dunard, state that as a result of wearing or being in proximity to Twin Hill uniforms in the workplace, they experienced bodily reactions. These allegations meet the definition of accidental injuries that arose out of and occurred in the course of

---

[15] The plaintiffs dispute that Plaintiff Chester's claim is barred, arguing that Indiana is a substantial certainty state. Pls.' Resp. MTD at 19 n.10, ECF No. 133. The Supreme Court of Indiana, however, has declined to adopt the substantial certainty test, *see Baker*, 637 N.E.2d at 1275 n.5. The defendants state that Indiana, like Washington, uses the actual knowledge test, but do not further address Plaintiff Chester's claim. American Defs.' Reply MTD Apps. A-M at 4, ECF No. 149.

their employment with American; accordingly, these claims fall within workers' compensation exclusivity under Virginia law and may not proceed.[16]

In California the only exceptions to workers' compensation exclusivity are for willful physical assault by the employer, injuries aggravated by the employer's fraudulent concealment of the existence of the injury, or those caused by a defective product manufactured by the employer that is thereafter provided for the employee's use by a third party. Cal. Lab. Code § 3602. The plaintiffs domiciled in California do not state facts that would meet one of these exceptions. To the extent that the plaintiffs allege that their injuries were aggravated by American's fraudulent concealment, that concealment would have been of the risks posed by the uniform, not the existence of the injuries: the plaintiffs themselves were the ones who claim to have informed American of their injuries. *See, e.g.*, *Johns-Manville Prod. Corp. v. Superior Court*, 27 Cal. 3d 465, 477, 612 P.2d 948, 955 (Cal. 1980); *cf. Millison v. E.I. du Pont de Nemours & Co.*, 101 N.J. 161, 501 A.2d 505 (N.J. 1985) (intentional tort claim permitted where employers and company physicians were the first to discover workers' asbestos-related occupational diseases and kept that

---

[16] The plaintiffs dispute that Plaintiffs Coulter and Dunard may not proceed; the plaintiffs allege that Plaintiff Dunard has sustained a cumulative injury because of continued exposure to the Twin Hill uniforms, and this injury is "gradually incurred" and "not the result of an identifiable incident" within the meaning of *Lichtman v. Knouf*, 248 Va. 138, 139-40, 445 S.E.2d 114, 115 (Va. 1994). Pls.' Resp. American Defs.' Suppl. MTD Apps. A-M at 5-6, ECF No. 149. The defendants argue first that the "Virginia Workers' Compensation Act does not cover injuries caused by cumulative repetitive action or injuries that are 'gradually incurred,'" and second that Plaintiff Dunard, in fact, pleads injuries based on an identifiable incident. American Defs.' Reply Suppl. MTD Apps. A-M at 4, ECF No. 153. The defendants argue that Plaintiff Dunard alleges adverse reactions to the Twin Hill uniform, which is an injury occurring from an identifiable incident that, even if it happens multiple times, is not cumulative or gradually incurred so as to evade workers' compensation exclusivity. Because Plaintiff Dunard alleges injuries based on a single, albeit repeated, event, wearing or being around the Twin Hill uniforms, the Court agrees with the defendants that the Virginia Workers' Compensation Act bars his claim. *Id.* at 4-6.

information from the affected employees). Accordingly, Plaintiff Snow's claim cannot proceed.[17]

And finally, seven of the Applicable States (Arizona, Colorado, Illinois, Nevada, Ohio, South Carolina, and Tennessee) require that the employer have specific intent to injure, not simply knowledge that injury will occur, to overcome workers' compensation exclusivity. There are no allegations in the SAC that American had specific intent to injure their employees, much less the named plaintiffs specifically, or that harm from the Twin Hill uniforms was American's goal rather than an unintended consequence. The plaintiffs domiciled in these states,[18] therefore, may not proceed with their claims.

### B. States with Substantial Certainty Exceptions

The remaining Applicable States (Connecticut, Iowa, New York, North Carolina, Oklahoma, and Texas) use a "substantial certainty" standard for the intentional tort exception to

---

[17] Plaintiffs dispute this finding, arguing that Plaintiff Snow meets two exceptions to the California Workers' Compensation Act: American's conduct exceeds the scope of the typical employer-employee relationship, because by not removing the Twin Hill uniforms from the workplace, American requires proximity reactors to suffer at work; and Plaintiff Snow properly pleads the fraudulent concealment exception. Pls.' Resp. American Defs.' Suppl. MTD Apps. A-M at 7-8, ECF No. 149. The defendants aver that the cases that Plaintiff Snow relies on regarding conduct exceeding the scope of the typical employer-employee relationship involve "far more egregious" conduct than she alleges here, as "receiving a work uniform from your employer or even exposure to low levels of chemicals is a reasonably—if not highly—anticipated condition of work." American Defs.' Reply Suppl. MTD Apps. A-M at 6-7, ECF No. 153. The defendants also argue that Plaintiff Snow does not properly plead the fraudulent concealment exception because the exception does not apply if the employer learned of the plaintiff's injury from the plaintiff herself, or if the employer concealed only generalized risks rather than knowledge of a specific work-related injury. *Id.* at 8. The Court agrees that issuing a uniform is not beyond the scope of the typical employer-employee relationship and that because Plaintiff Snow allegedly first informed American of her proximity reactions, she cannot plead that American fraudulently concealed the existence of her condition from her; accordingly, Plaintiff Snow's claims cannot proceed.

