**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOR ZURBRIGGEN, et al., on behalf of themselves and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | No. 1:17-cv-5648 |
| TWIN HILL ACQUISITION COMPANY, INC. a California corporation, AMERICAN AIRLINES GROUP INC., a Delaware corporation, AMERICAN AIRLINES, INC., a Delaware corporation, PSA AIRLINES, INC., a Pennsylvania corporation, ENVOY AIR INC., a Delaware corporation, AMERICAN AIRLINES, INC., a Delaware corporation, and MI HUB, LTD. trading as Dimensions, a United Kingdom private limited Company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge John J. Tharp, Jr.<br><br>Magistrate Judge Jeffrey Cole |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs are current and former pilots, flight attendants, and customer service agents for American Airlines ("American"). They allege that new uniforms American ordered from the clothing manufacturer Twin Hill in 2015 contained harmful chemicals that triggered an array of symptoms, including rashes, hives, headaches, and throat swelling. The plaintiffs contend that American engaged in battery and intentional infliction of emotional distress by refusing to cancel its rollout despite persistent reports of reactions and disquieting results from laboratory tests. The plaintiffs bring the same claims against Twin Hill and its affiliate Mi Hub, in addition to strict and negligent products liability.

The defendants have moved for summary judgment in full, arguing that the evidence is insufficient for a reasonable jury to conclude that defects in the Twin Hill uniforms caused the plaintiffs harm. The Court agrees for two principal reasons. First, the plaintiffs' two experts who speak to the uniforms' defectiveness employ methodologies that are insufficiently reliable to be admitted under Federal Rule of Evidence 702, and the raw non-opinion evidence in the record cannot sustain an inference of defectiveness by itself. Second, even if admissible, the opinions of the plaintiffs' experts fail to plausibly establish that the plaintiffs, specifically, were exposed to harmful defects.

## BACKGROUND

In February 2015, American Airlines hired Twin Hill to produce a new line of uniforms for its approximately 65,000 flight attendants, pilots, and customer service representatives (collectively "above-the-wing" or "ATW" employees). Pls.' Resp. to Am. Airlines' Rule 56.1 Statement ¶ 2, ECF No. 606. The line consisted of wool and non-wool varieties of a wide range of garments, from jackets and vests to cardigans and dresses. *Id.* at ¶ 5.

Before launching its new uniform line, American conducted a wear test in early 2015. After several complaints of irritation, the company retained a scientific consultant, Intertek Scientific & Regulatory Consultancy, to test the garments for chemicals that could cause a skin rash. Am. Airlines' App. of Evid. in Supp. of Summ. J. 1343, ECF No. 552.

Intertek concluded that, while most chemicals detected on the Twin Hill uniforms were unlikely to cause reactions, two had sensitization potential (meaning they could theoretically trigger an allergic immune response) and several were potential skin irritants (meaning they could theoretically cause reversible inflammation or irritation). *Id.* at 1352. Intertek qualified its findings, however, by noting that both sensitizers were common ingredients of cosmetic fragrances and

appeared only in test garments that had already been worn. *Id.* It further caveated that any effects from detected irritants would depend on concentration, which Intertek did not measure. *Id.*

Another wear test followed in fall 2015. Some participating employees reported a "chemical smell/mildew," prompting a second round of Intertek testing. *Id.* at 1341. The results mirrored those of the first, with Intertek concluding that most chemicals lacked sensitization or irritation potential, a handful were potential sensitizers, and several irritants existed that would not cause reactions at low concentrations. *Id.* at 1368.

In September 2016, American officially released the new uniforms. Employee complaints soon followed, which American fielded and logged through its Flight Attendant Service Center. ECF No. 606 at ¶ 14. The complaints concerned a wide variety of issues, including incorrect sizing, uncomfortable fit, itchiness, rashes, and other allergic reactions. ECF No. 552 at 1228, 1231.

Two flight-attendant unions—the Association of Professional Flight Attendants ("APFA") and Association of Flight Attendants ("AFA")—solicited and collected complaints about the Twin Hill uniforms. The unions created webpages for that purpose, encouraging members to complete questionnaires describing any symptoms that the members attributed to the new uniforms. ECF No. 606 at ¶ 16; ECF No. 552 at 1315. APFA also encouraged all members "who [were] uncomfortable wearing the new uniforms" to report concerns to American's call center, "regardless of whether they ha[d] experienced a reaction." ECF No. 606 at ¶ 17.

Over the next several months, American employees submitted thousands of complaints of irritation and reactions through the call center and questionnaires.[1] While most attributed

---

[1] American's log data indicate between 2,000 and 2,500 calls related to irritation and reactions after wearing Twin Hill garments. ECF No. 552 at 3161-62. The AFA survey indicates 472 symptom reports. Ex. 22 to Pls.' App. of Evid. in Opp. to Summ. J. 2, ECF No. 579-21. The

symptoms to direct wear, some described severe allergic reactions from merely being in the proximity of the uniforms. Ex. 18 to Pls.' App. of Evid. in Opp. to Summ. J., ECF No. 579-18; Am. Airlines' Resp. to Pls.' Rule 56.1 Statement ¶ 23, ECF No. 665.

By October 2016, American responded to mounting complaints by permitting employees to resume using their old uniforms or purchase similar-looking items off the rack. ECF No. 606 at ¶¶ 19-20. Meanwhile, American ordered more Intertek testing and requested a health-hazard evaluation from the National Institute for Occupational Safety and Health ("NIOSH").

Intertek issued additional findings in November 2016. ECF No. 552 at 1371. This time, the company tested for both the presence and concentration of a large list of potential sensitizers and irritants. It analyzed 123 garments from the Twin Hill uniform line, including new items, returned unworn items, and returned worn items. *Id.* at 1400. In addition, the company tested 30 unworn garments from the old uniform line that Twin Hill had replaced ("legacy uniforms") and four off-the-rack garments selected at random. *Id.*

Intertek found that all four categories of clothing—new Twin Hill uniforms, returned Twin Hill uniforms, legacy uniforms, and retail items—contained potential skin sensitizers. *Id.* at 1399-1400. No single sensitizer appeared in every Twin Hill garment. Indeed, even garments of the same type exhibited significant variation. *Id.* at 1400-01.

In addition to the sensitizers common to all clothing categories, Intertek detected eight that were unique to those manufactured by Twin Hill. *Id.* at 1398. The company concluded that "it is unlikely that these chemicals would cause sensitization at the concentrations reported." *Id.* at 1403.

---

precise number of reports collected by the APFA is difficult to determine, in part because the plaintiffs neglected to produce the underlying data before the discovery deadline, *see* Minute Order Dated June 4, 2024, ECF No. 509, and in part because the summary spreadsheets do not distinguish between injuries and other issues like sizing and fit, *see generally*, *e.g.*, Ex. 19 to Pls.' App. of Evid. in Opp. to Summ. J., ECF No. 579-19.

That said, Intertek noted that "if individuals wearing these articles of clothing were already allergic to these chemicals, it is possible, but unlikely at these low concentrations, that these chemicals could produce a rash." *Id.*

Echoing Intertek, NIOSH found that it was "possible that textile chemicals in the uniforms . . . caused skin symptoms among some [American] employees" but that "evidence from the extensive garment testing d[id] not identify a single chemical, an individual uniform component, or combinations that were responsible for the constellation of symptoms." *Id.* at 1146. NIOSH further concluded that "the analytical data and available literature" indicated that mere "proximity exposure [was] unlikely to result in symptoms. *Id.* at 1147.

While testing was ongoing, symptom reports continued to accumulate. Facing mounting pressure from its ATW employees, American decided to change course. In 2017, it terminated its contract with Twin Hill and hired Lands' End, Inc. and M&H to manufacture a new uniform line instead. ECF No. 606 at ¶ 40. In the meantime, American permitted employees to wear Twin Hill garments, legacy uniforms, or off-the-rack substitutes according to their preference.

Believing American's accommodations to be belated and inadequate, a group of employees filed this class-action lawsuit in federal court. The plaintiffs alleged that Twin Hill and American had committed a variety of torts by manufacturing and imposing uniforms with harmful chemicals, respectively. First Am. Compl. ¶¶ 91-135, ECF No. 14.

American and Twin Hill filed motions to dismiss. Twin Hill's Mot. to Dismiss, ECF No. 30; Am. Airlines' Mot. to Dismiss, ECF No. 35. The Court denied Twin Hill's motion, finding that the complaint alleged a plausible claim under a product-liability theory. Mem. Op. & Order 34-43, ECF No. 96. But it granted American's motion on the basis of state statutory preemption. The Court found that workers' compensation statutes in the relevant states foreclosed any

common-law tort claim against American for unintentional misconduct—the only form of wrongdoing plausibly alleged in the complaint. *Id.* at 13-15. While recognizing that some jurisdictions defined intentional torts to include actions taken with "substantial certainty" that harm would result, the Court nonetheless found that American's decision to permit employees to stop wearing the Twin Hill uniforms in 2016 undercut any plausible inference of intent.

The plaintiffs filed a second amended complaint, this time emphasizing that mere proximity to Twin Hill uniforms had been enough to trigger symptoms. Second Am. Compl., ECF No. 98. American again moved to dismiss. The Court denied its motion in part, holding that those plaintiffs who alleged proximity reactions could plausibly claim intentional misconduct on the basis that American had knowingly permitted their continued exposure by not completely recalling the Twin Hill uniforms after they filed reports. *See generally* Mem. Op. & Order, ECF No. 185.

The plaintiffs then filed the operative complaint, alleging battery and intentional infliction of emotional distress ("IIED") on the part of all defendants and strict and negligent products liability on the part of Twin Hill and its affiliate Mi Hub.[2] *See* Fourth Am. Compl. ¶¶ 514-41, ECF No. 699; Third Am. Compl. ¶¶ 514-41, ECF No. 339.[3] To comply with the Court's orders, the

---

[2] The operative complaint alleges that Mi Hub is a holding company and successor in interest to Dimensions UK, which manufactured the Twin Hill American ATW uniforms. *See* ECF No. 699 at ¶ 2 n.1. No defendant has contested this allegation, nor does any evidence in the record undercut it.