[18] Brasier and Mangone (Arizona), Epstein, Gordon, Heirlmeier, and Kresko (Colorado), Behnke, Boxtel, Julie Burke, Drake, Gradei, Hamdan, Haley Johnson, Onody, Stuart, Weigel, and Zurbriggen (Illinois), Bell (Nevada), Maginn, Patterson, Seiber, Sutherland, and Wooten (Ohio), Graham (South Carolina), and Demetria Anderson, Jennifer Johnson, and Sizemore (Tennessee).

workers' compensation exclusivity. To meet this standard, the plaintiffs must show that American was substantially certain that its conduct would injure a specific plaintiff, either individually or as a member of a small class of potential victims. "[M]ere knowledge and appreciation of a risk," without more, does not amount to substantial certainty. *See Lucenti v. Laviero*, 327 Conn. 764, 775, 176 A.3d 1, 9 (Conn. 2018). In addition to the degree of risk and identity of the victim, substantial certainty involves the employer's subjective belief or intent: "To satisfy the substantial certainty standard, a plaintiff must . . . demonstrate that his employer *believed* that its conduct was substantially certain to cause the employee harm." *Sullivan v. Lake Compounce Theme Park*, 277 Conn. 113, 118, 889 A.2d 810, 814 (Conn. 2006).

Based on this definition, certain of the plaintiffs' claims must fail. Seven plaintiffs (Bean, Corey, Dugué, Kimberly Johnson, McCord, Terry, and Young) domiciled in substantial certainty states allege that they never reported proximity reactions to American. By not previously reporting, these individuals assert the same sort of statistical risk claim that was rejected in the First Amended Complaint. Without knowledge of the initial reaction, American could not know with requisite certainty that these individuals would react to the uniforms in the future.

That leaves plaintiffs Cherie Anderson (North Carolina), Joseph Arcate (New York), Dena Catan (Connecticut), Joseph Catan (Connecticut), Doug Crumrine (Texas), Lisa Joy (North Carolina), Mary McAlpin (Texas), Nadia Ouladbrik (New York), LaJuan Preston (North Carolina), Bret Rosengren (Oklahoma), Kaneesha Shanneen (North Carolina), Suzanne Thierry (North Carolina), and Veronica Vera (Texas). Each of these plaintiffs has alleged that they previously reported their proximity reactions to American, narrowing the set of potential victims from all American employees to a sufficiently identifiable group, and thereby avoiding the problematic "proportional risk" approach taken in the First Amended Complaint. Standing alone,

however, that does not suffice to establish substantial certainty. The issue is not whether it is substantially certain that these proximity reactors were injured, or that it was substantially certain that there would be proximity reactors. The issue is whether the plaintiffs have plausibly alleged that American knew with substantial certainty that *these individuals* would continue to suffer harm if they were required to work in proximity to the Twin Hill uniforms.

### C.  Assessment of Substantial Certainty of Harm

The defendant argues, and plaintiffs dispute, that this case is like several "sick building" cases in which plaintiffs alleged that their working environment was making them ill but could not support a finding that the employer was substantially certain that they would be injured. *See Anderson v. Piedmont Aviation, Inc.*, 68 F. Supp. 2d 682 (M.D.N.C. 1999); *Allen v. IBM Corp.*, 308 F. Supp. 2d 638 (M.D.N.C. 2004); *Stebbins v. Doncasters, Inc.*, 47 Conn. Supp. 638, 820 A.2d 1137 (Conn. Super. Ct. 2002), *aff'd* 263 Conn. 231 (2003). American contends that these cases demonstrate that employees' self-reported injuries are insufficient to make an employer substantially certain that injury will occur. Mem. Supp. MTD at 14, ECF No. 108.

None of the holdings of these cases, however, hinges on the *per se* inadequacy of self-reports. Instead, *Anderson* seems to hold plaintiffs to a higher standard than is applicable here, holding that the plaintiffs "must allege facts establishing that injury to Plaintiffs was a 'virtual certainty'"[19] and that plaintiffs' allegations "fall well short of indicating that Defendant engaged in conduct substantially certain to injure all or nearly all of its employees." 68 F. Supp. 2d at 688. Here, as noted, the plaintiffs must plausibly allege only that American knew with substantial

---

[19] The court in *Anderson* applied Florida law to plaintiffs' fraudulent concealment and IIED claims. While Florida abided by the substantial certainty standard at the time *Anderson* was decided, in 2003 the legislature adopted the virtual certainty standard. *See, e.g.*, *R.L. Haines Const., LLC v. Santamaria*, 161 So. 3d 528, 530 (Fla. Dist. Ct. App. 2014).

certainty that harm to a sufficiently limited group of identifiable individuals would result. In *Stebbins*, only a few employees at one location reported symptoms, though the same materials were used at another plant, and the "outbreak subsided without definitive findings as to its cause or remission," 47 Conn. Supp. at 642-43, 820 A.2d at 1141, in contrast to the reports of symptoms across American's above-the-wing workforce and the plaintiffs' persistent proximity reactions, which have occurred over a period of years and based on the allegations in the SAC have not yet subsided. Finally, in *Allen* the court held that the "alleged hazards due to toxic mold were not 'obvious'" to the defendant, and that plaintiffs' allegation that an IBM worker in a hazmat suit was sent to remove mold-covered materials was insufficient to show that the employer knew during the relevant time period that the mold was hazardous. 308 F. Supp. 2d at 645. As further discussed below, American's management was aware of the remaining plaintiffs' proximity reactions and their purported relationship to the Twin Hill uniforms; while the precise cause of plaintiffs' reactions may not have been clear, the volume, timing, and persistence of symptom reports plausibly support causation and distinguish this case from the "sick building" cases that American cites.

For their part, the plaintiffs attempt to distinguish the sick building cases on the grounds that (1) "[n]one of the sick building cases cited by American involved the employer knowingly forcing its employees to work in these sick buildings *after* it was clear that the buildings were harmful, as is the case here," leading to continued injury, Pls.' Resp. MTD at 20, ECF No. 133; (2) unlike in some of the sick building cases, where chemicals were found below the legal limits, in this case some of the chemicals found in the uniforms have no safety standards, and "it is known that the chemicals in the Twin Hill uniforms can cause injury at subthreshold levels as well as in combination with one another," *id.* at 21; and (3) the scale of the injuries reported in this case is

30

far greater than in the cited sick building cases. Plaintiffs' first two points are unpersuasive. In both *Anderson* and *Allen*, plaintiffs continued to work in what they termed "sick buildings" after they reported their symptoms and concerns to their employers. *See* 68 F. Supp. 2d at 684-85; 308 F. Supp. 2d at 640. In *Allen*, plaintiffs allegedly experienced a variety of symptoms due to mold after a flood in their office building. Outside testing confirmed the presence of toxic mold. One plaintiff's doctor ordered that she be removed from the building for six weeks to determine whether the building was causing her symptoms. An IBM employee denied the request, stating "that she did not see any medical reason for Allen to be transferred out of the building." 308 F. Supp. 2d at 640. The plaintiff continued to work in the building and her symptoms allegedly continued to worsen until she was unable to work. *Id.* at 640-41. The sick building cases are therefore not distinguishable on the grounds that only American "knowingly forc[ed] its employees to work in these sick buildings *after* it was clear that the buildings were harmful." Pls.' Resp. MTD at 20, ECF No. 133.