[3] Following the Court's second dismissal order, the plaintiffs filed a third amended complaint dropping their unintentional tort claims against American. *See* ECF No. 339. After the Supreme Court's decision in *Royal Canin USA., Inc. v. Wullschleger*, 604 U.S. 22 (2025), and in response to the Court's order directing the parties to brief subject-matter jurisdiction in light of that decision, the plaintiffs filed a fourth amended complaint clarifying that they sought to retain their class-action allegations. *See* ECF No. 699. In light of the limited amendments it contained, the Court determined that the filing of the fourth amended complaint did not moot the instant summary-judgment and *Daubert* motions. *See* Minute Entry Dated April 2, 2025, ECF No. 698.

plaintiffs' claims against American were founded solely on alleged proximity reactions while those against Twin Hill and Mi Hub encompassed both direct contact and proximity exposure.

Though filed as a class action, the plaintiffs have not sought class certification.[4] Instead, the parties agreed to proceed on a bellwether basis, trying claims from individual plaintiffs in two separate flights. Plaintiffs Douglas Crumrine, Lisa Joy, and Veronica Vera were selected as flight one plaintiffs; Carrie Bean, Deanna Jones, and Constance McCord comprised flight two.

During discovery, the plaintiffs disclosed three expert witnesses: Dr. Peter Hauser, Ph.D., Dr. Arch Carson, M.D., Ph.D., and Dr. Phil Lebovitz, M.D. *See* ECF No. 552 at 3-8. The plaintiffs also listed a Rule 26(a)(2)(C) witness, Ms. Judith Anderson. *Id.* at 9-13. Dr. Carson, an expert physician and toxicologist, was retained to opine on whether exposure to the Twin Hill uniforms plausibly resulted in the plaintiffs' symptoms. *Id.* at 3-4. Dr. Hauser, an expert in textile chemistry, concluded that the chemicals detected by Intertek stemmed from a defective manufacturing process. *Id.* at 5-6. Psychiatrist and psychoanalyst Dr. Lebovitz provided opinions on the

---

[4] After soliciting supplemental briefing on the issue, the Court concludes that it possesses subject-matter jurisdiction over this action under the Class Action Fairness Act notwithstanding the lack of a certified class for three reasons. First, while *Royal Canin* held that post-removal amendment of a complaint to remove all federal claims defeats subject-matter jurisdiction predicated on 28 U.S.C. §§ 1331 and 1367, it never addressed § 1332(d)—the basis for this Court's jurisdiction. *See* 604 U.S. at 30-31. Second, the Seventh Circuit has explicitly held that jurisdiction under the Class Action Fairness Act ("CAFA") survives a plaintiff's decision to forgo class certification. *See In re Burlington N. Santa Fe Ry. Co.*, 606 F.3d 379, 380 (7th Cir. 2010) ("[J]urisdiction under CAFA is secure even though, after removal, the plaintiffs amended their complaint to eliminate the class allegations."). Neither *Royal Canin* nor any subsequent decision has overruled that holding, and it is not this Court's place to find it abrogated by implication. *See Schindler v. Great Plains Fin., LLC*, 2024 WL 4664279, at *2 (W.D. Wis. Nov. 4, 2024) ("Unless a Supreme Court decision directly conflicts with a Seventh Circuit decision, it is for the court of appeals to determine whether to overrule itself."); *Leimkuehler v. Am. United Life Ins. Co.*, No. 10-cv-333, 2011 WL 1565887, at *3 (S.D. Ind. Apr. 25, 2011) ("[T]rial courts should follow the Seventh Circuit authority if it is on point and not in conflict with the exact question presented by later Supreme Court authority."). Finally, even if *Royal Canin*'s broader holding extended to § 1332(d), the operative fourth amended complaint unambiguously invokes CAFA and pleads its jurisdictional prerequisites. *See* ECF No. 699 at ¶¶ 506-13.

psychological injuries sustained by the plaintiffs. *Id.* at 7-8. And Ms. Anderson, an industrial hygienist for the AFA, was expected to testify to her experiences regarding flight attendants' symptoms. *Id.* at 9-13.

American and Twin Hill filed motions for summary judgment, contending that no reasonable jury could conclude that defects in the Twin Hill uniforms caused any of the bellwether plaintiffs' symptoms. The defendants also filed motions to disqualify the plaintiffs' experts under Federal Rule of Evidence 702, arguing that their methodologies were insufficiently reliable to pass muster under *Daubert v. Merril Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The plaintiffs responded with several *Daubert* motions of their own.

For the sake of judicial economy, the Court will resolve all pending motions in this consolidated order.

## DISCUSSION

Summary judgment is warranted when the record, construed in the light most favorable to the non-moving party, contains no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). To establish a genuine issue of material fact, a plaintiff must present enough evidence to allow a reasonable jury to find in their favor on the essential elements of each claim for which they bear the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

The defendants argue that summary judgment is warranted because the plaintiffs cannot convince a reasonable jury that they were exposed to Twin Hill uniforms with harmful defects. That argument contains two premises: First, each of the plaintiffs' claims requires a finding that they were exposed to harmfully defective uniforms. Second, no reasonable jury could reach that finding given the available evidence. In support of the second premise, the defendants contend

that expert testimony is necessary to convince a reasonable jury that the Twin Hill uniforms were defective, that the plaintiffs failed to provide admissible expert testimony on that subject, and that, even if admissible, the plaintiffs' experts cannot establish that their particular uniforms were defective.

The Court agrees with the defendants across the board. To prevail on any one of their claims, the plaintiffs must prove that the specific uniforms they wore contained harmful defects. Doing so requires expert testimony. But the plaintiffs' proffered expert testimony on the subject of defectiveness is insufficiently reliable to be admitted. Moreover, the plaintiffs' experts do not address whether the plaintiffs specifically interacted with defective uniforms, rendering their testimony insufficient to sustain the plaintiffs' burden in any case.

### 1. Each of the plaintiffs' claims hinges on a finding of harmful defects.

The plaintiffs assert four causes of action: battery, IIED, strict products liability, and negligent products liability. To discern what those claims require, the first step, as a court sitting in diversity, is to identify the governing jurisdiction by applying Illinois' choice-of-law rules. *See CSX Transp., Inc. v. Chicago & Nw. Transp. Co.*, 62 F.3d 185, 188 (7th Cir. 1995) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). This involves a threshold assessment as to whether Illinois law differs in a dispositive way from those of other relevant states. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020). If it does, the Court will apply the law of the state with "the more significant relationship with the occurrence and with the parties." *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 901 (Ill. 2007) (quoting *Ingersoll v. Klein*, 262 N.E.2d 593, 595 (Ill. 1970) (emphasis removed)). In tort cases, the state with the most significant relationship is generally the one where the injury occurred. *Id.* (holding that the place of injury generally supplies its law, unless another has a demonstrably stronger connection in light of where

the parties are domiciled, where the tortious conduct occurred, and where the parties' relationship was centered).

Here, the specific law selected to govern the plaintiffs' claims is not outcome determinative. In every state plausibly implicated in this dispute, each of the plaintiffs' four claims share a common requirement: to prevail, the plaintiffs must demonstrate that they were exposed to defective uniforms capable of causing harm.

Under Illinois' choice-of-law rules, the potentially applicable states are:

- Illinois (the forum);

- North Carolina (plaintiffs Joy's and Bean's place of domicile and injury);

- Texas (plaintiffs Crumrine's and Vera's place of domicile and injury);

- Florida (plaintiff McCord's place of domicile and injury); and

- either Massachusetts or New York (plaintiff Jones' place of domicile and injury).[5]

*See* Twin Hill's Reply in Supp. of Summ. J.  9, ECF Nos. 659; Pls.' Resp. to Twin Hill's Rule 56.1 Statement ¶ 8, ECF No. 603; Ex. 160 to Pls.' Suppl. App. of Evid. in Opp. to Summ. J. 37:12–38:15, ECF No. 615-2 (Joy and Bean); ECF No. 603 at ¶¶ 7, 9 (Crumrine and Vera); Ex. 159 to Pls.' Suppl. App. of Evid. in Opp. to Summ. J. 73:23–74:7, ECF No. 615-1 (McCord); Ex. 41 to

---

[5] In its reply brief, Twin Hill asserts that the Court should apply the law of the states where the flight two plaintiffs were domiciled at the time this lawsuit was filed. ECF No. 684, at 2. That is not the law. By default, Illinois defers to the state where the injury occurred, considering the place of domicile only as a secondary factor. *See Townsend*, 227 Ill.2d at 160. Even then, the state where parties were domiciled at the time of filing is irrelevant. What matters for choice of law purposes is where the parties were domiciled at the time of injury. *See Esser v. McIntyre*, 169 Ill. 2d 292, 298, 661 N.E.2d 1138, 1141 (1996) ("[T]he relevant time to examine the domicile of the parties is at the time of the accident.").

Pls.' App. of Evid. in Opp. to Summ. J. 15:21-16:16, ECF No. 580-11 (stating that Jones lived in both New York and Massachusetts during the relevant period: 2015-2020)).

The basic elements of battery are consistent across the applicable states. To commit battery, a defendant must, at a minimum, cause a harmful or offensive contact with the plaintiff. *See Lynn v. Burnette*, 531 S.E.2d 275, 279 (N.C. Ct. App. 2000); *City of Watauga v. Gordon*, 434 S.W.3d 586, 592-93 (Tex. 2014); *Pereira v. Clarke*, No. 10-cv-10238, 2010 WL 4181387, at *2 (D. Mass. Oct. 20, 2010) (citing *Waters v. Blackshear*, 591 N.E.2d 184, 185 (Mass. 1992)); *Baxter v. Roberts*, 54 F.4th 1241, 1272 (11th Cir. 2022); *Merzon v. Cnty. of Suffolk*, 767 F. Supp. 432, 448 (E.D.N.Y. 1991); *Wagner v. Cook Cnty. Sheriff's Off.*, 453 F. Supp. 3d 1101, 1102 (N.D. Ill. 2020).[6] The plaintiffs cannot establish that exposure to the Twin Hill uniforms was harmful unless the uniforms contained defects capable of causing harm. The same is true for "offensive" contact. Each of the relevant jurisdictions imports a reasonable-person standard into their definition of offensiveness. *See, e.g.*, *Mazzariello*, 2017 WL 3948400, at *4 (holding that contact is considered "offensive" when it "offends a reasonable sense of personal dignity"). And a reasonable person would not be offended by exposure to uniforms with no defects or harmless defects.