Plaintiffs also argue that in the sick building cases the levels of certain chemicals were below the legal safety limits, whereas there were no applicable safety limits for certain chemicals detected in, or on, the Twin Hill uniforms. Contrary to plaintiffs' inference that the lack of safety thresholds for these chemicals means that any exposure is hazardous, in *Allen* the court found that a lack of applicable safety limits undercut the contention that the defendants were substantially certain that harm would result. 308 F. Supp. 2d at 646. Moreover, here NIOSH found that "the levels of chemicals found in the garments would be unlikely to 'off-gas' and lead to air concentrations that would cause symptoms" and that "proximity exposure is unlikely to result in symptoms." NIOSH Letter at 4-5, ECF No. 98-2. Like *Allen*, in which the presence of toxic mold was confirmed by outside testing but its potentially hazardous effects were not obvious to the

employer, here Intertek and NIOSH testing revealed a number of chemicals present in the uniforms, but did not reveal concentrations that were likely to cause irritation, nor did they indicate that the unidentifiable substances in the uniforms were cause for concern. While the APFA testing allegedly revealed cadmium levels above the Oeko-Tex limit, and the NIOSH report noted that subthreshold concentrations of irritants can have additive effects and lead to a reaction, these findings demonstrate only that a reaction is possible, not plausible, and are insufficient to render American substantially certain that injury would result from the presence of these chemicals. "[S]imply having knowledge of some possibility, or even probability, of injury or death is not the same as substantial certainty," particularly where, as here, the scientific evidence indicates a limited likelihood of injury. *See Whitaker v. Town of Scotland Neck*, 357 N.C. 552, 557, 597 S.E.2d 665, 668 (N.C. 2003). In this regard, plaintiffs' critiques of American's uniform testing, both internally and with Intertek and NIOSH, do not significantly support their claim. Even if the results of these tests were discarded altogether, it would not make the case for substantial certainty any stronger. By contrast, American's reliance on the Intertek and NIOSH reports, which indicated that proximity reactions were unlikely to occur, seems to give American a good argument that it was ***not*** substantially certain that proximity to the Twin Hill uniforms caused plaintiffs' symptoms, when it had been told that such responses were unlikely. Moreover, notwithstanding plaintiffs' claims that exposure to chemicals in the uniform would increase employees' sensitization to even small amounts of the substance, the fact that many of these irritants and sensitizers appear in common household items presents a significant causation issue. On the other hand, NIOSH acknowledged the limitations in assessing work-related chemical exposure, stating that it could not determine whether working in proximity to the Twin Hill uniform would cause symptoms, Intertek tested only for skin irritation rather than the risk of respiratory symptoms or other

proximity reactions, and American could potentially have been on notice about issues with the uniform based on the APA's concerns about the symptoms alleged by Twin Hill-wearing Alaska Airlines employees, among others.

On plaintiffs' third point, however, the sick building cases are distinguishable. The volume of uniform complaints, their contemporaneous onset each time the uniform was distributed, and their continuing nature may set plaintiffs' claim apart from these "sick building" cases. Unlike in *Allen* and *Stebbins*, in which few employees reported injuries related to their workplaces, according to the SAC an estimated 14,000 employees had elected to wear an alternative to the Twin Hill uniform by 2017, and at least 3,500 were proximity reactors. SAC ¶ 14. In *Allen*, an IBM employee performing a safety inspection for mold after office buildings flooded informed one of the plaintiffs that "if only three employees in the building were sick, there was not a mold problem." 308 F. Supp. 2d at 640. Similarly, in *Stebbins*, the court found that the employer was not substantially certain that harm would occur to its employees where "the outbreak of pneumonitis was confined to its Farmington plant even though the same type of machinery and fluids were used during the same period at another facility" and the "majority of employees at the Farmington plant exhibited no signs of the illness." 47 Conn. Supp. at 642, 820 A.2d at 1141. By contrast, American employees allegedly reported complaints about the uniform from the first wear test, which continued when the uniforms were first distributed and escalated with the official rollout in September 2016. The SAC alleges that within a month of the rollout, American had received 250 adverse reaction reports, and the APFA over 600. SAC ¶¶ 199, 202. More than half of American's 15,000 pilots have allegedly "certified, by name and in writing to American, that they are having health problems with the Twin Hill uniforms." *Id.* ¶ 15.