---

[6] Differences in how the relevant jurisdictions define battery are not relevant to this dispute. For instance, North Carolina requires general intent to cause contact while Texas requires specific intent to cause harmful or offensive contact. *Compare Russ v. Great Am. Ins. Companies*, 464 S.E.2d 723, 725 (N.C. Ct. App. 1995), *Watauga*, 434 S.W.3d at 592, *United States v. Alvarez-Murillo*, 722 F. Supp. 3d 648, 651 (W.D. Tex. 2024), *with Blackshear*, 591 N.E.2d at 185. North Carolina also differs from other jurisdictions in holding that "the intent required for battery may be supplied by grossly or culpably negligent conduct." *Lynn*, 531 S.E.2d at 279. The jurisdictions use different language to define "offensiveness" as well. *See, e.g.*, *Mazzariello v. Atlantic Coast Waterproofing, Inc.*, No. 16-cv-835, 2017 WL 3948400, at *4 (W.D.N.C. Sept. 8, 2017) (holding that contact is considered "offensive" when it "offends a reasonable sense of personal dignity"); *Alvarez-Murillo*, 722 F. Supp. 3d at 651 ("Contact is 'offensive' when it 'would offend the ordinary person'—that is, when such contact 'is unwarranted by the social usages prevalent at that time and place at which it is inflicted.'" (quoting *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 803 n.15 (Tex. 2010))). Under any of these formulations, however, the plaintiffs could not prevail without proving exposure to harmfully defective uniforms.

The plaintiffs' IIED claim requires the same showing. In all relevant jurisdictions, IIED consists of (1) "extreme and outrageous" conduct by the defendant (2) that the defendant intended to cause emotional distress and that (3) did in fact cause severe emotional distress. *Waddle v. Sparks*, 414 S.E.2d 22, 27 (N.C. 1992); *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999); *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014); *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014); *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001); *Cohen v. Smith*, 648 N.E.2d 329, 334 (Ill. App. Ct. 1995). There is nothing "extreme and outrageous" about being required to wear a non-defective or harmless uniform while at work. *See Everett v. Redmon*, No. 16-cv-323, 2017 WL 2313468, at *8 (E.D.N.C. May 26, 2017) ("To be considered extreme and outrageous, the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (quotation marks omitted)); *GTE Sw.*, 998 S.W.2d at 611 (same); *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (same).

The defect requirement is even more explicit for strict products liability. *See Romo v. Ford Motor Co.*, 798 F. Supp. 2d 798, 806 (S.D. Tex. 2011) ("The concept of defect is considered central to any products liability action." (quotations omitted)). In states that recognize such claims,[7] the

---

[7] North Carolina has barred strict-products-liability actions by statute. *See* N.C. General Statute 99B-1.1 ("There shall be no strict liability in tort in product liability actions."). As Twin Hill emphasizes, this provides an independent basis to grant summary judgment as to plaintiffs Joy and Bean's strict-products-liability claim. Massachusetts also does not recognize independent tort claims for strict products liability. *See Guzman v. MRM/Elgin*, 567 N.E.2d 929, 932 (Mass. 1991). But Massachusetts does permit actions for breach of implied warranty under the Uniform Commercial Code, "a remedy intended to be fully as comprehensive as the strict liability theory of recovery." *Mason v. Gen. Motors Corp.*, 490 N.E.2d 437, 441 (Mass. 1986). To the extent that Massachusetts governs Jones' claims, the Court finds that the plaintiff has adequately alleged breach of implied warranty under Massachusetts law. *See Cruickshank v. Clean Seas Co.*, 346 B.R. 571, 578 (D. Mass. 2006) (reading a complaint "liberally" to hold that a "strict products liability claim could be considered an alternative means of pleading breach of warranty"); *see also O'Grady v. Vill. of Libertyville*, 304 F.3d 719, 723 (7th Cir. 2002) ("A plaintiff is not required to set forth a

plaintiff must establish that a product left its manufacturer's control in a condition that rendered it "unreasonably dangerous." *See Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997); *Dye v. Covidien LP*, 470 F. Supp. 3d 1329, 1334 (S.D. Fla. 2020); *Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d 398, 411 (N.D.N.Y. 2012); *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 335 (Ill. 2008). Absent a defect, plaintiffs cannot establish that any uniform was unreasonable dangerous.

So too with negligent products liability. Such claims arise when a manufacturer's failure to "exercise[] ordinary care in the design or manufacture of the product" results in injury. *Romo v. Ford Motor Co.*, 798 F. Supp. 2d 798, 807 (S.D. Tex. 2011); *Harbor Point Homeowners' Ass'n, Inc. ex rel. Bd. of Directors v. DJF Enterprises, Inc.*, 697 S.E.2d 439, 447 (N.C. Ct. App. 2010); *Provanzano v. MTD Prods. Co.*, 215 F. Supp. 3d 134, 139 (D. Mass. 2016); *Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1226 (M.D. Fla. 2009); *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1369 (S.D. Fla. 2012); *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 85-86 (S.D.N.Y. 2001) (New York); *Show v. Ford Motor Co.*, 697 F. Supp. 2d 975, 986 (N.D. Ill. 2010), *aff'd*, 659 F.3d 584 (7th Cir. 2011). To establish an injury-causing breach of the manufacturer's standard of care, the plaintiff must first identify a defect.

Regardless of which of the potentially applicable state(s) governs this dispute, the plaintiffs cannot prevail on their battery, IIED, strict-, or negligent-products-liability claims without first proving that their uniforms contain defects capable of causing harm. Because that common requirement is dispositive, *see* Sections 2-4, *infra*, there is no need to engage in a full choice-of-

---

legal theory to match the facts, so long as some legal theory can be sustained on the facts pleaded in the complaint."). Because the sole basis for Jones' implied-warranty claim is "a product that is defective and unreasonably dangerous," *see Haglund v. Philip Morris, Inc.*, 847 N.E.2d 315, 322 (Mass. 2006) (cleaned up), the same analysis applies.

law analysis. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." (quotation marks omitted)).

The plaintiffs argue that the choice-of-law issue is dispositive for a different reason. They contend that, because there is no outcome-determinative difference between applicable state laws, the defendants have failed to meet their "obligation of setting forth the basic facts and law which . . . warrant[] summary judgment" and the Court must deny their motions outright. *See* Pls.' Resp. to Am. Airlines' Mot. for Summ. J. 34-35, ECF No. 604 (quoting *Carmichael v. Vill. of Palatine, Illinois*, 605 F.3d 451, 460 (7th Cir. 2010)). The Court disagrees.

It is true that the party seeking to apply foreign law in Illinois bears the burden of demonstrating an outcome-determinative conflict with the forum. *See Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (citing *Bridgeview Health Care Ctr., Ltd.*, 10 N.E.3d 902, 905 (Ill. 2014)).[8] When that burden has not been met, however, the proper course is not to categorically deny summary judgment. Rather, courts in our district have uniformly adopted one of two approaches: either apply both forum and foreign law after finding no meaningful difference between them, or simply apply forum law as dictated by Illinois choice-of-law rules. *See*, *e.g.*, *Sosa*, 8 F.4th at 637-38 (noting that "the district court properly applied Illinois law" after the movant failed to establish a conflict); *Glob. Cash Network, Inc. v. Worldpay, US, Inc.*, 148 F. Supp. 3d 716, 722 (N.D. Ill. 2015) (applying both forum and foreign law after finding that "a choice-of-

---

[8] As noted above, *see* note 7, the defendants have met their burden with respect to Joy and Bean's strict-liability claim. The defendants have also met their burden with respect to Crumrine and Vera's IIED claim, since Texas does not recognize IIED as an independent cause of action. *See Hoffmann-La Roche Inc v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). For all other claims, the defendants have not established a dispositive difference in law. *See*, *e.g.*, Am. Airlines' Reply in Supp. of Summ. J. 21, ECF No. 664 (acknowledging that the elements of battery are "substantive[ly]" and "largely identical" across states).

law analysis is unnecessary because the result would be identical under each state's law");
*Radioactive Energy of Ill., LLC v. GZ Gourmet Foods & Beverage, Inc.*, No. 8-cv-311, 2009 WL
458616, at *3 (N.D. Ill. Feb. 24, 2009) (same).[9]

In line with precedent, the Court declines to deny summary judgment on the choice-of-
law issue. Instead, the Court concludes that the issue is not dispositive because in all applicable
jurisdictions, prevailing on any of the plaintiffs' claims requires showing that the Twin Hill
uniforms were harmfully defective—an element that, as explained below, the plaintiffs cannot
establish.

### 2. The plaintiffs cannot prove that any uniform was defective without expert testimony.

The defendants argue that proving a harmful defect in the Twin Hill uniforms requires
expert testimony. The Court agrees. Unaided, a lay jury is not equipped to resolve whether Twin
Hill uniforms contained chemicals capable of triggering the plaintiffs' negative reactions, given
the scientific complexity of that question and the evidence that bears on it.

Expert testimony is required when "a causal connection [] cannot be explained to a
reasonable degree of certainty without scientific, technical or specialized knowledge." *Crawford
v. Davis*, 597 F. Supp. 3d 1243, 1245 (S.D. Ill. 2022).[10] "Cases involving toxic substances often

---

[9] The plaintiffs do not cite a single in-circuit authority for the proposition that a wholesale
denial of summary judgment is warranted when a movant fails to identify a dispositive conflict
with Illinois law. Instead they rely heavily on a single decision from the Western District of
Louisiana: *Herbel v. Allen, Gibbs & Houlik, L.C.*, No. 20-cv-563, 2024 WL 1398949 (W.D. La.
Apr. 1, 2024). The court in *Herbel* denied summary judgment to a movant who flatly ignored the
court's previous choice-of-law ruling and based an entire brief on law that had already been
deemed inapplicable. *See id.* at *3-4. The Court declines to follow *Herbel*, as no analogous
circumstances exist here.

[10] The standard for when a case calls for expert testimony does not depend on the Court's
choice of law. As several courts have noted, "all jurisdictions" require expert testimony when an
issue "is outside the common knowledge and experience of a lay juror." *In re Mirena IUD Prods.
Liab. Litig.*, 202 F. Supp. 3d 304, 316 (S.D.N.Y. 2016), *aff'd*, 713 F. App'x 11 (2d Cir. 2017); *In*

pose difficult problems of proof of factual causation," because of the "special problem in these cases" of "proving the connection between a substance and development of a specific disease." Restatement (Third) of Torts: Phys. & Emot. Harm § 28, cmt. c(1) (2010). "[W]hen a typical layperson does not possess the requisite knowledge to draw a causative line" between symptoms and exposure to an allegedly harmful substance, the plaintiff must support their claim with expert testimony. *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 702 (7th Cir. 2015); *see also Korte v. Exxonmobil Coal USA, Inc.*, 164 F. App'x 553, 557 (7th Cir. 2006) (concluding expert testimony was required to determine whether exposure to coal dust caused a plaintiff's symptoms).