Moreover, employees from multiple states have complained about the Twin Hill uniforms,

in contrast to the localized complaints at issue in *Stebbins*. When NIOSH examined American's OSHA logs from 2015, 2016, and early 2017, it found that while there were "no skin disorder entries documented on the 2015 OSHA logs," the 2016 logs contained 87 skin disorder entries, of which 83 were reported to be related to the uniforms, all of which were reported after the new uniforms had begun to be distributed.[20] NIOSH Report at 5, ECF No. 98-2. Respiratory concerns similarly increased, from 14 in 2015 (none of which were reportedly related to the uniform) to 68 in 2016 and 39 in the first few months of 2017. *Id.* All but one American hub reported at least one skin disorder entry that was allegedly related to the new uniforms in 2016, and the remaining hub had only one OSHA entry for the year. *Id.* In *Stebbins*, the court found that the employer was not substantially certain that harm would occur to employees in one plant where the same materials that allegedly caused plaintiffs' symptoms were used at another facility without incident, and the majority of employees at plaintiffs' facility exhibited no signs of the illness. Here, the symptoms plaintiffs describe are widespread, both geographically and with respect to the population of employees. In a single sick building, it is possible that some confounding factor may be causing symptoms; here, the extent of the uniform complaints is persuasive (though it does not show that American knew with substantial certainty that these specific plaintiffs would be injured), as is the apparent association between the introduction of the uniforms and the onset of the complaints. At each interval that the uniform was introduced, including during wear tests, initial distribution, the main roll-out, and distribution to new employees since that time, certain employees have complained about symptoms allegedly related to the uniforms. Across American's above-the-wing workforce, the uniform was consistently associated with employees developing and reporting

---

[20] All of the 2016 skin disorder entries were made after the new uniforms were distributed, and all but two were made after the official September 9, 2016 rollout date.

symptoms.

Even if American relied on the NIOSH report and did not know *a priori* that proximity reactions would occur and to whom, the question is whether, once plaintiffs had reported their reactions, it was substantially certain that these plaintiffs would continue to be harmed by their proximity to the Twin Hill uniforms. These plaintiffs experienced proximity reactions that they reported to American; all but two[21] reported their reactions multiple times, which would indicate to American that their reactions were ongoing. Against a backdrop of multiple complaints that began with the introduction of the new uniforms, when few such symptoms were reported the year prior (none of which were attributed to the old uniforms), it is plausible to infer that the Twin Hill uniforms were the cause of these new symptoms. As plaintiffs continued to report their ongoing reactions and remained in proximity to Twin Hill-wearing colleagues, especially the plaintiffs whom American allegedly precluded from arranging with their colleagues to wear alternative uniforms, American could be substantially certain that the plaintiffs would be harmed by their continued proximity to the Twin Hill uniforms. American's objection that it could not know what circumstances would trigger proximity reactions is not well-founded: the proximity reaction claims that they received came from working around others wearing the Twin Hill uniforms. While American might not have been sure of what chemical or combination of chemicals in the uniforms would trigger proximity reactions, the Court cannot say that these allegations are insufficient as a matter of law to plausibly allege that American knew with substantial certainty that working in the close confines of an aircraft would generate enough exposure to trigger a reaction for those plaintiffs who had previously experienced and reported proximity reactions.

---

[21] Plaintiffs Ouladbrik and Dena Catan each indicate that they reported their reactions to American once; plaintiffs Rosengren and Shanneen state that they reported on "numerous occasions," and the other plaintiffs provide estimated dates of their repeated reports.

In addition to a sufficiently identifiable potential victim, or group of potential victims, "satisfaction of the substantial certainty exception requires a showing of the employer's subjective intent to engage in activity it knows bears a substantial certainty of injury to its employees." *Lucenti*, 327 Conn. at 779, 176 A.3d at 11. This subjective inquiry concerns whether "the defendant held the belief that its course of action [or] inaction would lead, inevitably, to the respiratory illness contracted by the plaintiffs," or to their other symptoms. *Stebbins*, 47 Conn. Supp. at 644, 830 A.2d at 1142. As an example, on February 16, 2017, an American employee wrote to several members of American's upper-level management team, including President Robert Isom, describing her proximity reactions and stating "we cannot work around others in the greys [Twin Hill uniforms]. Giving those with reactions another option will not fix this problem. The issue here is toxins in the material, not the type of material." Internally, American VP Jill Surdek "commented that there is going to be 'continued noise' like this . . . and then suggested that American offer leaves of absence for such employees." SAC ¶¶ 308-10. This exchange plausibly suggests that management at American was aware that employees were experiencing proximity reactions, that they were told that alternative uniform offerings would not solve the problem, and that American management anticipated further complaints from proximity reactors.

Plaintiffs' argument that American has not done enough to mitigate the risk of reactions to the uniform, however, is not a substantial certainty argument; failure to take reasonable measures to prevent harm is a claim of negligent rather than intentional conduct. The failure to heed warnings or to take affirmative remedial action, "even if wrongful, does not demonstrate an affirmative intent to create a situation that causes personal injury." *Melanson v. West Hartford*, 61 Conn. App. 683, 689, 767 A.2d 764, 768 (Conn. App. Ct. 2001). At the same time, American's claim that its remediation efforts—agreeing to perform garment testing, setting up the call center for uniform

36

complaints, and permitting employees to opt for an alternative uniform—mitigated the risk of reactions and made future injury less certain is not persuasive, as the allegations plausibly establish that American lacked a basis to believe that these steps would lower the risk specific to the individuals who had reported proximity reactions. NIOSH indicated that limitations in garment testing constrained its ability to assess whether proximity reactions could occur. John Romantic, an American employee identified in the SAC as an "upper level manager," wrote in an email to other managers that: "There is no simple solution at this time. *While there is no scientific evidence that this could occur*, we have heard from team members that it is a concern." SAC ¶ 319. According to the SAC, American received 1,400 unique complaints about the Twin Hill uniforms in December 2016 alone, and by January 24, 2017 had received 3,828 complaints. *Id.* ¶¶ 284, 300. Rather than decreasing American's certainty that employees would be injured, providing a designated avenue for them to report their reactions bolsters the likelihood that American knew with substantial certainty that plaintiffs were experiencing proximity reactions and, based on the number of new complaints that arose into 2017, would continue to react if they worked with Twin Hill-wearing colleagues. All but two of the remaining plaintiffs reported their reactions to American repeatedly over a period of several months or years: Plaintiff Vera reported her reactions eight times from March 2017 to July 2018, *id.* ¶ 390, Plaintiff Cherie Anderson reported her reactions in March 2017 and January 2019, *id.* ¶ 539, and Plaintiff Rosengren's most recent report was in January 2019, *id.* ¶ 536. The plaintiffs allege that American knows these proximity reactors by name due to their reported complaints; the ongoing nature of their complaints also lends credence to their argument that American was substantially certain that their reactions would continue.