A reasonable jury could not decide whether the Twin Hill uniforms were defective without the aid of experts. In its November 2016 report, Intertek detected eight potential sensitizers and irritants unique to the Twin Hill uniforms. Those results are a quintessential example of "scientific, technical [and] specialized" data demanding expert interpretation. *Crawford*, 597 F. Supp. 3d at 1245. Without specialized expertise regarding the potency, characteristics, transmissibility, and stability of those chemicals (among other factors), jurors would be left in the dark regarding whether any could have harmed a wearer, particularly in the concentrations detected on the uniforms. Assuming yes, jurors could still only guess regarding *which* specific symptoms might plausibly develop at a given dosage, proximity, environment and duration of exposure.

Without expert testimony, a lay jury also cannot assess whether any given chemical is indicative of a manufacturing defect. Jurors would not know which chemicals serve a legitimate purpose in manufacturing or whether residual quantities on finished garments is abnormal. For all

---

*re Paraquat Prods. Liab. Litig.*, 21-md-03004, 2024 WL 1655500, at *3 (S.D. Ill. Apr. 17, 2024) ("Illinois . . . like every other state, also requires expert testimony in cases involving specialized or complex issues beyond a layperson's understanding.").

they know, the detected chemicals could be standard, harmless byproducts that exist in low quantities on all garments of a similar makeup.

An unaided jury would be equally ill-equipped to draw inferences from the complaints filed by ATW employees. At best, those complaints illustrate a correlation between uniform exposure and the onset of symptoms. That alone is not enough for a jury to conclude that the uniforms were, in fact, harmfully defective. To reach that conclusion, a jury must find that the Twin Hill uniforms *caused*, not merely coincided with, ATW employees' symptom reports—a difficult epidemiological question requiring specialized expertise.

"The mere existence of a temporal relationship [between exposure to a substance] and the onset of symptoms does not show a sufficient causal relationship." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904–05 (7th Cir. 2007); *see also Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005) ("*Post hoc ergo propter hoc* is not a good way to establish causation."). Whether a causal relationship can be inferred from a correlation between uniforms and symptoms—and indeed whether such an association exists in the first place—is a highly technical question requiring expert knowledge of statistics, experimental design, and epidemiology. Moreover, without a subject-matter expertise in toxicology, chemistry, or biology, a jury cannot determine whether such a causal relationship is even scientifically plausible. That would prevent the jury from ruling out alternative causes for the symptom reports, rendering them insufficient to sustain a verdict for the plaintiffs. *See Crawford*, 597 F. Supp. 3d at 1245; *see also Gilbert v. Lands' End, Inc.*, No. 19-cv-1066, 2022 WL 2643514, at *4-5 (W.D. Wis. July 8, 2022) (concluding that "a lay jury could not have the knowledge or experience to determine whether any garment in [an airline] uniform line was defective" and thus "[e]xpert testimony is required").

Given the complexity of the causation question, the Court finds that evidence of symptoms, no matter how robust, would be insufficient on its own to establish that the Twin Hill uniforms were defective. Even if that proposition were untrue as a general matter, however, the symptom reports in this particular case provide insufficient information to allow a jury to meaningfully assess the uniforms' defectiveness.

The ATW employees' complaints consist mainly of laypersons' incomplete descriptions of their own symptoms, omitting critical context such as medical history, preexisting symptoms, allergies, and concurrent health problems. *See* ECF 552 at 704, 2588. The complaints also do not reveal the duration or intensity of an employee's exposure to the Twin Hill uniforms, key data points for assessing even a correlative relationship. Worse still, each complaint represents only a snapshot in time—a single moment when an employee experienced a symptom they attributed to a uniform. The documents generally do not indicate when symptoms began, intensified, ameliorated, or ended. Those considerable information gaps preclude a jury from finding that uniform defects caused the plaintiffs' symptoms on the basis of the complaints alone. *See Gilbert*, 2022 WL 2643514, at *8 (assigning less weight to symptoms reported in questionnaire responses because "[t]he questionnaires were not drafted by epidemiologists or other scientists to evaluate association or causation," and thus "were not designed to control for errors or subjective responses").

The ubiquity of the reported symptoms in the general population further reduces their evidentiary value. Many complaints describe exceedingly common ailments with a variety of potential causes, such as hives, itching, throat irritation, and swollen fingers. ECF 552 at 704. Because these symptoms occur so frequently in the general population and result from such a wide spectrum of allergens and medical conditions, their presence within the ATW workforce says little

about the likelihood that they resulted from defective uniforms. *See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 643 (7th Cir. 2010) (when an injury "has multiple etiologies, expert testimony is necessary to establish causation").

Given the specialized expertise required to validly infer causation from evidence of a correlation, the substantial background knowledge needed to make sense of complex chemical test reports, and limitations in both the Intertek and complaint data, a lay jury would be unable to reliably resolve this dispute without the assistance of expert testimony. Linking symptoms with exposure to an unknown chemical substance is an inherently challenging endeavor, made worse in this case by several informational gaps in the available evidence. Left to its own devices, a lay jury would be ill-equipped to make such complex scientific judgments. Expert testimony not only advisable but necessary.

### 3. The plaintiffs' expert testimony purporting to establish that the Twin Hill uniforms were defective is insufficiently reliable to be admitted under Federal Rule of Civil Procedure 702.

Two plaintiff experts concluded that exposure to the Twin Hill uniforms caused the plaintiffs' symptoms—Dr. Arch Carson and Dr. Peter Hauser.[11] While neither identified a specific chemical or chemicals responsible for the symptoms, both opined that such granularity was unnecessary. According to Dr. Carson, causation can be readily inferred from the fact that Intertek detected multiple chemicals with established sensitization or irritation potential, several such chemicals appeared on only Twin Hill–manufactured uniforms, the introduction of those uniforms

---

[11] The plaintiff's third designated expert, Dr. Phil Lebovitz, does not address purported defects in the uniforms. As a psychiatrist and psychoanalyst, his testimony is confined to the psychological injuries experienced by the plaintiffs. A fourth designee, Ms. Judith Anderson, was originally offered as an expert in industrial hygiene but has been withdrawn by the plaintiffs following the defendants' opening *Daubert* briefs. *See* Pls.' Resp. to Defs.' Mots. to Exclude Judith Anderson 2-3, ECF No. 588.

coincided with a deluge of reported symptoms from employees, and the complaints slowed and ceased as the Twin Hill uniforms were replaced. Dr. Hauser agrees, adding that, from a textile-chemistry perspective, the mere presence of several chemicals on the Twin Hill uniforms indicates a process failure, given that they played no useful purpose in manufacturing.

The defendants contend that Dr. Carson's and Dr. Hauser's testimony is insufficiently reliable to be admitted and thus considered at summary judgment. While the defendants do not contest either expert's qualifications, they vigorously challenge the reliability of the methodologies they employed, contending that they lacked a valid basis to infer causation from the available evidence.

Rule 702 of the Federal Rules of Evidence states that a party seeking to introduce expert testimony must first establish by a preponderance of the evidence that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 entrusts district courts with a "gatekeeping" responsibility to ensure that any proffered expert testimony is both relevant and reliable before it can be admitted. 509 U.S. 579, 589, 597 (1993). Testimony premised on unreliable methodology is inadmissible under *Daubert* even if it derives from a well-qualified expert witness. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). Four non-exclusive factors inform the reliability of an expert's methodology: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Dhillon v. Crown*

*Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (emphasizing that no single factor is essential to or dispositive of the admissibility of expert testimony).

### a. Dr. Carson

The Court concludes that Dr. Carson's testimony fails at "step zero" of the *Daubert* reliability analysis: Dr. Carson never developed a theory for how the Twin Hill uniforms caused the plaintiffs' reactions, let alone one that has been tested, peer reviewed, assessed for error rates, or accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94.

To meet *Daubert*'s reliability threshold, "[a] toxicologist should analyze whether the [plaintiff's symptoms] can be related to chemical exposure by a biologically plausible theory." *Wintz by & Through Wintz v. Northrop Corp.*, 110 F.3d 508, 513 (7th Cir. 1997). Dr. Carson fails to articulate the most essential element of such a theory—a chemical or set of chemicals that is biologically capable of triggering the plaintiffs' adverse reactions.[12] Rather than identify a plausible culprit for the observed symptoms, Dr. Carson leaves jurors guessing as to whether any compound identified by Intertek is sufficiently toxic or allergenic to provoke the plaintiffs' ailments. His report lacks any toxicological analysis of those chemicals, categorically declining to evaluate their structure, potency, characteristics, or transmissibility.[13]

---

[12] Dr. Carson's admission on this point leaves little room for ambiguity: "I have not identified a specific chemical or group of chemicals that I believe are responsible for the reported reactions." ECF No. 552 at 1128.

[13] While the plaintiffs' own experts do not emphasize this point in their reports, the plaintiffs argue in their briefing that the presence of "aromatic nitriles" on the Twin Hill uniforms signaled potential harm. *See* ECF No. 604 at 9. That misconstrues Intertek's reports, which state that "the limited information available suggests that 'aromatic nitriles' are unlikely to be irritants or sensitizers at 0.01%"—the concentration at which they were identified. ECF No. 552 at 455.

Dr. Carson suggests that he did not need to evaluate particular chemicals because Intertek already classified them as irritants and sensitizers and because his report provides a general explanation for how substances bearing those classifications might trigger symptoms. That explanation fails to persuade. First, Intertek categorized only "potential" irritants and sensitizers, pointedly stopping short of suggesting that any caused a reaction. ECF No. 552 at 1195, 1199–1200, 1347. Moreover, the Intertek results do not support the conclusion that Twin Hill uniforms were *uniquely* symptom inducing, given that both old legacy uniforms and off-the-rack samples contained many of the same potential irritants and sensitizers. *See* 552 at 1399-400, 1482 (finding several of the same irritants and sensitizers detected on the Twin Hill uniforms in the legacy uniforms that predated them, often at higher concentrations); *see also id.* at 1488-89 (noting that many of the most common potential irritants and sensitizers also appeared on random garment samples obtained from retail stores). Thirdly, Intertek did not purport to evaluate the origins of any given chemical—or, critically, whether any derived from a defect in the manufacturing process. Indeed, Intertek identified several aromatic substances that might be associated with commercial fragrances, suggesting contamination by users. And, as the Court noted in a prior order, "many of these irritants and sensitizers appear in common household items," suggesting that they may have been introduced only after an otherwise non-defective production process. *See* Mem. Op. & Order, ECF No. 185, at 32. Even if the Court ignored those issues, Intertek's findings at best support an inference that chemicals on the Twin Hill uniforms could cause *some* allergic or irritation responses. Yet they offer no insight as to whether those chemicals could plausibly account for the magnitude or variety of symptoms reported by the plaintiffs and other ATW employees. For these

reasons, Dr. Carson's cannot simply delegate identification of an actual biochemical cause to Intertek; Intertek's limited findings simply do not support that conclusion.[14]

Even if Dr. Carson had identified chemicals capable of triggering the plaintiffs' reactions, his testimony would still be incomplete. A "biologically plausible" theory of exposure must permit a toxicologist to "examine if the [p]laintiff was exposed to the [toxic] chemical in a *manner that can lead to absorption* in the body." *Wintz*, 110 F.3d at 513 (emphasis added). That requires something Dr. Carson never provides—a description of the environmental conditions necessary for exposure to trigger an outbreak. But Dr. Carson offers no opinion on the type, duration, or intensity of exposure necessary to yield symptoms. Nor does he explain how background conditions like temperature, humidity, or air pressure might impact exposure—especially salient considerations given the unique features of airplane cabins. Providing no such context, Dr. Carson's testimony would not enable a jury to meaningfully assess the likelihood that uniform exposure caused—or even could have caused—the plaintiff's injuries.