Furthermore, while American states that it permitted employees to wear alternative

uniforms, decreasing their certainty that plaintiffs would be injured by their proximity reactions, plaintiffs argue that for some employees this concession was illusory. Instead, certain plaintiffs report that they were punished for reporting reactions or precluded from taking self-help measures like wearing an alternative uniform or, in a precursor to the concept of "social distancing," trying to keep away from Twin Hill-wearing colleagues that would have mitigated their reactions. Applying the substantial certainty standard, the Connecticut Supreme Court distinguished the facts in *Lucenti* from those in *Suarez v. Dickmont Plastics Corp.*, 229 Conn. 99, 639 A.2d 507 (Conn. 1994), because in *Suarez* "there was evidence that the employer placed its employees under significant duress insofar as their foreman, as an alter ego of the employer, specifically threatened them with termination of their employment if they did not clean running machinery in an unsafe manner in order to save time and money," which was sufficient to state an intentional tort claim and overcome workers' compensation exclusivity. *Lucenti*, 327 Conn. at 791-92, 176 A.3d at 18. "In the absence of any evidence of deception, coercion, or duress," the court held, "and without other evidence of intent to injure on the part of the defendants, we decline to impute the requisite subjective intent to the defendants." *Id.* at 792. The plaintiffs in this case have plausibly alleged at least a comparable amount of duress as in *Suarez*, as when Plaintiff Julie Burke was threatened with termination if she could not perform her flight attendant duties in close proximity to others wearing Twin Hill uniforms, SAC ¶ 375, or when Plaintiff Joe Catan was allegedly grounded from flying in retaliation for asking his First Officer to wear an alternative uniform, *id.* ¶ 359, and his First Officer was specifically forbidden from wearing a non-Twin Hill uniform when flying with him, *id.* ¶ 363. Though American states that it permitted employees to wear an alternative uniform, the SAC plausibly alleges that for some proximity reactors this avenue was not a real option, and they were prevented from protecting themselves against proximity reactions even through

ostensibly permissible means. The remaining plaintiffs[22] have plausibly alleged that American knew with substantial certainty that they would be harmed by ongoing exposure to the Twin Hill uniforms and accordingly have stated a claim that fits the intentional tort exception to workers' compensation exclusivity.

### D. Intentional Tort Theories

American has also argued that, substantial certainty or no, the SAC fails to state a viable claim under the tort theories it identifies. Accordingly, the Court will address the specifics of plaintiffs' tort theories to the degree necessary to ensure that, once workers' compensation exclusivity no longer poses an obstacle, the plaintiffs have plausibly stated a claim upon which relief can be granted under some theory. The plaintiffs allege battery, intentional infliction of emotional distress, a claim for medical monitoring, and fraud against American.[23]

---

[22] Based on the Court's analysis, the claims of plaintiffs Cherie Anderson, Joseph Arcate, Dena and Joseph Catan, Doug Crumrine, Lisa Joy, Mary McAlpin, Nadia Ouladbrik, LaJuan Preston, Bret Rosengren, Kaneesha Shanneen, Suzanne Thierry, and Veronica Vera survive.

[23] Six of the Applicable States recognize an independent cause of action for medical monitoring: Colorado, Florida, Illinois, Massachusetts, Pennsylvania, and Utah. *See Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468 (D. Colo. 1991); *Petito v. A.H. Robins Co. Inc.*, 750 So. 2d 103 (Fla. Dist. Ct. App. 1999); *Carey v. Kerr-McGee Chemical Corp.*, 999 F. Supp. 1109 (N.D. Ill. 1998); *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 914 N.E.2d 891 (Mass. 2009); *Redland Soccer Club, Inc. v. Department of the Army*, 548 Pa. 178, 696 A.2d 137 (Pa. 1997); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993). None of these states, however, are substantial certainty states. As noted, Massachusetts provides no exception to workers' compensation exclusivity, Pennsylvania provides only the limited exception for fraud, Florida and Utah require virtual certainty of injury, and Colorado and Illinois require that the employer have specific intent to injure the employee. Accordingly, the only plaintiffs who could state an independent cause of action for medical monitoring are barred by workers' compensation exclusivity. *See Building & Const. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1493 (10th Cir. 1993) (holding medical monitoring claim barred by Colorado Workmen's Compensation Act); *Johnson v. Hames Contracting, Inc.*, 208 Ga. App. 664, 667-68, 431 S.E.3d 455, 458 (Ga. Ct. App. 1993) (claims seeking "redress based on the potential for current or future injury due to occupational disease or otherwise" are barred by workers' compensation exclusivity). The Court makes no representation as to the availability of medical monitoring as a remedy, but medical monitoring by itself cannot support a claim upon which relief may be granted.

### 1. *Battery*

With respect to battery, based on the foregoing, the plaintiffs have plausibly alleged that American intended to cause a harmful or offensive contact. *See* Restatement (Second) Torts § 18 cmt. e ("In order that the actor may be liable [for battery], it is necessary that an act be done for the purpose of bringing about a harmful or offensive contact or an apprehension of such contact to another or to a third person or with knowledge that such a result will, to a substantial certainty, be produced by his act."). With respect to these proximity reactors, the plaintiffs have plausibly alleged that American was substantially certain that these individuals would be harmed by continued exposure to Twin Hill uniforms in the workplace. The plaintiffs have further stated that offensive contact resulted, directly or indirectly, from American's conduct. *See id.* cmt. c ("All that is necessary is that the actor intend to cause the other, directly or indirectly, to come in contact with a foreign substance in a manner which the other will reasonably regard as offensive. Thus, if the actor daubs with filth a towel which he expects another to use in wiping his face with the expectation that the other will smear his face with it and the other does so, the actor is liable as fully as though he had directly thrown the filth in the other's face or had otherwise smeared his face with it."). The actor must intend to cause the contact but need not intend to cause injury.