Dr. Carson neglects another critical factor as well: the minimum dosage at which detected sensitizers and irritants become harmful. To opine that exposure to a toxic substance caused a plaintiff's symptoms, an expert toxicologist must "offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient." *Id.*; *see also Korte*, 164 F. App'x at 557 (disqualifying an expert who "did not . . . opine whether the dose to which the plaintiff was exposed is sufficient to cause the disease" (quotation omitted)); *Ahnert v. Emps. Ins. Co. of Wausau*, No. 10-cv-156, 2018 WL 2048379, at *6 (E.D. Wis. May 2, 2018) (excluding an expert who "assumed" exposures "were above background concentrations—whatever those were"). Dr. Carson neglects to do so, offering

---

[14] Tellingly, Dr. Carson appears to implicitly acknowledge as much, going as far as to describe the Intertek results as "unusable" in his rebuttal report. ECF No. 552 at 1126.

no testimony on whether the low concentrations observed by Intertek were enough to cause reactions. This omission is particularly damning, given that Intertek itself concluded that "it is unlikely that these chemicals would cause sensitization at the concentrations reported." ECF No. 552 at 1403.

The plaintiffs assert that Dr. Carson did not need to specify a dose threshold because he concluded that *any* amount of the Intertek-detected chemicals would be unsafe. That explanation is unpersuasive, given that Intertek found many of the same supposedly hazardous chemicals on legacy uniforms Dr. Carson deems safe. Moreover, the Seventh Circuit has held that "this cumulative 'any exposure' theory is not reliable" in most cases. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017). "An expert [] cannot avoid" the question of dose by simply "asserting that there is no safe level of exposure." *Hostetler v. Johnson Controls, Inc.*, 15-cv-226, 2020 WL 5543081, at *4 (N.D. Ind. Sept. 16, 2020); *see also Johnson v. Edward Orton, Jr. Ceramic Found.*, No. 19-cv-6937, 2021 WL 5493231, at *3 (N.D. Ill. Nov. 23, 2021) (barring expert testimony for failing to establish a harmful dosage). Rather, an expert must first prove, as a matter of scientific fact, that a chemical has "no safe level of exposure to known sensitive populations." *See Donaldson v. Cent. Illinois Pub. Serv. Co.*, 767 N.E.2d 314, 334 (Ill. 2002). Dr. Carson provides no counterpoint to Intertek's conclusion that the potential sensitizers and irritants were likely not toxic at the concentrations detected. Instead, he simply insists that no dosage of certain sensitizers is safe without explaining why. *See Rosen*, 78 F.3d at 319 ("[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

Dr. Carson's lack of a plausible biological theory for how a direct or proximity reaction could have occurred is fatal to the admissibility of his expert testimony. *Daubert* demands the exclusion of expert toxicological testimony that is "not able to articulate any scientifically

physiological explanation as to how [a challenged substance] would cause [the symptoms experienced by the plaintiffs]." *Ervin*, 492 F.3d at 904; *see also Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."). Dr. Carson neglected to identify a toxic substance detected on the Twin Hill uniforms, clarify its minimum harmful dosage, or opine on the required conditions of transmission. As such, his methodology is insufficiently reliable to warrant admission. *See Wintz*, 110 F.3d at 513 (finding that *Daubert* barred an expert toxicologist from opining that exposure to bromide caused the plaintiff's symptoms because the expert "did not know how frequently, in what quantity, or in what form [the plaintiff] was exposed to bromide," "did not know the specifics of the work environment," and did not "attempt to correlate any specific dose [plaintiff] received with [plaintiff's] symptoms").

Assuming for the sake of argument that Dr. Carson had provided a plausible theory of exposure, his theory would still fail the satisfy the four *Daubert* factors. Start with the first—"whether the proffered theory can be and has been tested." *Dhillon*, 269 F.3d at 869. Dr. Carson never tested the makeup of the uniform samples made available to him, a surprising fact given that his report hinged on the assumption that they contained harmful and volatile chemicals. Nor is his theory supported by Intertek or NIOSH, as explained above. Indeed, the record contains no testing, either from Dr. Carson or another source, that establishes that chemicals in the Twin Hill uniforms were capable of provoking serious reactions at low concentrations.

Any theory of exposure offered by Dr. Carson would also not be subjected to peer review, assessed in light of error rates, or accepted in the scientific community. Indeed, the toxicologist provided no articles or studies evaluating whether a low concentration of any Intertek-detected

chemical could cause a reaction, much less the specific symptoms reported by the plaintiffs. When, as here, an expert's theory "has not been adopted or independently validated in any peer-reviewed scientific analysis outside of this litigation," . . . courts "view such scientific isolation as an evidentiary red flag." *In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 850 (S.D. Ill. 2024) (citing *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) (per curiam)); *see also id.* ("[C]ourts may only admit the state of science as it is." (quotation marks omitted)); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("Law lags science; it does not lead it.").

Because Dr. Carson failed to provide a plausible biological theory of exposure, and because any such theory would not have been tested, peer reviewed, or scientifically accepted, Dr. Carson's methodological basis for his causation opinion is insufficiently reliable to be admitted under *Daubert* and Rule 702.[15]

The plaintiffs concede that Dr. Carson did not develop a biological theory explaining how a given dosage of any particular chemical could have triggered the plaintiffs' symptoms—through direct contact or otherwise. The plaintiffs maintain, however, that Dr. Carson did not need such a theory because he was able to infer a causal relationship between the symptoms and Twin Hill

---

[15] While Dr. Carson's causation conclusion fails *Daubert*'s reliability analysis on any theory, his proximity-reaction theory stands out as particularly unsupported. The NIOSH Report drove this point home, reporting that "[w]e were not able to find scientific literature that addresses respiratory or dermal symptoms secondary to intermittent, close proximity to textiles worn by others." ECF No. 552 at 1162. To the extent the proximity-reaction theory had been professionally reviewed, NIOSH emphasized that it had been rejected:

[T]he chemicals identified in the uniforms have low volatility in the temperatures found on an aircraft and in normal indoor environments, and the levels of chemicals found in the garments would be unlikely to "off-gas" and lead to air concentrations that would cause symptoms. . . . Based on our review of the analytical data and available literature regarding health and exposure to textiles, we think that proximity exposure is unlikely to result in symptoms."

*Id.* at 1146-47.

uniforms by applying the Bradford Hill epidemiological framework to the complaints submitted by ATW employees.

Bradford Hill is a well-established methodology for determining whether a correlation between two variables reflects a causal relationship. It involves first determining whether a statistically significant association exists between two phenomena and then analyzing that association along nine criteria: strength of association, (*i.e.*, the statistical significance of an association between two variables), consistency (*i.e.*, the degree to which the association has been demonstrated across multiple epidemiological studies), specificity (*i.e.*, the number of plausible alternative causes), temporality (*i.e.*, whether the appearance of a hypothesized cause predated its effects and the extent to which the two overlapped), biological gradient, (*i.e.*, the strength of any dose-response relationship), plausibility (*i.e.*, the degree to which biological or social models offer support for a causal relationship), coherence (*i.e.*, the extent to which existing scientific knowledge is consistent with a causal relationship), experiment *(i.e.*, the degree to which experimentation supports a causal relationship), and analogy (*i.e.*, the degree of support for a causal relationship between sets of similar phenomena). *See* Kristen M. Fedak, Autumn Bernal, Zachary A. Capshaw & Sherilyn Gross, *Applying the Bradford Hill Criteria in the 21st Century*, EMERGING THEMES IN EPIDEMIOLOGY 2-7 (2015).

While the Bradford Hill methodology is widely accepted, the Court finds that Dr. Carson's application of it contained multiple methodological flaws.

First, Dr. Carson failed to establish a statistical association between the Twin Hill uniforms and the plaintiffs' symptoms, a critical precondition to applying Bradford Hill. *See Gilbert*, 2022 WL 2643514, at *7 ("We emphasize that these [Bradford Hill] guidelines are employed only after a study finds an association, to determine whether that association reflects a true causal

relationship." (quoting *Reference Manual on Scientific Evidence* 598-99)); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 925-26 (D.S.C. 2016) ("Courts exclude testimony that attempts to start at step two, applying the Bradford Hill criteria without adequate evidence of an association."). Dr. Carson claims that the sheer volume of complaints claiming injuries as a result of the Twin Hill uniforms, coupled with the fact that the complaints roughly mirror the introduction and substitution of the uniforms, is enough to prove an association between the two. But that is simply not the case.