Here, American intended for its above-the-wing employees to wear the Twin Hill uniforms, the first uniform change in nearly 30 years. Though employees reported reactions beginning with the first wear test in early 2015, American went ahead with the planned uniform rollout in September 2016. As concerns about the uniforms mounted, American began permitting employees to wear the old uniform or purchase an alternative in November 2016. Some plaintiffs have alleged that after that time, their supervisors required that they wear Twin Hill uniform pieces even after being informed of their specific proximity reactions: Plaintiff Behnke was asked to wear a Twin

Hill scarf rather than her alternative piece in July 2017, Plaintiff Sibai was directed to stop wearing alternative uniform pieces after she switched in October 2017, and Plaintiff Kresko was given a Twin Hill tie despite explaining her proximity reactions to the Flight Office in May 2018. In addition, American allegedly prevented several of the plaintiffs from mitigating their own proximity reactions to the Twin Hill uniforms. Plaintiff Joe Catan was forbidden from coordinating non-Twin Hill uniforms with his First Officer; indeed, his First Officer was instructed by the Flight Director to wear only the Twin Hill uniform, even though American permitted any individual who chose to wear an alternative uniform to do so; Plaintiff Julie Burke was told that she could not ask her Twin Hill-wearing colleagues to stay an arm's length away, and that she would be terminated if she was unable to perform her duties in close proximity to Twin Hill uniforms. These incidents indicate that American intended the contact with the Twin Hill uniforms.

The reactions caused by proximity to colleagues' Twin Hill uniforms, be it through skin contact, "off-gassing" of vapors, or coming into contact with work surfaces previously used by Twin Hill-wearing colleagues, plausibly constitute harmful or offensive contact. American alleges that this case is akin to prior cases in which cigarette smoking or wearing perfume were found not to constitute battery, even if these activities created or exacerbated employee health issues.[24] *See, e.g.*, *McCracken v. Sloan*, 40 N.C. App. 214, 252 S.E.2d 250 (N.C. Ct. App. 1979); *Pechan v. DynaPro, Inc.*, 251 Ill. App. 3d 1072, 1085, 622 N.E.2d 108, 118 (Ill. App. Ct. 1993). This case,

---

[24] The defendants argue that the plaintiffs' battery claim fails because they cannot show that their coworkers wearing Twin Hill intended offensive contact, analogizing to cases in which coworkers did not intend contact with cigarette smoke or perfume. Given American's substantial certainty that the proximity reactor plaintiffs who had previously reported their reactions would be injured by the presence of Twin Hill uniforms in the workplace, however, and American's insistence on employees wearing Twin Hill despite their representations that employees could choose to wear alternative pieces, the allegations are against American directly rather than based on a theory that American authorized their coworkers' independently tortious conduct.

however, appears to be distinguishable in several ways: the plaintiffs' allegations are more severe in that they have experienced contact with the toxic fabric in the uniforms, and the exposure alleged in this case is both of greater duration and frequency. Occasional exposure to secondhand cigarette smoke, for example, would be significantly less offensive than constant exposure throughout each and every workday, and while perfumes may irritate some, they are generally considered to be safe and non-hazardous, where by contrast testing revealed that some of the substances found on the Twin Hill uniforms were over prescribed safety limits and others were not identifiable even within a taxonomy of over 129 million organic and inorganic substances. Moreover, plaintiffs experienced reactions not only when wearing the Twin Hill uniform but also when working near anyone wearing a Twin Hill uniform or even when in close proximity to work surfaces previously used by a Twin-Hill wearing colleague, including jump seats, company vans, and crew sleeping bunks, in a manner that would be unlikely to result from occasional exposure to cigarette smoke or perfume.[25]

Exposure to chemicals in the workplace, even those found in common household products, has been found sufficient to state a claim for battery.[26] In *McClain v. City of New Orleans*, 137 So. 3d 671, 678 (La. Ct. App. 2014), the plaintiff stated a claim for battery when she alleged that her coworker, at the direction of their supervisor "sprayed Lysol in the public and work areas of the office as well as upon Ms. McClain directly, causing her to experience an adverse reaction consisting of an inability to breathe." Like the proximity reactors' allegations that they reported

---

[25] *See Badillo v. Am. Brands, Inc.*, 117 Nev. 34, 43, 16 P.3d 435, 441 (Nev. 2001) ("Exposure to environmental tobacco smoke raises many complex issues of legal causality and proof, such as the length and intensity of exposure necessary to create a significant increased risk or harm . . . A toxic exposure that is discrete and more ascertainable would be less problematic.").

[26] Cases cited in this discussion are not from courts in the remaining Applicable States, but the Court discerns (and American has identified) no atypical definitions or characteristics of battery in the remaining Applicable States that would likely lead to a different result.

their reactions to American and yet continued to react when exposed to the Twin Hill uniforms at work, "Ms. McClain also alleges that she had advised the City and Ms. Rodriquez on numerous occasions of her inability to breathe whenever exposed to the disinfectant, which she substantiated with medical documentation. According to Ms. McClain, despite the City and Ms. Rodriquez's knowledge of her condition, they continued to expose her to the chemical spray." *Id.* The court found that at the motion to dismiss stage, Ms. McClain pled sufficient facts to state a cause of action for the intentional tort of battery. *Id.* at 678-79.[27] Similarly, in *Franklin Corp. v. Tedford*, 18 So. 3d 215, 222 (Miss. 2009) (en banc), employees of a furniture manufacturer were exposed to a toxic glue used in the manufacturing process that causes respiratory and skin reactions. Plaintiffs alleged that they repeatedly complained to management about the symptoms they were experiencing and their need for ventilation and protective gear, to no avail. When one plaintiff informed her supervisor that using the glue was giving her headaches, "she was simply told to take some Tylenol." *Id.* at 224 n.16. After a three-week trial, the jury found for plaintiffs on their claims of battery and IIED. *Id.* at 229. Both the circuit court, on a motion for judgment notwithstanding the verdict, and the Mississippi Supreme Court found that there was "substantial, credible evidence presented… to support the Plaintiffs' causes of action for battery." *Id.* at 232. In *Gulden v. Crown Zellerbach Corp.*, 890 F.2d 195, 196 (9th Cir. 1989) found that employees stated a claim for battery when they were exposed to polychlorinated biphenyls (albeit at concentrations well over the EPA safety limit and sufficient to trigger serious health concerns).[28] As the plaintiffs have similarly

---

[27] The holding of this case would also seem to undermine defendants' emphasis that many of the chemicals found in the Twin Hill uniforms are also found in common household items, as exposure to a common household chemical like Lysol can constitute a battery.