"An association exists between exposure to a substance and a disease when the two 'occur together more frequently than one would expect by chance.'" *Gilbert*, 2022 WL 2643514, at *7 (quoting Michael D. Green, D. Michael Freedman & Leon Gordis, "Reference Guide on Epidemiology," *Reference Manual on Scientific Evidence* 566 (Federal Judicial Center 3d ed. 2011)). The ATW complaints cannot establish an association on their own, since they provide no frame of reference with which to compare the rate of symptoms among the Twin Hill uniform–wearing population to the rate that "one would expect by chance." *Id.* Dr. Carson did not even purport to determine how many employees who submitted complaints also exhibited symptoms before the Twin Hill launch. Nor did Dr. Carson evaluate the rate at which similar symptoms were reported by unexposed airline employees. Doing so would have required Dr. Carson to "compare the health of people exposed to a substance (the treatment group) to that of persons not exposed (the control group) to determine whether the exposure to the substance is associated with an increased rate of disease or symptoms." *Id.* (citing Green et al. at 218–19). Dr. Carson presented no such data because the complaints contained none. Nor did Dr. Carson cite any epidemiological or toxicological study linking the uniforms, or any of the chemicals they contained, to any type of adverse reaction. *See Ervin*, 492 F.3d at 904 (affirming the exclusion of expert testimony where

the expert "could not point to any epidemiological data supporting his opinion"). Any conclusions drawn from Dr. Carson's application of Bradford Hill must therefore be disregarded. *See Gilbert*, at *7 (disqualifying an expert who applied Bradford Hill yet "identified no control group, [] conducted no analysis of the treatment group," "did not conduct any epidemiological studies to determine whether there was an association between any of the [] uniform items and any of plaintiffs' health symptoms," and did not "cite to any peer-reviewed epidemiological or toxicological studies that found an association between the chemicals he cites and the alleged health symptoms").[16]

Dr. Carson's attempt to identify an association also suffers from a related but deeper flaw: the complaints he drew upon are not a reliable indicator of the rate of symptomology among even the exposed treatment group. Complaint volume alone reveals only that: the rate at which ATW employees filed complaints. That may or may not correspond to the rate at which those employees

_____

[16] The plaintiffs correctly note that an epidemiological study is not strictly required, citing in-circuit precedent to that effect. *See, e.g., Smith v. I-Flow Corp.*, No. 09 C 3908, 2011 WL 12556366, at *3 (N.D. Ill. May 3, 2011) ("There is no rule that requires an expert to base his causation opinion on an epidemiological study."); *In re Testosterone*, 2017 WL 1833173, at *11 ("[T]his Court and others have concluded previously that epidemiology showing a statistically significant association is not an absolute requirement for a reliable causation opinion, especially in a case where it would be difficult to perform an adequately powered epidemiological study to yield statistically significant evidence of association."). True enough, courts are loathe to impose an across-the-board requirement for causation experts to conduct or rely upon a controlled epidemiological study. That said, courts have consistently required at least *some* form of reliable evidence of an association before applying Bradford Hill. *See In re Lipitor*, 174 F. Supp. 3d at 924–25 ("While a causation opinion need not be based on epidemiological studies … it is well established that the Bradford Hill method used by epidemiologists does." (citing cases)); *Mathews v. Novartis Pharm. Corp.*, No. 12-cv-314, 2013 WL 5780415, at *27 (S.D. Ohio Oct. 25, 2013) ("Unless there is a statistically significant association between the drug and the disease, the Bradford–Hill analysis to determine causation is inapplicable."). In the cases cited by the plaintiff, the evidence of an association came in other forms. *See Smith*, 2011 WL 12556366, at *3 ("[A] significant number of peer-reviewed studies that, taken as a whole, suggest an association."); *In re Testosterone*, 2017 WL 1833173, at *11 (a "detail[ed]" dissection of "epidemiological evidence"). Here, no valid evidence, epidemiological or otherwise, establishes an association between the Twin Hill uniforms and the plaintiffs' symptoms.

developed symptoms. Many factors might increase the rate at which reports are filed even while the rate of symptomology remains constant. Indeed, the record suggests several such factors. For one, the APFA allowed employees to submit as many complaints as they wished, with one admitting to having filed between 10 and 100. ECF No. 552 at 4951 (Joy Depo. at 52:4-18). The spike in complaints also coincided with an energetic public-relations campaign by the union, which created a website for submitting uniform-related complaints, broadcast it widely, and encouraged members to report issues with the new uniforms "regardless of whether they ha[d] experienced a reaction." ECF No. 606, at ¶¶ 16, 17. This push provides a plausible alternative explanation for the spike in reports. Even if the uniforms were non-defective and the rate of symptomology unremarkable, a new, easily accessible, and widely disseminated reporting portal, coupled with explicit encouragement from the union to use it, might have quite plausibly boosted complaint rates.

Union messaging might have also compromised the complaint data itself. When circulating online questionnaires, APFA told its members that the Twin Hill uniforms were suspected of causing widespread health issues. Hearing that, employees would be more likely to consider and blame their uniforms for any symptoms they might experience.

Three specific lines of evidence suggest that the union's influence might have had a substantial effect on reporting. First, complaint rates rose consistently in the months following the uniform rollout. If exposure had been the only major factor behind that rise, it would have likely tapered as uniform toxicity dissipated with each consecutive wash. *See* ECF 552 at 704. Second, flight attendants were dramatically overrepresented in the data, suggesting a selection bias generated by the flight-attendant unions' campaign. *Id.* at 666 (indicating that flight attendants accounted for roughly 85% of the complaints reviewed by NIOSH); *see also id.* at 1149 (reporting

that flight attendants represented only 44% of the employees who received Twin Hill uniforms). Finally, testimonial evidence confirms the union's impact. Asked why she attributed symptoms to her uniform, one plaintiff explained that that it was because she had heard "through the grapevine" that "others [were] having the same symptoms," illustrating the biasing power of suggestion. *Id.* at 4607-08.

Dr. Carson does not address, much less persuasively account for, the flaws in the complaint data that prevent it from serving as a reliable proxy for symptom rates among the exposed population. Nor does he acknowledge that the data says nothing about the symptom rates in the unexposed population. Combined, those omissions prevent him from establishing an association, a fatal methodological flaw. *See In re Paraquat*, 730 F. Supp. 3d at 810 ("Before epidemiologists can draw conclusions about causation, they must assess whether there is an *association* between an exposure to the agent and the disease in question.").

Even if the Court assumed a valid association, Dr. Carson's application of the Bradford Hill factors would still fail. Consider the first: strength of association. Dr. Carson claimed that the association between uniform exposure and symptoms was strong due to the thousands of complaints filed soon after the rollout. As discussed above, there are strong reasons to believe that the complaint rate might differ from the relevant dependent variable—rate of symptomology. Moreover, Dr. Carson made no attempt to measure changes in the independent variable—rate of exposure over time. Without either variable, it is impossible to assess the strength of any association, to say nothing of its statistical significance.

Dr. Carson fares no better on the second criterion: consistency. Dr. Carson emphasizes that symptom reports came from a broad swath of geographies and employees. But the proper inputs for the consistency criterion are the results of controlled epidemiological studies. *See* Fedak et al.,

*supra*, at 3. As explained, symptom reports do not constitute valid studies as they contain no control group or reliable measurements of key variables. Dividing those reports into smaller subgroupings does not render the results valid.

The specificity factor also undercuts Dr. Carson's conclusions. Dr. Carson describes the self-reported symptoms as "mostly skin rashes and hives or respiratory reactions and fewer reactions involving other systems of organs" that "are, in fact, the same disease." ECF No. 552 at 41. As an initial matter, the Court is not obligated to accept such blanket assertions unsupported by a hint of rationale. *See Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) ("A court should not admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." (quotation marks omitted)). Moreover, Dr. Carson's cursory statement provides too little information to assess specificity. The specificity criterion refers to the number of diseases that could potentially be triggered by exposure to a given substance and vice versa. *See* LASH TL, VANDERWEELE TJ, HANEUSE S & ROTHMAN KJ, MODERN EPIDEMIOLOGY (4th ed. 2021). But Dr. Carson does not focus on any particular chemical substance or garment, making it impossible for him to determine whether the observed symptoms are the only ones that might result from exposure thereto. In addition, the observed symptoms are exceedingly common in the general population and could have resulted from a wide suite of allergic triggers. That fact, which Dr. Carson only passingly acknowledges, further undercuts any finding of specificity.

Dr. Carson concedes that he cannot show biological gradient without specifying a toxic chemical or dosage. That admission is both accurate and understated. In fact, Dr. Carson's failure to present a plausible biological theory of exposure also precludes a finding of plausibility, analogy, and coherence. Without identifying a toxic chemical, it is impossible to assess whether the existing scientific understanding of that chemical supports an inference of causality. *See In re*

*Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, No. 14-cv-01748, 2017 WL 1833173, at *11 (N.D. Ill. May 8, 2017) (finding the plausibility criterion satisfied when "experts discuss the plausibility of the biological mechanism in particularly extensive detail, relying on various studies and their own biological knowledge to explain" how a hypothesized cause could trigger observed effects). Nor can any expert assess whether a hypothesized cause follows analogous biological mechanisms when its own biological mechanism has not been developed.[17]

Dr. Carson claims that the "experiment" factor is satisfied because symptom reports followed the uniforms' rollout and subsided after its phase out. Not so. As described above, the complaint data upon which Dr. Carson relied lack any of the essential components of a scientific experiment: a control group, introduction of an independent variable, accurate measurement of a dependent variable, and reasonable attempts to eliminate confounding variables.

As for temporality, "epidemiologists universally agree" that "exposure must precede the onset of disease." Fedak et al., *supra*, at 4. Yet the complaint data do not specify the dates on which employees began experiencing symptoms, precluding Dr. Carson—or any expert for that matter—from determining whether the temporality criterion is met.

The Court finds that Dr. Carson's testimony provides an insufficient basis to conclude that any of the nine Bradford Hill criteria are supportable. His application of the Bradford Hill framework is thus unreliable, rendering his conclusions on causality inadmissible under Rule 702.

---

[17] In an attempt to demonstrate plausibility, Dr. Carson asserts that undefined "substances carried by the Twin Hill uniforms are alleged to stimulate" a hypersensitivity response. That broad and unsupported observation does nothing to help the jury assess whether any given substance in the dosage found on the Twin Hill uniforms could have stimulated an immune response in a manner consistent with prevailing scientific and medical knowledge. *See Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court.").

Even if the Court were wrong about one or more of the Bradford Hill factors, it would not make Dr. Carson's testimony admissible. To the contrary, it would only serve to highlight an even more systemic issue with Dr. Carson's analysis: a failure to explain the weight assigned to each factor.

"[A]n expert who relies on a weight of the evidence review based on [the] Bradford Hill framework must, at a minimum, explain how conclusions are drawn for each Bradford Hill criterion and how the criteria are weighed relative to one another." *In re Paraquat*, 730 F. Supp. 3d at 841 (cleaned up); *see also In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017) ("To ensure that the Bradford Hill/weight of the evidence criteria is truly a methodology, rather than a mere conclusion-oriented selection process, there must be a scientific method of weighting that is used and explained." (cleaned up)). If an expert neglects to specify the weight assigned to each of the Bradford Hill factors up front, his analysis becomes "virtually non-falsifiable" because "[i]f a jury were to disagree with his conclusion on one factor, he would be able to declare by unilateral fiat that his ultimate opinion on general causation remains intact because that factor was not important." *In re Paraquat*, 730 F. Supp. 3d at 841. Dr. Carson's testimony suffers from this precise defect. "By leaving obscure the weight that he attaches to each of the nine Bradford Hill factors and the relationship among them," Dr. Carson "effectively disables a finder of fact from critically evaluating his work." *Id.* (quoting *In re Mirena*, 341 F. Supp. 3d 213, 248 (S.D.N.Y. 2018)). That is not permitted.