[28] Nor do the "sick building" cases refute the plaintiffs' claim for battery, as plaintiffs' claims in the sick building cases did not include battery, *see Anderson*, 68 F. Supp. 2d at 685 (fraudulent concealment and IIED); *Allen*, 308 F. Supp. 2d at 643 (stating a claim under the intentional tort exception carved out in *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (N.C.

alleged that they were exposed to chemicals in the Twin Hill uniforms that caused their proximity reactions, at this stage the plaintiffs have plausibly alleged a claim against American for battery with respect to certain individuals within the proposed Proximity Reactor Class.[29]

### 2. Fraud

The SAC also adds a new claim based on fraud.[30] The fraud claim is brought on behalf of all individual plaintiffs and the Uniform Class. The claim is not brought on behalf of the Proximity Reactor Class, presumably because proximity reactors would, as a general proposition, have a difficult time establishing reliance on false statements by American about the safety of the new uniforms since they had already opted not to wear them. That said, several individual plaintiffs who have pled proximity reactions have plausibly pleaded reliance. As to these plaintiffs individually, the fraud claim may proceed.

As an intentional tort, fraud is subject to the same workers' compensation exclusivity analysis detailed above. *See, e.g.*, *Coffey v. Foamex L.P.*, 2 F.3d 157, 161 (6th Cir. 1993). That is, the claims of certain proximity reactor plaintiffs who are citizens of substantial certainty states may proceed, and the claims of plaintiffs in other states are barred—with one exception.[31] While

---

1991)); *Stebbins*, 263 Conn. at 232, 891 A.2d at 288 ("willful misconduct and intentional acts" in exposure to hazardous working conditions), and, as noted, this case is distinguishable from those on substantial certainty grounds.

[29] Having concluded that the SAC plausibly alleges battery as to these plaintiffs, it is unnecessary to consider at this juncture whether the intentional infliction of emotional distress theory is plausible.

[30] Because the fraud theory is based on conduct on which the other tort claims do not depend—specifically, the making of allegedly false and misleading statements—the Court concludes that it constitutes a distinct claim, subject to a 12(b)(6) challenge, rather than merely an alternative theory of liability for the introduction of the allegedly toxic uniforms.

[31] Because the members of the Uniform Class can assert only a statistical likelihood of harm that the Court has previously rejected, their claim of injuries stemming from reliance on American's alleged fraud cannot overcome the intentional tort exception to workers' compensation exclusivity and must be barred. As noted, while California has a fraudulent concealment exception

Pennsylvania's workers' compensation regime does not include an intentional tort exception, *Poyser*, 514 Pa. at 38, 522 A.2d at 551, the Pennsylvania Supreme Court has recognized a "very narrow exception to the exclusivity provision of the WCA where the employee demonstrates (1) fraudulent misrepresentation, which (2) leads to the aggravation of an employee's pre-existing condition." *Kostryckyj*, 52 A.3d at 338. The Pennsylvania Supreme Court explained, "There is a difference between employers who tolerate workplace conditions that will result in a certain number of injuries or illnesses and those who *actively* mislead employees already suffering as the victims of workplace hazards, thereby precluding such employees from limiting their contact with the hazard and from receiving prompt medical attention and care." *Martin*, 530 Pa. at 18, 606 A.2d at 448. To the extent that individual proximity reactor plaintiffs from Pennsylvania—Edward Burke, Katherine Christensen, Barbara Ivers, Gloria Morales, and Kathy Runkle—plead that American's fraudulent misrepresentation regarding uniform safety exacerbated their pre-existing reactions, their claims may proceed.

Claims sounding in fraud are subject to the heightened pleading standard set forth in Fed. R. Civ. P. 9(b); plaintiffs are required to describe the "who, what, when, where, and how of the fraud." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013). The plaintiffs allege that American fraudulently misrepresented the safety of its uniforms, including their compliance with Oeko-Tex standards. Specifically, the plaintiffs allege that a "November 30, 2016

---

to workers' compensation exclusivity, the exception applies only when "the employee's injury is aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with the employment" Cal. Lab. Code § 3602(b)(2). Where, as here, plaintiffs allege that they were the ones to first inform their employer of the existence of their injuries—that is, they do not plead that American discovered and then concealed the existence of their reactions from them—they do not meet the exception. *See, e.g.*, *Jensen v. Amgen Inc.*, 129 Cal. Rptr. 2d 899, 902 (Cal. Ct. App. 2003) ("Summary judgment was properly granted in this case because Amgen did not conceal the existence of Jensen's injury. Jensen herself knew of her symptoms before anyone at Amgen did.").

communication to American employees signed by Fernandez, Adler and Boda portrayed the results of the wear testing and claimed that the uniforms were proven safe." SAC ¶ 255. In addition, after the second round of Intertek testing, which found benzyl benzoate present in garments at 100 ppm rather than the 20 ppm levels found in the first round of testing, "American told its employees: 'testing proves American's new uniforms are safe for employees,'" *id.* ¶ 216, while internally communicating concern that benzyl benzoate was present in "both sweaters and tailored garments, which is considered a sensitizer and could result in an allergic response in certain people," *id.* ¶ 217. Finally, American represented "that our uniforms meet Oeko-Tex 100 requirements," *id.* ¶ 227, though as noted the fabrics had not been and could not be Oeko-Tex certified, several of the factories that manufactured the uniforms either did not have Oeko-Tex certifications or had expired certificates, and the APFA's garment testing allegedly indicated cadmium levels over the applicable Oeko-Tex limit. *See id.* ¶¶ 163, 229, 251.