Far from bolstering his conclusions, Dr. Carson's methodologically flawed application of Bradford Hill only underscores the unreliability of his testimony. In addition to not basing his analysis upon valid evidence of an association, Dr. Carson fails to explain the weight assigned to any of the Bradford Hill criteria or successfully establish that they have been met. Those three

independent reasons render his methodology for inferring causation insufficiently reliable for admission.

Dr. Carson's testimony also fails to pass muster for another, independent reason: failure to adequately address plausible alternative causes for the plaintiffs' symptoms.

The mere fact that an expert's conclusions conflict with evidence in the record does not render those conclusions inadmissible. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013). That said, "whether the expert has adequately accounted for obvious alternative explanations," is a relevant consideration when weighing the admissibility of the expert's testimony. *Id.* And an expert's "failure to rule out obvious potential alternative causes" can be "fatal to [his] testimony." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 774 (7th Cir. 2014); *see Korte*, 164 F. App'x at 557 (disqualifying an expert who "did not rule out possible alternative causes for the [plaintiff's] symptoms").

Dr. Carson did not "adequately account[]" for obvious alternative explanations for the plaintiffs' symptoms. *See Schultz*, 721 F.3d at 434. When asked about the possibility that certain chemicals might have been byproducts of Intertek's testing process, Dr. Carson acknowledged that he had not considered the possibility. ECF No. 552 at 4434. Dr. Carson also did not explain how he controlled for chemicals that might have been introduced by outside wearers, who supplied a small number of the uniforms tested by Intertek.

Dr. Carson also did not sufficiently grapple with the possibility that symptoms might have been entirely unrelated to the uniforms. The plaintiffs' medical records hint at several alternative causes. For instance, Vera's treating physician found that the "the timing and characteristics" of her symptoms were "not consistent" with her exposure to the Twin Hill uniforms, leading that physician to attribute Vera's symptoms to stress-induced chronic urticaria instead. ECF No. 552

at 3651-52; *see also id.* at 2121 ("I find it very unlikely that her work uniform (or proximity to others' work uniforms) is triggering the hives."). An independent medical examiner agreed: "[I]t is my opinion to a reasonable degree of medical certainty that Ms. Vera had chronic urticaria causing her hives, and not an allergy to the American Airlines uniforms. . . . [T]here is no objective evidence for such an allergy and the mechanism being proposed for such an allergy is not based on a scientifically viable pathophysiologic mechanism." *Id.* at 1114. Evidence also suggests that Vera's vehicle contained biting insects that could have triggered or exacerbated her condition. *Id.* at 2149.

Vera is not the only plaintiff for whom uniform exposure is not the only—or even most likely—suspect. Crumrine's treating physician, after performing bloodwork and patch testing, definitively concluded that "the fabric from his uniform was not the source of his allergic reaction." *Id.* at 4324; *see also id.* at 4317 (emphasizing that Crumrine's patch test was "totally negative" while explaining "if anything, I tend to overcall things [s]o if I said it was negative, it was negative"). Dr. James Haden, an allergist and immunologist who also treated plaintiff Crumrine, agreed: "In my 20 years of practice, I have never concluded that exposure to clothing caused [the specific symptoms asserted by Crumrine.]" *Id.* at 1051. The timeline of Crumrine's symptoms appears to support his physicians' assessments. In deposition, Crumrine acknowledged that his symptoms, far from disappearing after American replaced the Twin Hill uniforms, continued into what was then the present day. *Id.* at 3797-99.

Joy's medical records also suggest an alternative cause. The plaintiff, who has a long history of significant food allergies, at one point complained to her psychiatrist that "[s]he cannot find any doctor who is willing to say the uniform is causing the allergic reaction." *Id.* at 1621, 4744-45. Aside from suggesting that Joy might have been motivated to pin her symptoms on the

uniforms, this telling statement underscores the lack of medical evidence linking Joy's symptoms to uniform exposure.

Rather than confront and address the medical evidence above, Dr. Carson largely overlooks it. His expert report flatly ignores Vera's two diagnoses of stress-induced chronic urticaria, stating curtly (and falsely) that "[h]er physicians arrived at th[e] same conclusion" as he did. *Id.* at 47; *but see id.* at 1114, 2121. Dr. Carson also failed to address the possibility, confirmed in Joy's medical records, that Joy experienced food-related allergic reactions, despite claiming to eliminate other outside factors. *See id.* at 45. And, in attempting to rule out other causes of Crumrine's symptoms, Dr. Carson claimed that those symptoms had "disappear[ed]" after the Twin Hill uniforms were removed—even though Crumrine himself acknowledged that his symptoms had continued for years after. *Id.* at 48; *but see id.* at 3797-99.

Dr. Carson's handling of the plaintiffs' patch tests is equally unconvincing. Dr. Carson sought to dismiss results from Crumrine's patch test by explaining that "patch tests are designed to evaluate Type 4 reactions from which Mr. Crumrine did not suffer." *Id.* at 3668. Earlier in the same deposition, however, Dr. Carson conceded that "the process of a patch test could have been effective in eliciting a Type 1 response" despite it being designed for Type 4, completely undercutting his own rationale. *Id.* at 3638. Dr. Carson also attempted to explain away Joy's patch test by speculating that clinicians had "probably" placed the fabric on Joy's back or lower forearm despite her injuries concentrating near her face and eyes. *Id.* at 3639. But that explanation conflicts sharply with Dr. Carson's conclusion that mere proximity to a uniform can trigger symptoms.

The methodological basis for Dr. Carson's testimony is thus insufficiently reliable to be admitted under Rule 702 four times over. On a theoretical level, Dr. Carson offers no biological theory for how Twin Hill uniforms caused the plaintiffs' symptoms, declining to specify a

chemical, dosage, or set of environmental conditions that might render such transmission possible. More practically, any theory Dr. Carson could offer would be insufficiently supported by the evidence, given that the expert neither conducted independent testing nor relied on third-party tests. Dr. Carson's misapplication of the Bradford Hill framework further underscores the methodological unsoundness of his approach. And, in any case, Dr. Carson's decision to ignore alternative explanations for the plaintiffs' symptoms—explanations made plausible by substantial supporting evidence in the record—provides an independent basis to exclude his testimony.

### b. Dr. Hauser

Dr. Hauser's methodology is no more—and in several ways, is less—reliable that Dr. Carson's.

Like Dr. Carson, Dr. Hauser failed to articulate a biological theory for how exposure might have caused the plaintiffs' symptoms. *See Wintz*, 110 F.3d at 513. Dr. Hauser did not purport to identify a chemical capable of triggering the reported symptoms in any environment, in any dosage, at any distance (including direct contact).[18] Nor did Dr. Hauser provide any support—test results, studies, peer-reviewed literature, or otherwise—for the proposition that compounds on the Twin Hill uniforms could have triggered the plaintiffs' symptoms. At one point, Dr. Hauser hints at the opposite, acknowledging that no Intertek-detected compounds belonged to the Oeko-Tex 100 list of harmful chemicals. ECF No. 552 at 101. This lack of a toxicological theory, much less a supported one, is disqualifying.

---

[18] Dr. Hauser's testimony on this point is definitive:

Q: With respect to any of the 23 substances that are listed in . . . your 2023 report, do you know what potential health reactions or issues could be caused from exposure?

A: No. I'm not a dermatologist, and I'm not asked to comment on exposure.

ECF No. 552 at APP 4380.

Dr. Hauser's unjustified degree of reliance on employee complaints provides further grounds for inadmissibility. Like Dr. Carson, Dr. Hauser approached the causation question from the wrong direction, starting with employee complaints and inferring from them alone that the uniforms must have been defective rather than first analyzing whether the uniforms contained defects that could explain the complaints. Dr. Hauser asserted flatly that "the reported injuries/reactions in the plaintiffs and others in the American work force would not have occurred absent a defect in the manufacturing process." *Id.* at 1138. Rather than support that conclusion with toxicological tests or other actual evidence of defectiveness, Dr. Hauser engaged in circular reasoning, insisting that the reported reactions could not have occurred absent a defect because only a defect could explain the occurrence of the reported reactions. *See, e.g.*, *id.* at 103 ("The fact that wear tests of the Twin Hill uniforms led to adverse respiratory and dermatological reactions indicates that the uniforms were defective."); *id.* at 1139 (stating that the mere existence of the complaints indicates that the uniforms "clearly failed to perform as intended and expected"). As the Court has explained, the complaints alone cannot support an inference that the uniforms contained harmful defects. Neither, it stands to reason, can expert testimony based on little more.

Dr. Hauser provided even less reason to infer defects from employee complaints than Dr. Carson. Dr. Hauser made no reference to Bradford Hill or any other method of inferring causation from correlation. Instead, Dr. Hauser simply assumed, without explanation or apparent basis, several of the premises necessary to establish a link between complaints and defects. For instance, Dr. Hauser conceded: "I have been asked by Plaintiffs' counsel to assume that . . . the health issues experienced by the wearers only began when the Twin Hill garments were introduced . . . and that the health issues went away when the Twin Hill uniforms were no longer being worn," making no attempt to justify that critical assumption. *See id.* at 107. Dr. Hauser likewise presupposed that the

plaintiffs did not falsely attribute symptoms to their uniforms, a tenuous assumption considering the lack of a proven toxic chemical, the wide spectrum of potential alternative causes, and the likely impact of union messaging, co-workers' beliefs, and response bias.

As a textile expert, Dr. Hauser did present an additional reason for his defectiveness conclusion that Dr. Carson did not: None of the irritants or sensitizers that Intertek found on the uniforms served a legitimate role in manufacturing. *See id.* at 1138. Because those chemicals have no purpose in textile synthesis, their very presence on the uniforms, Dr. Hauser opined, is indicative of a process failure. *Id.* at 101.