The plaintiffs further allege that American intended for its employees to rely on these statements regarding the uniforms' safety. Upon discovery of the expired Oeko-Tex certificates, "American's Byrnes wrote to Szparaga of Twin Hill: "This is very serious. We need to squash employee concern immediately, and it would seem these certificates should be readily available ... no?" *Id.* ¶ 163. Regarding reports of adverse reactions to the uniform after the second wear test, American Senior Vice President for Hubs Suzanne Boda wrote to Byrnes saying: "This is too bad, as you say. We need to educate and disprove this theory as it will inevitably keep coming up. Can [Twin Hill] provide us evidence that we can use to provide 'proof' to all that the fabric is not treated chemically?" *Id.* ¶ 142. American's desire to assuage employee concern about the uniforms was partly fiscal; according to an internal authorization document "seeking approval from American upper level management to pay for this now third round of testing," *id.* ¶ 175, "[p]oor

46

employee perception may shorten the lifespan of the [uniform] collection, reducing the effectiveness of the investment thus far." *Id.* ¶ 181.

The plaintiffs allege that certain individual plaintiffs relied on these representations and continued to wear the Twin Hill uniform even after experiencing reactions. Plaintiff Arcate specifically pleads that he relied on American's representations regarding uniform safety:

> From the beginning of the rollout through May of 2017, Plaintiff Arcate believed that he had just developed health issues that were persistent but did not associate them with the Twin Hill uniforms, particularly since American had vouched for the uniforms both in words and in acts (to-wit they had not removed the uniforms from the workplace). In May 2017 he read an article that listed the reactions as including severe respiratory issues. As a result, he placed an order [for another brand of uniform] in July 2017.

*Id.* ¶ 515; *see also* Pls.' Resp. MTD at 4, ECF No. 133 ("Captain Arcate had some slight symptoms after the rollout while wearing the uniforms, but believed American's proclamation that the uniforms were safe and thus discounted his symptoms as being due to something he caught or developed on his own. But when he subsequently experienced serious health problems, and found those health problems subsided when he was not at work, he began to realize that he had been duped and that the uniforms were the cause of his ill-health."). Like Plaintiff Arcate, fourteen other individual plaintiffs allege that they continued to wear the uniforms after the November 2016 announcement that the uniforms were safe, and continued to do so for periods ranging from one to ten months (December 2016 to October 2017).[32] It is plausible to infer that these plaintiffs relied

---

[32] Plaintiffs Joy and Dena Catan never wore the Twin Hill uniforms to work and therefore do not plausibly allege reliance. SAC ¶¶ 368, 388. Plaintiff Ivers does not specifically state when she stopped wearing the uniform, *see id.* ¶¶ 651-52, and therefore does not provide a basis to infer that she relied on American's November 2016 representations and continued to wear the uniform thereafter. As to the other plaintiffs, five stopped wearing the Twin Hill uniform in December 2016 (Joe Catan, Ouladbrik, Preston, Thierry, Christensen), two in January 2017 (Cherie Anderson and Edward Burke), two in February 2017 (Rosengren and Runkle), one in March 2017 (Vera), three in May 2017 (Arcate, Crumrine, and Shanneen), one in July 2017 (Morales), and one in October 2017 (McAlpin).

on American's representations in deciding to continue wearing the uniforms even after experiencing reactions.

American has disputed whether the plaintiffs have sufficiently alleged reliance and whether, in the incidents alleged, the deceit precedes the harm. At this stage, such allegations are not required. *See Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir. 1993) ("Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that the plaintiff claims was fraudulent."); *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1045 (N.D. Ill. 2007) ("Accordingly, Rule 9(b) does not impose on Plaintiffs the added burden of ***pleading law*** or ***pleading the ingredients of a sound legal theory***, such as the elements of Plaintiffs' unfair practices claim.").[33] Certain individual proximity reactor plaintiffs—Cherie Anderson, Arcate, Edward Burke, Joe Catan, Christensen, Crumrine, McAlpin, Morales, Ouladbrik, Preston, Rosengren, Runkle, Shanneen, Thierry, and Vera—have stated their fraud allegations with sufficient particularity to move forward.

\* \* \* \* \*

For the foregoing reasons, American's motion to dismiss is denied with respect to plaintiffs Cherie Anderson, Joseph Arcate, Joseph Catan, Doug Crumrine, Mary McAlpin, Nadia Ouladbrik, LaJuan Preston, Bret Rosengren, Kaneesha Shanneen, Suzanne Thierry, and Veronica Vera, who have stated plausible claims for relief based on allegations that American exposed them to

---

[33] In any event, the plaintiffs do allege reliance and injuries after the representations, both for specific plaintiffs and based on a large number of injuries at a variety of different points in time that supports the inference of reliance. *See, e.g.,* Pls.' Resp. American Defs.' Suppl. MTD Apps. A–M at 11, ECF No. 149 ("Plaintiffs properly plead separate injuries following American's fraudulent representations at numerous points in time which produced separate and distinct injuries").

uniforms with substantial certainty that they would be harmed and that American fraudulently misrepresented the safety of those uniforms. The motion to dismiss is also denied as to the non-fraud claims of plaintiffs Dena Catan and Lisa Joy, and the fraud claims of plaintiffs Edward Burke, Katherine Christensen, Gloria Morales, and Kathy Runkle. American's motion to dismiss is granted with respect to all other individual plaintiffs.[34] Because the plaintiffs have had the opportunity to replead their claims and have done so at great length, the Court concludes that further amendment of the complaint would be futile. To the extent that the SAC fails to plead plausible claims as to individual plaintiffs, the dismissal of those plaintiffs is with prejudice.

Date: April 22, 2020

John J. Tharp, Jr.
United States District Judge

---

[34] This ruling addresses only the sufficiency of the pleading of the plaintiffs' individual claims. It does not extend to the issue of certification of the putative classes. The parties should, however, consider the nature of the analysis employed here in evaluating individual claims when evaluating the viability of the asserted class claims.