As an initial matter, Dr. Hauser's premise may be incorrect. During his deposition, Dr. Hauser conceded that several chemicals to which he had assigned no legitimate purpose in his report were in fact standard components of textile wet processing. Dr. Hauser acknowledged, for instance, that one such chemical was a raw material used to make polyurethane and spandex fibers. Ex. B to Twin Hill's Compendium of Evid. in Supp. of Summ. J. 26, ECF No. 531-1. Another, Dr. Hauser admitted, could have served as a surfactant during textile manufacturing; a third could have helped with dyes; a fourth could have acted as a solvent; and a fifth could have created water-repellent textile finishes. *Id.* at 39. Given that Dr. Hauser admitted to wrongfully labelling multiple compounds as useless, the Court declines to credit his conclusion that their existence necessarily indicates a process failure.

Errors aside, Dr. Hauser's assumption that the presence of unneeded sensitizers and irritants necessarily "render[ed] the uniforms defective" ignores an important alternative explanation: Those chemicals might have been introduced after production had already ended. *See* ECF 552 at 1138-39. For the most part, Dr. Hauser did not account for that possibility. Though he ruled out cleaning products as a potential source, he neglected to address whether the chemicals

40

could have been introduced during packaging, transportation, storage, or, for those that had already been worn, personal use. Any such corruption post-manufacturing would not be indicative of a defect.

In any case, the assumption that Twin Hill uniforms contained useless chemicals from a manufacturing standpoint at best establishes that the uniforms were defective. That is not enough. To sustain their claims, the plaintiffs must show that those defects could cause harm. In the context of this case, contact with a harmlessly defective uniform is not "harmful" or "offensive" for purposes of battery; nor would it establish "extreme and outrageous" conduct for purposes of IIED, an "unreasonably dangerous" product for strict products liability, or an "injury" for negligent products liability. And Dr. Hauser's testimony provides no basis to conclude that any defects were harmful.

Because Dr. Hauser's testimony suffers from the same fatal flaws as Dr. Carson's—no plausible theory of exposure, failure to identify a toxic chemical, lack of theoretical or empirical support, and unjustified reliance on complaint data and Intertek testing—and because Dr. Hauser's one unique rationale falls short in multiple ways, the Court concludes that his methodology is insufficiently reliable for admission.[19]

---

[19] The same evidentiary shortcomings that preclude the plaintiffs' experts from reliably inferring causation from the employee symptom reports and Intertek results also decisively undercut the plaintiffs' invocation of *res ipsa loquitur*. *See* Pls.' Resp. to Twin Hill's Mot for Summ J. 13-15, ECF No. 601. Inferring negligence through *res ipsa* requires proof that a plaintiff's injury "ordinarily would not happen in the absence[] of negligence." *Harms v. Lab'y Corp. of Am.*, 155 F. Supp. 2d 891, 906 (N.D. Ill. 2001). The record decidedly forecloses any such notion, given that the plaintiffs' symptoms were in no way unique to exposure to a toxic substance, the Intertek results do not indicate that any detected substance was capable of triggering the plaintiffs' symptoms at low concentrations in the first place, several alternative explanations for the plaintiffs' symptoms were not only plausible but endorsed by the plaintiffs' own treating physicians, the actual rate of symptomology among exposed employees is unknown, and, in any case, the presence of a toxic chemical on the Twin Hill uniforms would not necessarily reflect negligence on the part of the manufacturer (as opposed to post-production corruption).

The Court thus finds that Federal Rule of Evidence 702 bars Dr. Hauser's and Dr. Carson's testimony as neither expert satisfies the reliability standard articulated in *Daubert*.[20]

### 4. Even if admissible, the plaintiffs' expert testimony fails to establish that their specific uniforms were defective.

The finding that Dr. Carson's and Dr. Hauser's testimony is inadmissible effectively dooms the plaintiffs' claims, each of which turns on a finding of harmful defects that a lay jury cannot reach on its own—and that no other plaintiff expert provides.[21] That said, summary judgment in favor of the defendants would be warranted even if the Court considered Dr. Carson's and Dr. Hauser's testimony to be reliable for two reasons.

First, the same fundamental shortcoming that rendered Dr. Carson's and Dr. Hauser's testimony unreliable also makes it insufficient for a reasonable jury to conclude that harmful defects existed: Neither expert identified a chemical, dosage, environment, proximity, or duration of exposure that could have plausibly caused the plaintiffs' symptoms. Moreover, neither expert provided empirical support for the inference that chemicals present on the uniforms could have harmed the plaintiffs at any distance. Without that information, a jury would be forced to engage in uninformed speculation as to whether it was even biologically possible for the uniforms to trigger the plaintiffs' symptoms. Such "'speculation or conjecture' will not defeat a summary judgment motion." *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (quoting *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 591 (7th Cir. 1997)).

---

[20] Given this conclusion, the Court sees no need to address the third component of the *Daubert* analysis, which evaluates the relevance of a proffered expert's testimony to the trier of fact.

[21] The Court expresses no opinion on the defendants' *Daubert* challenges to the plaintiffs' other experts, who did not express an opinion regarding uniform defectiveness, or to Ms. Anderson, whom plaintiffs withdrew as an expert following the defendants' opening *Daubert* brief.

Second, even if Dr. Carson's and Dr. Hauser's testimony supported the conclusion that *some* Twin Hill uniforms contained defects capable of triggering adverse reactions, it would not follow that the plaintiffs' specific uniforms were defective. The Twin Hill uniform line consisted of approximately 250 garment types and 50 accessories manufactured at 12 factories in 6 countries from varying combinations of at least 5 natural and synthetic fiber types produced at 14 textile mills in 7 countries. ECF No. 552 at 1125. Even within a single mill, fibers were synthesized in batches, 100 to 1,000 yards at a time. *Id.* at 4468-69. Given the enormous variations in garment type, material, and origin, it is exceedingly unlikely that a single defect pervaded every item manufactured by Twin Hill.

The Intertek results confirm that any defects that might have infiltrated the Twin Hill uniform line were not universal. The company tested a wide variety of garment types, with some but not others testing positive for potential irritants or sensitizers. *See id.* at 1481-88; *see also id.* at 356 ("Chemicals of interest were detected only in a small subset of tested uniform pieces."). Even among pieces of the same clothing type, results varied considerably. Of the sensitizers and irritants detected on garments, only one was found on multiple items of the same type. *Id.* at 1579-89. As NIOSH summarized: "[t]he concentrations and types of chemicals were found to vary widely even in different sections of many of the individual uniforms tested, as well as across the multiple new uniform pieces." *Id.* at 1146.

Substantial differences in the composition and origin of Twin Hill garment pieces, coupled with the evidence suggesting that no single set of sensitizers or irritants applied to all or even most, makes it nearly impossible to discern whether the particular articles worn by the plaintiffs contained harmful defects. Dr. Carson acknowledged this explicitly, noting that the "many different types of garments" and "variability in quality or consistency" made it "impossible to trace

with specificity the chemical composition of any specific garment that was then sent to any particular AA employee." *Id.* at 1125-26; *id.* at 3592-93, 3604-05 (Dr. Carson conceding that he had "no way to determine that any particular garment was not unsafe").[22] Dr. Houser echoed the same concession, noting that "exposure [to chemicals] could have happened on one . . . mill shift and not on another" and that "it's possible that some coats were made without the contaminant . . . depending on which mill they came from." *Id.* at 4398-99, 4466-67, 4475.

In sum, Dr. Carson and Dr. Hauser's failure to identify a scientific mechanism by which chemicals detected on Twin Hill garments could have even theoretically triggered the plaintiffs' symptoms warrants summary judgment even if their testimony were admissible. Moreover, neither Dr. Carson nor Dr. Hauser opined that the plaintiffs specifically wore garments that contained defects. For these reasons, no reasonable jury could conclude that the plaintiffs were harmed by defects in the Twin Hill uniforms, even if they accepted the testimony of the plaintiffs' experts on its face.

\* \* \*

Regardless of the applicable jurisdiction that governs, the plaintiffs cannot prevail on any of their claims without first proving by a preponderance of the evidence that they were exposed to uniforms containing harmful defects. That baseline requirement is dispositive in this case, given that the symptom complaints present incomplete and unreliable information from which no reasonable lay jury could deduce a causal connection, the Intertek testing sheds little light on the

---

[22] At one point, Dr. Carson issued the same concession even more explicitly:

Q:     So are you opining that any of the sensitizers or irritants identified by Intertek caused the bellwether plaintiffs' alleged health problems?

A:     No.

ECF No. 552 at 3555.

source, characteristics, or toxicity level of any potentially harmful chemicals, Dr. Carson and Dr. Hauser fail to fill that gap with a plausible theory of their own, neither expert addresses likely alternative causes, neither expert correctly applied a reliable methodology for inferring causation from correlation, and, regardless, neither expert purports to establish that the plaintiffs specifically donned defective garments. Summary judgment in favor of the defendants is thus warranted in full. The Court therefore grants the defendants' motions for summary judgment as to both flights one and two,[23] grants the defendants' *Daubert* motions as to Dr. Arch Carson and Dr. Peter Hauser, and denies all other pending motions as moot.[24]

Dated: April 11, 2025

John J. Tharp, Jr.
United States District Judge

---

[23] Although this ruling grants summary judgment to the defendants only as to the claims of the bellwether plaintiffs, its rationale applies equally to the claims of all of the plaintiffs. In the absence of an agreed resolution of the entire case, the Court anticipates that it will grant summary judgment as to the non-movant plaintiffs pursuant to Fed. R. Civ. P. 56(f)(1).

[24] Because the plaintiffs have failed to present a genuine dispute of material fact regarding the existence of harmful defects, the Court declines to address the defendants' alternative arguments for summary judgment with respect to specific claims, such as American Airlines' contention that it is shielded by state workers' compensation acts, the defendants' arguments that IIED's status as a gap-filler tort bars specific bellwether plaintiffs from raising that claim, or the defendants' argument that plaintiff Crumrine failed to establish severe emotional distress.

Moreover even if a genuine question of material fact existed as to the defectiveness of the plaintiffs' specific uniforms, it would not follow that *all* the plaintiffs' claims should be reinstated. For instance, Twin Hill's potential liability for negligent products liability would turn on whether a reasonable jury could find a breach of duty on these facts, a question the Court has not addressed. Likewise, if a genuine question of fact exists as to the plausibility of direct-contact reactions but not proximity reactions, American Airlines would have a strong case for its own dismissal in light of the Court's previous holdings regarding the intentional-tort exception to workers' compensation acts. *See* ECF No. 185 at 22 (holding that the intentional-tort exception applies only to claims against AA made by employees who "had a proximity reaction, reported the reaction to American, and then continued to experience reactions").